## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDOZ, INC.                        ) | |
|                               ) | |
|         Plaintiff,            ) | |
| v.                           ) | Civil Action No. _____ |
|                               ) | |
| FOOD AND DRUG ADMINISTRATION,   ) | |
| MICHAEL O. LEAVITT, and         ) | |
| ANDREW C. VON ESCHENBACH      ) | |
|                               ) | |
|         Defendants.        ) | |
| _____ ) | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Sandoz, Inc. ("Sandoz") respectfully moves for a temporary restraining order. Sandoz seeks a temporary restraining order to maintain the status quo and restrain Defendants Food and Drug Administration, Michael Leavitt, and Andrew von Eschenbach (collectively "FDA") from issuing any final approvals of Abbreviated New Drug Applications for generic simvastatin tablets until Sandoz's motion for preliminary injunction can be heard. Unless restrained by this Court, FDA will issue such final approvals on June 23, 2006, and cause irreparable harm to Sandoz.

The legal and factual bases for this motion are described more fully in an accompanying memorandum and the Declarations of Sadie Ciganek, Frank Dellafera, Shashank Upadhye, and Arthur Y. Tsien.

This motion is accompanied by a proposed order granting a temporary restraining order.

June 22, 2006

Respectfully submitted,

Arthur Y. Tsien, Bar No. 411579
Patricia E. Pahl, Bar No. 427347
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3537 (fax)

Attorneys for Sandoz, Inc.

Of Counsel:

Shashank Upadhye, Esq.
Vice President – Head of Intellectual
   Property, Sandoz U.S.
Sandoz, Inc.
506 Carnegie Center
Princeton, NJ  08540-6543
609/627-8511
609/627-8500 (main)
609/627-8684 (FAX)

## CERTIFICATE OF SERVICE

I, Arthur Y. Tsien, HEREBY CERTIFY that on this 22nd day of June, 2006, a true and correct copy of the foregoing Plaintiff's Motion for Temporary Restraining Order, [Proposed] Temporary Restraining Order, Declaration of Arthur Y. Tsien, Declaration of Frank J. Dellafera, Declaration of Sadie Ciganek, Declaration of Shashank Upadhye, Memorandum in Support of Sandoz, Inc.'s Motion for a Temporary Restraining Order, Plaintiff's Certificate of Counsel of Compliance with Local Civil Rule 65.1, Complaint for Declaratory and Injunctive Relief, Corporate Disclosure Statement, Civil Cover Sheet, Statement of Related Cases, and Notice of Filing Computer Disk was served via hand-delivery and via E-mail upon the following counsel:

Drake S. Cutini
U.S. Department of Justice
Office of Consumer Litigation
Room 950 North
1331 Pennsylvania Ave., NW
Washington, D.C. 20004

Douglas B. Farquhar
John R. Fleder
Hyman, Phelps & McNamara, P.C.
700 Thirteenth Street, N.W.
Suite 1200
Washington, D.C. 20005

Kate C. Beardsley
Carmen M. Shepard
Buc & Beardsley
919 Eighteenth Street, NW, Suite 600
Washington, D.C. 20006

Arthur Y. Tsien
*Counsel for Apotex Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SANDOZ, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, | ) | |
| MICHAEL O. LEAVITT, and | ) | |
| ANDREW C. VON ESCHENBACH, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM IN SUPPORT OF SANDOZ, INC.'S
### MOTION FOR A TEMPORARY RESTRAINING ORDER

Sandoz, Inc. ("Sandoz") respectfully submits this memorandum in support of its motion for a temporary restraining order, to preserve the *status quo* and restrain the Food and Drug Administration ("FDA") from issuing any final approvals for any generic simvastatin products pending consideration of a motion for preliminary injunction or other disposition.[1]  Absent relief from this Court, FDA will do so on June 23, 2006.

### INTRODUCTION

Sandoz and others, including IVAX Pharmaceuticals Inc. ("IVAX") and Ranbaxy Laboratories Ltd. ("Ranbaxy"), have filed so-called "Paragraph IV ANDAs" for generic simvastatin, an important cholesterol medication currently marketed solely by Merck & Co., Inc. ("Merck") under the brand-name Zocor®.  Merck's sole remaining marketing exclusivity for this product expires on June 23, 2006, which should result in full and open generic competition by Sandoz and others.  Instead, however, FDA has made an unlawful decision under the Federal Food, Drug, and Cosmetic Act ("FDC Act") that will deny Sandoz and others access to the

---

[1]    Sandoz does not object if this Court deems it appropriate to consider its motion for a temporary retraining order as a motion seeking a preliminary injunction.

1

market and award IVAX and Ranbaxy a period of so-called "180-day exclusivity" to which they are not entitled. To prevent irreparable harm to Sandoz, the Court should preserve the *status quo* pending further resolution of this action.

Absent such an injunction, Sandoz will suffer irreparable harm, even if Sandoz ultimately prevails on the merits. IVAX and Ranbaxy intend to launch on or about June 23, 2006, which would effectively give them a period of exclusivity to which they may not be entitled and deprive Sandoz of the chance to obtain any meaningful relief from this Court. As the D.C. Circuit previously has recognized, denying a competitor access to the market because of unwarranted market exclusivity constitutes substantial harm. On the other hand, if this Court grants Sandoz's requested injunctive relief and temporarily delays the final approval of all simvastatin ANDAs, the *status quo* will be maintained until this Court has an opportunity to rule on the merits of FDA's decision.

## BACKGROUND

### I.    Statutory Background.

#### A.    Innovator or Branded Drugs—NDAs.

A company that seeks to sell a new innovator or branded drug must file with FDA a New Drug Application ("NDA"). The applicant must include in its NDA, *inter alia*, technical data on the composition of the drug, the means for manufacturing it, clinical trial results establishing its safety and effectiveness, and labeling describing the use for which approval is requested. *See* 21 U.S.C. § 355(b)(1). The NDA sponsor also must submit information to FDA with respect to any patent that "claims the drug for which the application was submitted or which claims a method of using such drug." 21 U.S.C. § 355(b)(1) and (c)(2). FDA publishes all such patent information in the so-called "Orange Book." *See id.*

B.    **Generic Drugs—ANDAs.**

The FDC Act includes simplified procedures for obtaining approval of generic drugs.  A company desiring FDA approval to market a generic version of an NDA drug must file an abbreviated new drug application ("ANDA") with FDA.  An ANDA applicant must establish, in relevant part, that its generic drug product has the same active ingredient and is "bioequivalent" to the NDA drug.  *See* 21 U.S.C. § 355(j)(2)(A).  The ANDA also must include a "certification" to any patents listed in the Orange Book.  *See* 21 U.S.C. § 355(j)(2)(A)(vii).  The statute provides four certification options, of which only two are relevant here:

- The so-called "Paragraph III" certification, where the applicant in essence states that it does not seek approval to market its generic product until after the patent has expired. 21 U.S.C. § 355(j)(2)(A)(vii)(III).

- The so-called "Paragraph IV" certification, where the applicant seeks immediate approval because the listed patent is asserted to be invalid and/or not infringed by the proposed ANDA product.  *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).  Where an ANDA applicant submits a Paragraph IV certification, it must notify the patentee and NDA-holder of the factual and legal bases for that certification.  *See* 21 U.S.C. § 355(j)(2)(B).

Submitting an ANDA containing a Paragraph IV certification has two important consequences.  First, it constitutes a technical act of infringement, vesting the district courts with subject matter jurisdiction over a patent infringement lawsuit.  *See* 35 U.S.C. § 271(e)(2)(A). If the patent holder sues the ANDA sponsor for patent infringement within 45 days after receipt of notice of the Paragraph IV certification, final approval of the ANDA is delayed for 30 months, unless there is an earlier court decision of patent invalidity or non-infringement.  *See* 21 U.S.C. § 355(j)(5)(B)(iii). Second, the first company to submit an ANDA containing a Paragraph IV

3

certification to any listed patent is entitled to a 180-day generic exclusivity period. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Congress created this exclusivity in the statute by preventing FDA from approving subsequent ANDAs with Paragraph IV certifications to the same patent until 180 days after the earlier of two so-called "triggering" events: (1) the start of the first Paragraph IV certification filer's commercial marketing ("the commercial marketing trigger"); or (2) a final, unappealable court decision that the patent is invalid or not infringed ("the court decision trigger"). 21 U.S.C. § 355(j)(5)(B)(iv).[2]

## II.    Factual Background.

The statements in this section are based on this Court's April 30, 2006 Memorandum Opinion in *Ranbaxy Laboratories Ltd. v. Leavitt*, __ F. Supp. 2d __, 2006 WL 1147797 (D.D.C. April 30, 2006) (Roberts, J.), as well as the supporting Declaration of Frank Dellafera ("Dellafera Decl."), the Declaration of Sadie Ciganek ("Ciganek Decl."), and the Declaration of Shashank Upadhye ("Upadhye Decl.").

### A.    In General.

Merck holds the approved NDA for simvastatin tablets, NDA 19-766, which it markets under the brand name Zocor®. Zocor® is a "blockbuster" drug that had U.S. sales in 2005 of approximately $3 billion, according to news reports. For the first quarter of 2006, Merck reported U.S. sales of over $800 million. Dellafera Decl ¶ 7.

Merck initially submitted one patent to FDA for Orange Book listing in connection with Zocor®, U.S. Patent No. 4,444,784 ("the '784 patent"). For FDA approval purposes, the '784

---

[2]    While the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 made substantial revisions to the FDC Act's 180-day exclusivity provisions, the first Paragraph IV ANDA for simvastatin was filed before the Act's December 8, 2003 enactment date. Accordingly, the cited, unamended statutory language governs in this case. *See* Pub. L. No. 108-173, § 1102(b)(1).

patent expires on June 23, 2006. Merck later amended its NDA to list two additional patents, U.S. Patent No. RE 36,481 ("the '481 patent") and U.S. Patent No. RE 36,520 ("the '520 patent"). *Ranbaxy Laboratories Ltd.*, 2006 WL 1147797 at *3-4.

Among other sponsors, IVAX and Ranbaxy filed ANDAs seeking approval for generic simvastatin. Both ANDAs included Paragraph IV certifications with respect to the '481 and '520 patents, and Paragraph III certifications with respect to the '784 patent. *Id.*

It appears that IVAX was the first sponsor to file an ANDA with a Paragraph IV certification for generic simvastatin in 5-mg, 10-mg, 20-mg, and 40-mg strengths, and Ranbaxy was the first to file a Paragraph IV ANDA for the 80-mg strength. *Id.*

Merck did not sue IVAX or Ranbaxy within 45 days of receiving notice of their Paragraph IV certifications. *Id.*[3]

In October 2003, Merck submitted a letter to FDA requesting that the '481 and '520 patents be removed from the list of patents claiming Zocor® in the Orange Book. In or about September 2004, FDA removed the '481 and '520 patents from the Orange Book. In doing so, FDA relied on its regulation that a patent will be removed from the Orange Book upon the request of the ANDA sponsor, except when the patent is the subject of infringement litigation brought by the patent owner against the first Paragraph IV ANDA sponsor. *Id.* at *5.

In January and February 2005 IVAX and Ranbaxy submitted separate citizen petitions to FDA, requesting that the FDA relist the '481 and '520 patents in the Orange Book and require all subsequent ANDAs for simvastatin tablets to contain certifications to the '481 and '520 patents. The asserted basis for both petitions was that FDA's removal of the '481 and '520 patents from

---

[3]    Apparently, Merck has not sued any other simvastatin ANDA applicant for infringement as a result of a Paragraph IV certification to the '481 or '520 patent.

the Orange Book was in derogation of the 180-day exclusivity rights of IVAX and Ranbaxy. *Id.* at *4.

On October 24, 2005, FDA denied IVAX's and Ranbaxy's citizen petitions. FDA decided that it would not relist the two patents, that no Paragraph IV ANDA sponsors would be eligible for 180-day exclusivity stemming from those patents, and that FDA would approve all subsequent simvastatin ANDAs when they are otherwise eligible for approval. *Id.* at *4.

IVAX and Ranbaxy separately challenged FDA's denial of their citizen petitions. The suits were consolidated in *Ranbaxy Laboratories, Ltd. v. Leavitt*, No. 05-1838 (RWR) (D.D.C.). In an Order and accompanying Memorandum Opinion dated April 30, 2006, Judge Roberts of this Court granted IVAX's and Ranbaxy's motions for summary judgment, and denied FDA's motion for summary judgment. The Court declared that FDA's decision was unlawful and remanded to FDA. The basis for the Court's decision was that the delisting of the two patents from the Orange Book was done in disregard of IVAX's and Ranbaxy's success in avoiding patent infringement suits, resulting in disparate treatment in contravention of the intent of Congress and effectively eliminating the "commercial marketing" trigger. 2006 WL 1147797 at *8. The Court's Order and Memorandum Opinion did not expressly address which ANDA sponsors (if any) would be eligible for 180-day exclusivity, and which subsequent sponsors (if any) would have their final approvals delayed by such exclusivity.

FDA's appeal is pending, No. 06-5154 (D.C. Cir.). According to the D.C. Circuit's docket, briefing is scheduled to be completed on July 28, 2006, with oral argument to be scheduled for the first available date thereafter.

On or about June 19, 2006, the '481 and '520 patents reappeared in the electronic version of the Orange Book, without explanation. Ciganek Decl. ¶ 17.

On June 19, 2006, a Sandoz representative spoke with a knowledgeable FDA official, who stated that FDA had decided that, upon expiration of the '784 patent on June 23, 2006, FDA will issue final approval only to those sponsors that are entitled to 180-day exclusivity. The sponsors of all other pending ANDAs will be required to certify to the '481 and '520 patents, as those patents have been relisted in the Orange Book. Sponsors submitting Paragraph IV certifications for the first time will be required to provide notice of their Paragraph IV certification to their NDA sponsor and the patent holder. Upadhye Decl. ¶¶ 17-25.

**B.    Sandoz and Aurobindo.**

On June 28, 2005, Sandoz submitted to FDA an ANDA for generic simvastatin tablets in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths. At the time Sandoz submitted its ANDA, the only patent listed in the Orange Book in connection with Zocor® was the '784 patent. Sandoz's ANDA included a Paragraph III certification to this patent, indicating that Sandoz sought approval to market its product after expiration of that patent. By letter dated August 25, 2005, FDA notified Sandoz that its ANDA had been assigned reference number ANDA 77-766 and had been accepted for review.  Ciganek Decl. ¶¶ 11-12.

On April 21, 2005, Aurobindo Pharma Ltd. ("Aurobindo") submitted to FDA an ANDA for a generic version of Zocor® in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths. At the time Aurobindo submitted its ANDA, the only patent listed in the Orange Book in connection with Zocor® was the '784 patent. Aurobindo's ANDA included a Paragraph III certification to this patent, indicating that Aurobindo sought approval to market its product after expiration of that patent. By letter dated April 19, 2006, FDA notified Aurobindo that its ANDA 77-691 was tentatively approved, meaning that Aurobindo had satisfied all substantive ANDA approval requirements, but could not yet receive final approval because of patent and/or exclusivity

constraints. FDA explained that its decision to grant no exclusivity had been challenged in *Ranbaxy Laboratories Ltd. v. Leavitt,* 2006 WL 1147797, and that the agency was currently evaluating a citizen petition challenging the agency's de-listing of the '481 and '520 patents. Pending further decisions with regard to the delisting of the '481 and '520 patents, FDA had determined that no exclusivity issues bar approval after June 23, 2006. Ciganek Decl. ¶¶ 13-15.

Sandoz and Aurobindo have entered into a contract, whereby Sandoz will market and distribute Aurobindo's simvastatin product once Aurobindo receives final ANDA approval. Sandoz and Aurobindo have taken action in reliance on Aurbindo's anticipated receipt of final approval on or about June 24, 2006. Aurobindo has commercial quantities of generic simvastatin tablets ready for launch on or about June 24, 2006 after receiving final FDA approval. Dellafera Decl. ¶ 12.

## ARGUMENT

Courts must weigh four factors in deciding whether to grant a temporary restraining order or preliminary injunction: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of harm to other parties if relief is granted; and (4) the public interest. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Raymen v. United Senior Ass'n*, Civ. No. 05-486(RBW), 2005 WL 607916, at *2 (D.D.C. Mar. 16, 2005) (granting temporary restraining order). A plaintiff "need not prevail on each factor in order to receive injunctive relief." *Raymen*, 2005 WL 607916, at *2. "Rather . . . the factors must be viewed as a continuum, with more of one factor compensating for less of another. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Blackman v. District of Columbia*, 277 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (internal quotations and citation omitted) (granting preliminary injunction).

"[I]ssuing an injunction may be justified 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'" *Raymen*, 2005 WL 607916, at *2 (quoting *Blackman*, 277 F. Supp. 2d at 78). Moreover, "[i]n cases that raise questions 'going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground . . . for more deliberative investigation,' . . . courts should eschew an 'exaggeratedly refined analysis of the merits at an early stage in the litigation.'" *Omar v. Harvey*, 416 F. Supp. 2d 19, 22 (D.D.C. 2006) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). "This is particularly true when the moving party seeks to maintain the status quo pending a final determination of the merits." *Omar*, 416 F. Supp. 2d at 22 (citations omitted).

Courts have granted such relief in cases involving generic drug 180-day exclusivity where necessary to preserve the *status quo* and prevent irreparable harm to the moving party pending resolution of the action on the merits. For example, in a case involving 180-day exclusivity for metformin hydrochloride extended-release tablets, Judge Jackson of this Court issued a temporary restraining order requiring FDA to delay the final approval issued to a competitor drug manufacturer (IVAX) and refrain from granting final approval to any other ANDA pending resolution of the matter on the merits. *See Purepac Pharm. Co. v. Thompson*, No. 03-2210, Order (D.D.C. Oct. 29, 2003) (Ex. A of Declaration of Arthur Y. Tsien ("Tsien Decl.")). Likewise, in an action involving 180-day exclusivity for gabapentin capsules, the D.C. Circuit entered an order staying final approval of the first-filer and preserving the *status quo*. *See Apotex, Inc. v. FDA*, No. 04-5211, Order (D.C. Cir. July 26, 2004) (Ex. B of Tsien Decl.).

Sandoz has a strong likelihood of prevailing on the merits; Sandoz will be irreparably harmed if IVAX and Ranbaxy are allowed a 180-day head start in the generic simvastatin

market; FDA will not be injured if temporary injunctive relief is granted; and the public will benefit from an order that allows for faithful application of the laws and prompt full generic competition.  Moreover, because FDA has not already granted final approval to any simvastatin ANDAs, an order delaying such final approvals will do no more than maintain the *status quo*.

## I.     There Is A Substantial Likelihood That Sandoz Will Succeed On The Merits Of Its Claims.

For the reasons discussed below, Sandoz has demonstrated a substantial likelihood of success on the merits of its challenge of FDA's decision.

### A.     FDA's Decision Is Contrary To The Plain Language Of The FDC Act.

While some provisions of the FDC Act related to 180-day exclusivity may be ambiguous, *see Apotex, Inc. v. FDA*, 414 F. Supp. 2d 61 (D.D.C. 2006) (Bates, J.) (finding that provision as to how many exclusivity periods can be awarded for one drug is ambiguous), the relevant provision here is clear on its face.  Under 21 U.S.C. 355(j)(5)(B)(iv), 180-day exclusivity operates only by delaying the final approval of subsequent ANDA sponsors who have submitted Paragraph IV certifications to the same patent. 21 U.S.C. § 355(j)(5)(B)(iv).  It does not operate to delay the final approval of any sponsor that was not required to certify to the patent in question because the patent was not listed in the Orange Book at the time the sponsor's original ANDA was submitted to FDA.

Thus, FDA's decision to impose 180-day exclusivity that delays the final approval of ANDAs that do not include Paragraph IV certifications for the two patents in question, like the Sandoz and Aurobindo ANDAs, is contrary to the plain language of the FDC Act.  As a result, FDA's decision cannot stand under what is commonly referred to as "step one" of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984) (footnotes omitted):

> First, always is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Accord Household Credit Services, Inc. v. Pfening*, 541 U.S. 232, 239 (2004).

To the extent that FDA's decision is based on its purported relisting of the two patents in the Orange Book, neither the FDC Act nor FDA regulations provide any basis for such action after a patent has been removed at the NDA sponsor's request. While the D.C. Circuit has recognized FDA's ability to "regulate directly from the statute" in situations not addressed by its regulations, *see Teva Pharmaceuticals, USA, Inc. v. U.S. FDA*, 182 F.3d 1003, 1005 (D.C. Cir. 1999), here there is no statutory basis of any kind for FDA's purported relisting of the two patents.

**B.    FDA's Decision Is Inconsistent With Its Ministerial Role In Patent Listings.**

FDA's decision to "relist" is directly contrary to various judicial decisions recognizing – and approving – that FDA views its role in the listing of patents as strictly ministerial, with substantive patent listing decisions made solely by the NDA sponsor. For example, in *aaiPharma v. Thompson*, 296 F.3d 227, 233 (4th Cir. 2003), the court described FDA's role in patent listings:

> The FDA, however, has determined that it will not become an arbiter of the correctness of Orange Book listings. Its regulations implementing the Hatch-Waxman Act provide only a very limited mechanism for resolving disputes regarding those listings. *See* 21 C.F.R. § 314.53(f). Consistent with its regulation, the FDA responded to aaiPharma's request by sending a letter to Lilly requesting that Lilly confirm the correctness of its Orange Book listing for Prozac. The letter explained that the FDA will make no change to the listing unless Lilly asked it to do so.

11

The Court went on to conclude that FDA's interpretation, that the agency's role in patent listings is ministerial, was reasonable. 296 F.3d at 238-39.

Similarly, in *Alphapharm Pty Ltd v. Thompson*, 330 F. Supp. 2d 1, 7 (D.D.C. 2004) Judge Robertson of this Court stated that the provisions of the FDC Act "are clear and unambiguous, and they support FDA's 'ministerial role' theory." *See also Apotex v. Thompson*, 347 F.3d 1335, 1347-48 (Fed. Cir. 2003); *Watson Pharmaceuticals Inc. v. Henney*, 194 F. Supp. 2d 442, 445-46 (D. Md. 2001).

Here, the NDA sponsor has spoken and requested that the patents be removed from the Orange Book.

## C.    FDA Failed To Read The Statute As A Whole.

It is a well established principle of statutory construction that different, related parts of a statute must be read as a whole. "[I]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998), quoting *Pilot Life Insurance Co. v. DeDeaux*, 481 U.S. 41, 51 (1987). Here, two different provisions of the FDC Act related to 180-day exclusivity are involved.

First, as interpreted by the D.C. Circuit in *Mova*, 140 F.3d 1060, and *Purepac Pharmaceutical Company v. Friedman*, 162 F.3d 1201 (D.C. Cir. 1998), eligibility for 180-day exclusivity is not premised upon a patent infringement lawsuit having been brought against the first Paragraph IV ANDA sponsor. This interpretation of the 180-day exclusivity provision of the FDC Act underlies this Court's decision in *Ranbaxy Laboratories, Ltd. v. Leavitt*, 2006 WL 1147797, that FDA's decision to deny the citizen petitions of IVAX and Ranbaxy was contrary to Congressional intent.

Second, at the same time, the plain language of 21 U.S.C. § 355(j)(5)(B)(iv) provides that 180-day exclusivity only delays the final approvals of subsequent ANDA sponsors with Paragraph IV certifications to the patent in question. Thus, when read together, these provisions permit – if not require – the following interpretation: FDA might be able to deem the '481 and '520 patents to be relisted in the Orange Book, but the 180-day exclusivity rights of IVAX and Ranbaxy do not operate to delay the final approvals of sponsors like Sandoz and Aurobindo that were not required to certify to the '481 and '520 patents because those patents were not listed in the Orange Book at the time their original ANDAs were submitted.[4]

This interpretation does not render the 180-day exclusivity rights of IVAX and Ranbaxy a nullity. Those exclusivity rights would operate to delay the final approvals of any ANDA sponsors that originally submitted Paragraph IV certifications to the '481 and '520 patents (because the patents were listed in the Orange Book at the time of their ANDA submissions) or sponsors that submit their ANDAs after the patents were relisted in the Orange Book.

### D.    FDA's Decision Is Not Entitled To Any Deference.

Finally, FDA's decision to relist the two patents is not based on a regulation resulting from notice-and-comment rulemaking or on formal adjudication, thereby limiting the amount of deference to which it is entitled. Nevertheless, FDA's decision may be entitled to some degree of deference, depending on "the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight." *See United States v. Mead Corp.,*

---

[4] The treatment of 180-day exclusivity resulting from Paragraph IV certifications to patents that were once listed in the Orange Book, but subsequently removed, should be analogous to the treatment of 180-day exclusivity stemming from Paragraph IV certifications to Orange Book patents that expire during the course of infringement litigation. In the latter case, despite the ANDA sponsor's efforts to open the door for generic competition by challenging the Orange Book patent and its efforts in defending infringement litigation, the first Paragraph IV ANDA sponsor receives no benefit. *See Dr. Reddy's Laboratories, Inc. v. Thompson,* 302 F. Supp. 2d 340, 350-51 (D.N.J. 2003) (patent expiration terminates any related 180-day exclusivity)).

533 U.S. 218, 235 (2001). Here, however, where FDA's purported patent relisting has no statutory or regulatory basis and has the effect of undercutting the statutory language on 180-day exclusivity, it is not entitled to any deference.

### E.    FDA's Action Violated The APA.

Under the APA, this Court is empowered, in pertinent part, to hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law. 5 U.S.C. § 706(2). When a final agency action is challenged under the APA in district court, the district court "sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the [agency's decision] was factually flawed." *PPG Indus., Inc. v. United States,* 52 F.3d 363, 365 (D.C. Cir.1995), quoting *Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1225 (D.C. Cir.1993). *See also Palisades General Hospital Inc. v. Leavitt,* 426 F.3d 400, 403 (D.C. Cir. 2005). "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus.,* 52 F.3d at 365, *citing SEC v. Chenery Corp.,* 318 U.S. 80, 94-95 (1943). *See also Palisades General Hospital Inc.,* 426 F.3d at 403.

Here, FDA has made an error of law. The agency incorrectly interpreted this Court's April 30 Memorandum Opinion and order and the FDC Act. FDA's decision to delay the final approvals of Sandoz, Aurobindo, and similarly situated ANDA sponsors that never submitted Paragraph IV certifications to the '481 and '520 patents is at odds with the plain language of 21

U.S.C. § 355(j)(5)(B)(iv).  As such, the decision was in excess of statutory authority and not otherwise in accordance with law (5 U.S.C. § 706(2)) and should be set aside.[5]

For these reasons, Sandoz is likely to succeed on the merits.

## II.    The Harm To Sandoz Is Substantial And Irreparable.

FDA's decision prevents Sandoz from marketing generic simvastatin until 180 days *after* IVAX and Ranbaxy launch on or about June 23, 2006, and secure a strangle-hold over the market.  Indeed, IVAX and Ranbaxy have publicly announced their intent to launch immediately after receiving final approval upon expiration of the '784 patent on or about June 23, 2006. Dellafera Decl. ¶ 11.  Once IVAX and Ranbaxy launch, they will tie up distribution channels and access to customers; enter into long-term sales agreements; increase sales across all product lines; and retain greater market share in the long-term.  *Id.* ¶¶ 21, 25.  Sandoz, on the other hand, will lose the opportunity to effectively compete in the simvastatin market.  *Id.* ¶¶ 21, 25-26. Thus, absent emergency injunctive relief preserving the *status quo*, FDA's decision will deny Sandoz access to the market, thus causing Sandoz irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails in this action.  As the D.C. Circuit found in *Teva Pharmaceuticals, USA, Inc. v. U.S. FDA*, 182 F.3d 1003, 1011 n. 8 (D.C. Cir. 1999), unlawful deprivation of a generic company's access to the market constitutes irreparable harm. *See also Mova,* 140 F.3d at 1066 n.6.

---

[5]    FDA has not explained the legal and policy bases for its decision.  Thus, at a minimum, it fails for lack of reasoned decisionmaking and should be set aside on that basis alone.  *See Teva Pharmaceuticals, USA, Inc. v. U.S. FDA*, 182 F.3d 1003 (D.C. Cir. 1999); *see also Teva Pharmaceuticals USA, Inc. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006).

Sandoz has spent considerable sums developing a generic simvastatin tablet product for eventual sale in the United States, including compiling the information required to submit an ANDA to the FDA. Dellafera Decl. ¶13. In anticipation of commercial launch, Sandoz has manufactured nearly 50 million simvastatin tablets. Additionally, Sandoz placed an order for an additional 50 million tablets from Aurobindo at a cost of over $3 million under its marketing agreement with that company. 18 million of those Aurobindo tablets are manufactured, labeled, and ready to be shipped to customers. *Id.* ¶¶ 15-16.

Through sales of its own and Aurobindo's simvastatin tablets, Sandoz had budgeted for over $11 million in sales in the first 6 months after launch. *Id.* ¶ 17. Next year's forecast is for about $20 million in sales. *Id.* ¶ 22. If, however, IVAX and Ranbaxy are allowed to launch with 180 days of exclusivity prior to all other applicants, Sandoz projects that, when it is finally able to enter the market, it will lose 80 to 90% of these anticipated sales. *Id.*

The market's response to the expected exclusivity to Ranbaxy and IVAX has enormously injured Sandoz. Sandoz had been in negotiation with a leading customer. Sandoz expected that this customer alone would generate about $90 million in annualized sales for the first year, assuming six generic competitors. When that customer learned that only IVAX and Ranbaxy were likely to enter the market on or about June 23, 2006 and that Sandoz and Aurobindo would only be able to enter 180 days later, that customer took its order elsewhere. *Id.* ¶ 18.

Additionally, there are considerable – often incalculable – benefits to receiving 180-day exclusivity and being the first generic entrant to the market. The period of 180-day exclusivity also allows the first-movers (here, Ranbaxy and IVAX) to recover their investment and earn profits prior to others entering the market, all of which can then be used for developing and marketing new products. Conversely, subsequent entrants to the market, like Sandoz and

16

Aurobindo here, find it difficult to find prospective customers, much less recoup product investments and obtain any significant market share. *Id.* ¶ 21.

Moreover, the generic simvastatin that Sandoz and Aurobindo have already manufactured bears an expiration date of 2 years. Six months will pass on that expiration dating before Sandoz and Aurobindo will be able to launch, and customers typically will not purchase product with less than one year remaining on its expiration date. This means that Sandoz and Aurobindo will have only 6 months to sell 100 million simvastatin tablets to customers who have already locked into sales arrangements with IVAX and Ranbaxy. *Id.* ¶ 23.

Sandoz's simvastatin products are significant not only for Sandoz, but for its customers. If Sandoz is forced to delay the sale of its simvastatin products, Sandoz would suffer not only a financial loss in terms of sales, but also a significant loss of goodwill in the eyes of its customers. This loss of goodwill could potentially adversely impact sales of other generic products Sandoz sells to its customers today and in the future. *Id.* ¶ 26.

Sandoz has no remedy against FDA to recover these losses, including Sandoz's investments and projected lost sales, if IVAX and Ranbaxy are allowed to commercially launch with exclusivity while this litigation is still pending. This is true even if Sandoz prevails on the merits.

In sum, Sandoz conservatively estimates that an unwarranted 180-day head start for IVAX and Ranbaxy would result in over $11 million in lost sales for Sandoz in the first 180 days alone. *Id.* ¶¶ 22, 28. Even if Sandoz were to prevail in this case, the harm will have been done—Sandoz will never recover those lost revenues, profits, and market share. *Id.* ¶ 28. In

addition, Sandoz will suffer unquantifiable, intangible losses of customer goodwill and future business opportunity for simvastatin and other product lines. Such lost opportunities will continue to harm Sandoz long after IVAX's and Ranbaxy's exclusivity expires. *Id.* Such losses are irreparable in every sense of the term. *See Teva,* 182 F.3d at 1011 n.8. Indeed, this court so found when granting a temporary restraining order in the *Purepac* metformin matter. *See* Tsien Decl. Ex. A.

*Purepac* involved a similar dispute over an award of 180-day exclusivity for generic metformin. There, Purepac sought to enjoin FDA from granting final approval to any metformin ANDAs on the basis that Purepac, and not Ivax, was entitled to 180-day exclusivity for that drug product. The Court found that Purepac had shown that it would be "immediately and irreparably harmed absent temporary relief" and, thus, granted the requested relief. *See Id.* This Court should do the same here.

## III. Injunctive Relief Will Not Injure Any Other Interested Parties.

Temporary injunctive relief preserving the *status quo* will not harm any other interested parties. FDA admittedly has no commercial stake in the outcome of this dispute either way. Moreover, as a governmental agency, FDA's interests are aligned with the public's interest, which favors injunctive relief.

Nor would IVAX and Ranbaxy suffer any appreciable harm whatsoever from emergency injunctive relief preserving the *status quo*. If Sandoz ultimately prevails in this case on the merits, IVAX and Ranbaxy had no legal right to launch with exclusivity in the first place. But, if FDA prevails, IVAX and Ranbaxy can still enjoy their exclusivity.

Thus, absent injunctive relief, Sandoz stands to lose millions of dollars, goodwill with its customers, and other significant tangible and intangible benefits (Dellafera Decl. ¶¶ 13-28), while IVAX and Ranbaxy stands to lose little to nothing if temporary relief is granted. Accordingly, the balance of harms tips decidedly in favor of granting Sandoz's request for a temporary restraining order. *See Mova*, 140 F.3d at 1066.

## IV.    An Injunction Would Further The Public Interest.

Finally, the public interest is best served by issuing injunctive relief and maintaining the *status quo* until this dispute can be resolved on the merits. Most significantly, the public interest will be well-served by the competitive benefits of four generic entrants into the simvastatin market, rather than only two. With four potential suppliers, this means simply more product, more readily available in all markets and at a lower price to purchasers. The public interest will be served best by delaying the introduction of two generic simvastatin drugs temporarily in order to assure that when generic competition does begin, it is full, vigorous, and lawful.

Moreover, the public's interest lies in the "faithful application of the laws," *see Mova*, 140 F.3d at 1066, which, here, is served by requiring the agency to apply the governing statute in a manner that is consistent with its plain language. Thus, injunctive relief comports with the purpose of the statute. Any other result would ultimately harm the consuming public.

## CONCLUSION

Sandoz has demonstrated a substantial likelihood of success on the merits of its challenge of FDA's decision, which is inconsistent with the plain language of the FDC Act. Sandoz will suffer irreparable harm absent the requested injunction. FDA, on the other hand, would suffer no

harm from an order merely preserving the *status quo*. For all of these reasons, the Court should enter an order temporarily preserving the *status quo* and delaying the final approvals of all simvastatin ANDAs, including IVAX's and Ranbaxy's ANDAs, until the resolution of this case.

June 22, 2006

Respectfully submitted,

Arthur Y. Tsien, Bar No. 411579
Patricia E. Pahl, Bar No. 427347
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3537 (fax)

Attorneys for Sandoz, Inc.

Of Counsel:

Shashank Upadhye, Esq.
Vice President – Head of Intellectual
   Property, Sandoz U.S.
Sandoz, Inc.
506 Carnegie Center
Princeton, NJ  08540-6543
609/627-8511
609/627-8500 (main)
609/627-8684 (FAX)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SANDOZ, INC.                                    )
                                                )
                    Plaintiff,                  )
                                                )
            v.                                  )        Civil Action No. _____
                                                )
FOOD AND DRUG ADMINISTRATION,                   )
MICHAEL O. LEAVITT, and                         )
ANDREW C. VON ESCHENBACH,                       )
                                                )
                    Defendants.                 )
_____ )

## DECLARATION OF FRANK J. DELLAFERA

I, Frank J. Dellafera, declare as follows:

1.      I am the Vice President of Sales and Marketing of Sandoz, Inc. (Sandoz), which is located in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG. Sandoz develops and manufactures generic drugs for sale in the United States and throughout the world. I have held this position with Sandoz for one year and its predecessor company Eon Labs for nine years.

2.      I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3.      I submit this Declaration in support of Sandoz's motion for a temporary restraining order to preserve the *status quo* pending resolution of this case on the merits.

4.      In my current position, I am personally involved in the introduction and promotion of new generic drug products for the United States market. I am familiar with the benefits and advantages of so-called "180-day exclusivity," which generally allows one generic company to market and sell its product without other generic competition for 180 days. This exclusive "first-mover advantage" generates significant tangible benefits such as enduring

market share, increased sales across all product lines, and higher profit margins, as well as intangible benefits such as improved market position, customer goodwill, and reputation.

5.      I am also well aware of the considerable disadvantages and irreparable harm that a company suffers when its approval is delayed by 180-day exclusivity that is improperly granted to another company.  These losses include, but are not limited to:  significant lost profits and sales across all product lines; an accompanying decrease in overall market share; decreased access to important customers; loss of customer goodwill; and diminished reputation—all of which prevent a company from effectively competing in the ultra-competitive generic drug industry.

6.      In short, it is virtually impossible for late-comers to the market to overcome the lasting benefits of the first-mover advantage.  That is precisely the irreparable harm that Sandoz will suffer if Ranbaxy Laboratories Limited (Ranbaxy) and IVAX Pharmaceuticals, Inc. (IVAX) are allowed to launch their simvastatin tablets before this dispute is decided and thus enjoy a period of exclusivity to which they may not be entitled.

### Zocor® (Simvastatin)

7.      Merck & Co., Inc. (Merck) currently markets Zocor® (simvastatin) tablets, in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths, in the United States for the prevention of heart disease and stroke and treatment of high cholesterol.

8.      Zocor® is a very lucrative drug for Merck.  In April 2006, Merck reported first quarter sales of $1.063 billion USD in worldwide sales.  For the same first quarter, Merck reported US sales of $833 million.  Given the size of the brand market, simvastatin tablets have an enormous potential for generic sales.

2

### The Market For Simvastatin

9.    Sandoz has on file with the Food and Drug Administration (FDA) an abbreviated new drug application (ANDA) for a generic version of Zocor® in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths.

10.    Aurobindo Pharma Limited (Aurobindo) submitted an ANDA for a generic version of Zocor® in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths to FDA. By letter dated April 19, 2006, FDA notified Aurobindo that its ANDA was tentatively approved, meaning that Aurobindo had satisfied all substantive ANDA approval requirements, but could not yet receive final approval because of patent and/or exclusivity constraints.

11.    I understand that IVAX and Ranbaxy have filed ANDAs with FDA seeking approval to market generic versions of Zocor®. It is my understanding that FDA intends to approve these ANDAs, and that IVAX and Ranbaxy intend to commercially launch their generic simvastatin, on or about June 23, 2006, which will happen before the resolution of this action on the merits absent a restraining order. It also is my understanding that FDA intends to award IVAX and Ranbaxy 180-day exclusivity, which will prevent Sandoz and Aurobindo from going to market for 180 days after IVAX and Ranbaxy launch.

12.    Sandoz and Aurobindo have entered into a co-marketing contract, whereby Sandoz will market and distribute Aurobindo's simvastatin product once Aurobindo receives final ANDA approval. This contract allows Sandoz to market the Aurobindo simvastatin product under the private label of its Eon Labs subsidiary, while also marketing the Sandoz simvastatin product under the Sandoz label. Sandoz entered into this marketing agreement with Aurobindo in order to better supply what Sandoz expected would be an enormous demand for generic

3

simvastatin. By marketing two products, Sandoz will be able to obtain better market penetration and a greater share of the simvastatin market.

## Harm to Sandoz

13.     Sandoz has spent considerable sums developing a generic simvastatin tablet product for eventual sale in the United States, including compiling the information required to submit an ANDA to the FDA.

14.     With respect to market penetration, across the top 110 products Sandoz sells, the weighted average market share Sandoz achieves is about 21%. Sandoz expects that simvastatin will be a top seller also.

15.     Sandoz had anticipated being able to go to market with its own generic simvastatin on or about June 23, 2006. To date, Sandoz has manufactured nearly 50 million simvastatin tablets in anticipation of commercial launch of its product.

16.     Additionally, Sandoz placed an order for an additional 50 million tablets at a cost of over $3 million from Aurobindo under their marketing agreement. 18 million of those Aurobindo tablets are manufactured, labeled, and ready to be shipped to customers.

17.     Through sales of its own and Aurobindo's simvastatin tablets, Sandoz had budgeted for over $11 million in sales in the first 6 months after launch. While the actual sales volume would vary depending upon the number of generic entrants, I believe this was a conservative estimate based upon the number of competitors who were also likely to enter the market on or about June 23, 2006, and the ability of those companies to meet the anticipated demand for generic simvastatin.

18.    Sandoz had been in negotiation with a leading industry customer.  Negotiations had proceeded well and Sandoz expected that this customer alone would generate about $90 million in annualized sales in generic simvastatin for the first year, assuming six or less generic competitors.  When that customer learned that only IVAX and Ranbaxy were likely to enter the market on or about June 23, 2006 and that Sandoz and Aurobindo would only be able to enter 180 days later, that customer took its order elsewhere.

19.    Unless the Court grants injunctive relief preserving the *status quo* until this dispute is resolved, Ranbaxy and IVAX will enjoy a period of marketing exclusivity to which they may not be entitled.  Such a result would unlawfully deny Sandoz and Aurobindo access to the market, thus causing Sandoz irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails.

20.    As an initial matter, if Sandoz is delayed in being able to introduce its own and/or Aurobindo's simvastatin, and IVAX and Ranbaxy are permitted to launch their generic products with 180-day exclusivity, the long-term financial losses to Sandoz will be substantial and unrecoverable, even if Sandoz is successful on the merits of this litigation.

21.    My experience with other drug products has shown that there are considerable— often incalculable—benefits to receiving 180-day exclusivity and being the first generic entrant to the market.  The first-movers (here, Ranbaxy and IVAX) establish market dominance that is nearly impossible for other, subsequent entrants like Sandoz and Aurobindo to overcome.  The period of 180-day exclusivity also allows the first-mover to recover its investment and earn profits prior to others entering the market, all of which can then be used for developing and marketing new products.  Conversely, subsequent entrants to the market, like Sandoz and

Aurobindo here, find it difficult to find prospective customers, much less recoup product investments and obtain any significant market share.

22.    As discussed above, I have analyzed the potential market share for generic simvastatin during the first 6 months of competition with Zocor®. If Sandoz and Aurobindo were allowed to launch at the same time as IVAX and Ranbaxy, Sandoz projects that it will earn over $11 million in the first 6 months of generic simvastatin competition. Next year's forecast is about $20 million. If, however, IVAX and Ranbaxy are allowed to launch with 180 days of exclusivity prior to all other applicants, Sandoz projects that when it is finally able to enter the market, it will lose 80 to 90% of these anticipated sales.

23.    Moreover, the generic simvastatin that Sandoz and Aurobindo have already manufactured bears an expiration date of 2 years. Six months will pass on that expiration dating before Sandoz and Aurobindo will be able to launch, and customers typically will not purchase product with less than one year remaining on its expiration date. This means that Sandoz and Aurobindo will have only 6 months to sell 100 million simvastatin tablets. And, those sales will have to be to customers who have already locked into sales arrangements with IVAX and Ranbaxy.

24.    In the event IVAX and Ranbaxy are allowed to launch with 180 days of exclusivity prior to all other applicants, Sandoz would not recoup its development and manufacturing investments and costs associated with the product.

25.    Furthermore, the effects of an exclusive launch by Ranbaxy and IVAX extend well beyond the unrecoverable loss of sales, market share, profits, and investments. This is because the first company to commercially market a generic drug product generally reaps a long-term benefit that extends well beyond the period of time when it may have the only FDA-

approved generic product. This occurs because the first company to reach the marketplace in essence fills the pipeline and is able to enter into long-term contracts with most, if not all, of the major customers. In other words, if IVAX and Ranbaxy are first to hit the market alone, they will be able to tie up valuable distribution channels so that, even after the 180-day head-start, the loss of access to major customers would still foreclose Sandoz from effectively competing in the simvastatin market.

26.    Sandoz's simvastatin products are significant not only for Sandoz, but for its customers. Sandoz's image as an important supplier of generic pharmaceuticals has been established over the years due to its ability to bring lower-cost alternatives of important pharmaceuticals, such as simvastatin, to the market. If Sandoz is forced to delay the sale of its simvastatin products, Sandoz would suffer not only a financial loss in terms of sales, but also a significant loss of goodwill in the eyes of its customers. This loss of goodwill could potentially adversely impact sales of other generic products Sandoz sells to its customers today and in the future.

27.    It is my understanding that Sandoz has no remedy against FDA to recover these losses, including Sandoz's investments and projected lost sales, if IVAX and Ranbaxy are allowed to commercially launch with exclusivity while this litigation is still pending. This is true even if Sandoz prevails on the merits.

### Conclusion

28.    In sum, emergency injunctive relief preserving the *status quo* is crucial to avoid devastating and irreparable harm to Sandoz before this case is decided. Without immediate injunctive relief, if IVAX and Ranbaxy launch their simvastatin tablets before this dispute is decided, Sandoz will irreparably lose initial sales of over $11 million in the first 180 days, and

80 to 90% of expected revenues thereafter, significant market share for this and other products, and indeed its entire simvastatin investment, its customer goodwill, and access to major customers.

I, Frank J. Dellafera, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

Frank J. Dellafera

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SANDOZ, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, | ) | |
| MICHAEL O. LEAVITT, and | ) | |
| ANDREW C. VON ESCHENBACH, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SADIE CIGANEK

I, Sadie Ciganek, declare as follows:

1.       I am the Vice President, Regulatory Affairs, of Sandoz, Inc. ("Sandoz"), which is located in Princeton, New Jersey.  Sandoz is a subsidiary of Novartis AG. Sandoz develops and manufactures generic drugs for sale in the United States and throughout the world.  I have worked for Sandoz and its predecessor company Eon Labs, for 13 years and have held the position of Vice President, Regulatory Affairs, for 12 years.

2.       I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3.       I submit this Declaration in support of Sandoz's motion for a temporary restraining order to preserve the *status quo* pending resolution of this case on the merits.

4.       In my current position, I am personally involved in the development, regulatory approval, and introduction of new generic drug products for the United States

market.  I am familiar with the benefits and advantages of so-called "180-day exclusivity," which generally allows one generic company to market and sell its product without other generic competition for 180 days.

5.    Sandoz challenges the Food and Drug Administration's ("FDA") decision, not to grant final approval to the abbreviated new drug application ("ANDA") of Sandoz and other similarly situated sponsors for generic versions of Zocor® (simvastatin), a cholesterol drug, until after the expiration of the 180-day exclusivity periods of those drug sponsors entitled to such 180-day exclusivity rights.  I believe these sponsors are IVAX Pharmaceuticals, Inc. ("IVAX") and Ranbaxy Laboratories, Ltd. ("Ranbaxy").

6.    Merck & Co. Inc. ("Merck") holds the approved new drug application (NDA) for simvastatin tablets, NDA 19-766, which it markets under the brand name Zocor®.

7.    Merck initially submitted one patent to the FDA as claiming Zocor®, U.S. Patent No. 4,444,784 ("the '784 patent").  The '784 patent expires on June 23, 2006. Merck later amended its NDA to list two additional patents, U.S. Patent No. RE 36481 ("the '481 patent") and U.S. Patent No. RE 36520 ("the '520 patent").

8.    Among other sponsors, IVAX and Ranbaxy filed ANDAs seeking approval for generic simvastatin.  I believe that both ANDAs included Paragraph IV certifications with respect to the '481 and '520 patents, and Paragraph III certifications with respect to the '784 patent.

9.    I believe IVAX was the first sponsor to file an ANDA with a Paragraph IV certification for generic simvastatin in 5-mg, 10-mg, 20-mg, and 40-mg strengths, and Ranbaxy was the first to file a Paragraph IV ANDA for the 80-mg strength.  I understand

that in October 2003, Merck submitted a letter to FDA requesting that the '481 and '520 patents be removed from the list of patents claiming Zocor® in the Orange Book.

10.    In or about September 2004, FDA removed the '481 and '520 patents from the Orange Book.

11.    On June 28, 2005 Sandoz submitted an ANDA for generic simvastatin tablets in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths to FDA. At the time Sandoz submitted its ANDA, the only patent listed in the Orange Book in connection with Zocor® was the '784 patent. Sandoz's ANDA included a Paragraph III certification to this patent, indicating that Sandoz sought approval to market its product after expiration of that patent.

12.    By letter dated August 25, 2005, FDA notified Sandoz that its ANDA had been assigned reference number ANDA 77-766 and had been accepted for review as of June 30, 2005.

13.    On April 21, 2005, Aurobindo Pharma Ltd. ("Aurobindo") submitted an ANDA for a generic version of Zocor® in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths to FDA. At the time Aurobindo submitted its ANDA, the only patent listed in the Orange Book in connection with Zocor® was the '784 patent. Aurobindo's ANDA included a Paragraph III certification to this patent, indicating that Aurobindo sought approval to market its product after expiration of that patent.

14.    I am familiar with the status of Aurobindo's simvastatin ANDA at FDA because Sandoz has closely followed the progress of Aurobindo's ANDA. Sandoz and Aurobindo have entered into a contract, whereby Sandoz will market and distribute Aurobindo's simvastatin product once Aurobindo receives final ANDA approval.

15.    By letter dated April 19, 2006, FDA notified Aurobindo that its ANDA was tentatively approved, meaning that Aurobindo had satisfied all substantive ANDA approval requirements, but could not yet receive final approval because of patent and/or exclusivity constraints.  FDA explained that its decision to grant no exclusivity had been challenged in the suit discussed above, <u>Ranbaxy Laboratories Ltd. v. Leavitt</u>, Civil No. 05-1838 (RWR), and that the agency was currently evaluating a citizen petition challenging the agency's de-listing of the '481 and '520 patents.  Sandoz received a copy of Aurobindo's April 19, 2006 tentative approval letter from Aurobindo.  I attach a true and correct copy of the approvable letter that FDA sent to Aurobindo as Exhibit 1.

16.    I understand that FDA is prepared to issue Sandoz a tentative approval letter for its simvastatin product,  ANDA 77-766, but that the letter must still proceed through agency clearance procedures first.

17.    On    or    about    June    19,    2006,    the    FDA    website, <u>http://www.fda.gov/cder/orange/default.htm</u>, shows that FDA relisted the '481 and '520 patents in the Orange Book.

I, Sadie Ciganek, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

Sadie Ciganek

Dated: June 20, 2006

**EXHIBIT 1**

# FAX COVER SHEET

*Department of Health and Human Services*
*Public Health Service*
*Food and Drug Administration*
*Center for Drug Evaluation and Research*
*Office of Generic Drugs*
*Rockville, Maryland*

Date: 4/20/06

To: Prasada

Phone: 609-716 1190   Fax: 609 716 1192

From: Simon Eng

Phone: (301) 827-5848          FAX: (301) 594-0180

Number of pages: 4
*(Including Cover Sheet)*

Comments: Congrats! 77691 is TA'ed.

---

THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW. If you are not the addressee, or a person authorized to deliver the document to the addressee, this communication is not authorized. If you have received this document in error, please immediately notify us by telephone and return it to us at the above address by mail.

Thank you.

DEPARTMENT OF HEALTH & HUMAN SERVICES

ANDA 77-691

Food and Drug Administration
Rockville MD 20857

APR 19 2006

Aurobindo Pharma Limited Inc.
U.S. Agent for: Aurobindo Pharma Limited
Attention: Prasada Kambham
666 Plainsboro Road, Suite 210
Plainsboro, NJ 08536

Dear Sir:

This is in reference to your abbreviated new drug application
(ANDA) dated April 21, 2005, submitted pursuant to Section
505(j) of the Federal Food, Drug, and Cosmetic Act (the Act),
for Simvastatin Tablets USP, 5 mg, 10 mg, 20 mg, 40 mg, and
80 mg.

Reference is also made to your amendments dated November 28,
2005; and January 3, and January 18, 2006.

We have completed the review of this abbreviated application,
and based upon the information you have presented to date we
have concluded that the drug is safe and effective for use as
recommended in the submitted labeling. However, we are unable
to grant final approval to your application at this time because
of the unexpired patent issue noted below. Therefore, the
application is tentatively approved. This determination is
based upon information available to the agency at this time,
(i.e., information in your application and the status of current
good manufacturing practices (cGMPs) of the facilities used in
the manufacture and testing of the drug product). This
determination is subject to change on the basis of new
information that may come to our attention.

The referenced listed drug (RLD) upon which you have based your
ANDA, Zocor Tablets of Merck Research Laboratories, is subject
to a period of patent protection. As noted in the agency's
publication entitled Approved Drug Products with Therapeutic
Equivalence Evaluations (the "Orange Book"), U.S. Patent No.
4,444,784 (the '784 patent) is scheduled to expire on June 23,
2006 (with pediatric exclusivity).

Your ANDA contains a paragraph III certification to the '784 patent under section 505(j)(2)(A)(vii)(III) of the Act. Therefore, final approval of your ANDA may not be made effective pursuant to 21 U.S.C. 355(j)(5)(B)(ii) of the Act until the expiration of the '784 patent, i.e., currently June 23, 2006, with pediatric exclusivity added.

Please note that the agency has determined that no exclusivity issues will bar approval on June 23, 2006. However, that decision is currently being challenged in Ranbaxy Laboratories, Ltd. v. Leavitt, No. 05-1838 (D.D.C). With respect to Patent Nos. RE36481 and RE36520, the Agency is currently evaluating a citizen petition (Docket No. 2005P-0008) submitted by IVAX Pharmaceuticals, Inc., that challenges the delisting of these two patents from the "Orange Book." FDA's response to the citizen petition will determine whether the patents were properly delisted, and if any applicants are eligible for 180-day exclusivity with respect to these patents.

To reactivate your application prior to final approval, please submit a "MINOR AMENDMENT – FINAL APPROVAL REQUESTED" 90 days prior to the date you believe that your application will be eligible for final approval. This amendment should provide the legal/regulatory basis for your request for final approval, and it should also identify changes, if any, in the conditions under which the product was tentatively approved, i.e., updated information such as final-printed labeling, chemistry, manufacturing, and controls data as appropriate. This amendment should be submitted even if none of these changes were made. This amendment should be designated clearly in your cover letter as a "MINOR AMENDMENT – FINAL APPROVAL REQUESTED".

In addition to the amendment requested above, the agency may request at any time prior to the date of final approval that you submit an additional amendment containing the requested information. Failure to submit either or, if requested, both amendments may result in rescission of the tentative approval status of your application, or may result in a delay in the issuance of the final approval letter.

Any significant changes in the conditions outlined in this abbreviated application as well as changes in the status of the manufacturing and testing facilities' compliance with current good manufacturing practices (CGMPs) are subject to agency review before final approval of the application will be made. Such changes should be submitted as an amendment to the ANDA and categorized as representing either "major" or "minor" changes.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SANDOZ, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, | ) | |
| MICHAEL O. LEAVITT, and | ) | |
| ANDREW C. VON ESCHENBACH, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF SHASHANK UPADHYE

I, Shashank Upadhye, declare as follows:

1.      I am the Vice President – Head of Intellectual Property, Sandoz US, for Sandoz Inc. (Sandoz), which is located in Princeton, New Jersey.  Sandoz is ultimately a subsidiary of Novartis AG.  Sandoz develops and manufactures generic drugs for sale in the United States and throughout the world.  I have held this position with Sandoz and its predecessor company Eon Labs for two years.

2.      I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3.      I submit this Declaration in support of Sandoz' motion for a temporary restraining order to preserve the *status quo* pending resolution of this case on the merits.

4.      In my current position, I am the chief attorney responsible for counseling Sandoz on intellectual property and related FDA regulatory laws, rules, and regulations.

5.      I am familiar with the benefits and advantages of so-called "180-day exclusivity," which generally allows one generic company to market and sell its product without other generic competition for 180 days.  I have counseled Sandoz on its legal strategies related to patents, Orange Book listings, 180-day exclusivity, and associated legal issues.

6.      Merck & Co. Inc. ("Merck") holds the approved new drug application (NDA) for simvastatin tablets, NDA 19-766, which it markets under the brand name Zocor®.

7.      Merck initially submitted one patent to the FDA as claiming Zocor®, U.S. Patent No. 4,444,784 ("the '784 patent").  The '784 patent expires on June 23, 2006.  Merck later amended its NDA to list two additional patents, U.S. Patent No. RE 36481 ("the '481 patent") and U.S. Patent No. RE 36520 ("the '520 patent").

8.      Among other sponsors, IVAX and Ranbaxy filed ANDAs seeking approval for generic simvastatin.  I believe that both ANDAs included Paragraph IV certifications with respect to the '481 and '520 patents, and Paragraph III certifications with respect to the '784 patent as demonstrated by Judge Roberts' decision in <u>Ranbaxy Laboratories, Ltd. v. Leavitt</u>, Civil No. 05-1838, dated April 30, 2006.

9.      I believe IVAX was the first sponsor to file an ANDA with a Paragraph IV certification for generic simvastatin in 5-mg, 10-mg, 20-mg, and 40-mg strengths, and Ranbaxy was the first to file a Paragraph IV ANDA for the 80-mg strength.

10.      I understand that in October 2003, Merck submitted a letter to FDA requesting that the '481 and '520 patents be removed from the list of patents claiming Zocor® in the Orange Book.  In or about September 2004, FDA removed the '481 and '520 patents from the Orange Book.

11.    On June 28, 2005 Sandoz submitted an ANDA for generic simvastatin tablets in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths to FDA.  At the time Sandoz submitted its ANDA, the only patent listed in the Orange Book in connection with Zocor® was the '784 patent.  Sandoz' ANDA included a Paragraph III certification to this patent, indicating that Sandoz sought approval to market its product after expiration of that patent.

12.    By letter dated August 25, 2005, FDA notified Sandoz that its ANDA had been assigned reference number ANDA 77-766 and had been accepted for review as of June 30, 2005.

13.    On April 21, 2005, Aurobindo Pharma Ltd. ("Aurobindo") submitted an ANDA for a generic version of Zocor® in 5-mg, 10-mg, 20-mg, 40-mg, and 80-mg strengths to FDA. At the time Aurobindo submitted its ANDA, the only patent listed in the Orange Book in connection with Zocor® was the '784 patent.  Aurobindo's ANDA included a Paragraph III certification to this patent, indicating that Aurobindo sought approval to market its product after expiration of that patent.

14.    I am familiar with the status of Aurobindo's simvastatin ANDA at FDA because Sandoz has closely followed the progress of Aurobindo's ANDA.  Sandoz and Aurobindo have entered into a contract, whereby Sandoz will market and distribute Aurobindo's simvastatin product once Aurobindo receives final ANDA approval.  I have personally contacted the CEO of Aurobindo regarding his expectations of obtaining final approval on June 23, 2006.

15.    By letter dated April 19, 2006, FDA notified Aurobindo that its ANDA was tentatively approved, meaning that Aurobindo had satisfied all substantive ANDA approval requirements, but could not yet receive final approval because of  patent and/or exclusivity constraints.  FDA explained that its decision to grant no exclusivity had been challenged in the suit discussed above, Ranbaxy Laboratories, Ltd. v. Leavitt, Civil No. 05-1838 (RWR), and that

the agency was currently evaluating a citizen petition challenging the agency's de-listing of the '481 and '520 patents. Sandoz received a copy of Aurobindo's April 19, 2006 tentative approval letter from Aurobindo.

16.    On June 13, 2006, I personally visited the FDA's Orange Book website and confirmed that the only patent listed was the '784 patent and confirmed that its patent expiry date was still identified as June 23, 2006. I attach a copy of the website printout as Exhibit A.

17.    On Monday, June 19, 2006, in the morning, I participated in a telephone call with a senior supervisory regulatory official in  the Office of Generic Drugs at FDA. I identified myself as being a lawyer counseling Sandoz.

18.    The official and I spoke about the FDA's position regarding simvastatin generic approvals. I specifically asked the official two questions, among others: (i) had FDA made a final decision to issue final approvals to Ivax and Ranbaxy on June 23, 2006; and (ii) had FDA made a final decision about what it intended to do with ANDA filers who filed a Paragraph III to the then-only listed patent.

19.    In the following conversation, the official specifically  stated it was the agency's final decision to issue final approvals to Ivax and Ranbaxy. The official also stated that it was FDA's intent to relist the patents. The official stated that the patents were either already relisted or soon would be. The official stated that the Agency was taking that action unilaterally and was not being requested by Merck to relist the patents.

20.    With regard to approving the Paragraph III filers, the official stated that once the patents were relisted in the Orange Book, each Paragraph III filer would have to certify against the patents, either with a Paragraph III or Paragraph IV certification. If the filer chose to certify with a Paragraph III, then the ANDA would not be approved until the expiration of the last patent, which is the '520 patent expiring November 26, 2009.

21.    The official stated that if the ANDA filer chose to file a Paragraph IV, then the ANDA filer would be required to complete the Paragraph IV notice letter procedures, await 45 days to ensure that no suit would be filed, and then the FDA would grant tentative approval to the ANDA.

22.    The official stated that the consequence of new Paragraph IV certifications to the newly relisted patents would be that the ANDA would be held back from final approval for 180 days due to the imposition of the Ivax/Ranbaxy exclusivity.

23.    I personally asked the official if the Agency had definitely committed to the relisting of the patents, the requirement for new certifications, and the recognition of the 180-days of exclusivity.  The official stated that it was the Agency's firm and final position.  The official then informed me that a letter to all ANDA applicants memorializing these decisions was in the process of being sent out.  The official then stated that the procedures he had just outlined to me were based on the letter.

24.    The official then recited several passages verbatim from the letter to confirm and explain the Agency's position with respect to Paragraph III filers.  The official stated that it was important to read the letter verbatim because I was a lawyer and the official did not want to misstate anything to a lawyer.  The official stated that the letter was a two-page or so letter that explained what Paragraph III filers who had never certified against the now-relisted patents had

to do; what previous Paragraph IV filers who had certified but then converted to Paragraph III had to do with regard to the relisted patents.

25.     I asked the official if he would share that letter with me at that moment.  The official said that the FDA fully intended to send the letter to ANDA applicants on Monday afternoon or early Tuesday morning.

26.     In the afternoon of June 19, 2006, I again visited the FDA's website, http://www.fda.gov/cder/orange/default.htm, which now showed that the FDA had relisted the '481 and '520 patents in the Orange Book.

27.     I have every reason to believe that the Agency's position regarding the award of exclusivity described to me by the official  is final because of the above conversation, the stated intention that FDA would relist the patents, and the fact that FDA then did so.

**Conclusion**

28.     I, Shashank Upadhye, hereby declare under the penalty of perjury that the foregoing is true and correct.

Shashank Upadhye

Dated:  June 22 2006

# EXHIBIT A

**Patent and Exclusivity Search Results from query on Appl No 019766 Product 001 in the OB_Rx list.**

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Drug Substance Claim | Drug Product Claim | Patent Use Code |
|---------|---------|-----------|-------------------|----------------------|--------------------|-----------------|
| 019766 | 001 | 4444784 | DEC 23,2005 | | | U-59 |
| 019766 | 001 | 4444784*PED | JUN 23,2006 | | | U-59 |

## Exclusivity Data

| Appl No | Prod No | Exclusivity Code | Exclusivity Expiration |
|---------|---------|------------------|------------------------|
| 019766 | 001 | I-350 | OCT 18,2005 |
| 019766 | 001 | PED | APR 18,2006 |
| 019766 | 001 | I-390 | APR 16,2006 |

Additional information:
1. Patents are published upon receipt by the Orange Book Staff and may not reflect the official receipt date as described in 21 CFR 314.53(d)(5).
2. Patents submitted on FDA Form 3542 and listed after August 18, 2003 will have one to three patent codes indicating specific patent claims as submitted by the sponsor and are detailed in the above table.
3. Patents listed prior to August 18, 2003 are flagged with method of use claims only as applicable and submitted by the sponsor. These patents may not be flagged with respect to other claims which may apply.
4. *PED and PED represent pediatric exclusivity. Patents with pediatric exclusivity granted after August 18, 2003 will be indicated with *PED as was done prior to August 18, 2003. Patents with *PED added after August 18, 2003 will not contain any information relative to the patent itself other than the *PED extension. Information related specifically to the patent will be conveyed on the original patent only.

View a list of all patent use codes
View a list of all exclusivity codes

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:
    Orange Book Data - **Monthly**
    Generic Drug Product Information & Patent Information - **Daily**
    Orange Book Data Updated Through April, 2006
    Patent and Generic Drug Product Data Last Updated: June 13, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SANDOZ, INC.                 )
                                     )

         Plaintiff,       )

        v.                )      Civil Action No. _____

                                   )

FOOD AND DRUG ADMINISTRATION, )
MICHAEL O. LEAVITT, and      )
ANDREW C. VON ESCHENBACH,   )

                                   )

        Defendants.     )
                                   )

## DECLARATION OF ARTHUR Y. TSIEN

I, ARTHUR Y. TSIEN, declare as follows:

1. I am a principal in the law firm of OLSSON, FRANK AND WEEDA, P.C., counsel for Sandoz, Inc. ("Sandoz").

2. I am a practicing attorney and member in good standing of the Bar of the District of Columbia, and am admitted to practice before the United States District Court for the District of Columbia and before the United States Court of Appeals for the District of Columbia Circuit.

3. I submit this Declaration in support of Sandoz's Motion for a Temporary Restraining Order.

4. I have personal knowledge of the facts stated in this Declaration and am competent to testify to the same.

5. Attached hereto at Exhibit A is a true and accurate copy of the October 29, 2003 Order entered in *Purepac Pharmaceutical Co. v. Thompson*, Civ. A. No. 03-2210 (D.D.C.), granting Purepac's motion for a temporary restraining order.

1

6.   Attached hereto at Exhibit B is a true and accurate copy of the July 26, 2004 Order entered in *Apotex, Inc. v. FDA*, No. 04-5211 (D.C. Cir.), granting Apotex's motion for a stay pending resolution of the appeal.

Dated: June 22, 2006

I, ARTHUR Y. TSIEN, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

ARTHUR Y. TSIEN

2

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUREPAC PHARMACEUTICAL CO.,                )
                                            )
        Plaintiff,                      )
                                            )
    v.                                      )
                                            )
TOMMY G. THOMPSON,                          )
Secretary of Health and Human Services,     )
                                            )    Civil Action No. ___-____
    and                                     )
                                            )
MARK B. McCLELLAN,                          )
Commissioner of Food and Drugs,            )
                                            )
        Defendants.                     )
                                            )

**03 2210**

## ORDER

Upon consideration of Plaintiff Purepac's Motion for Temporary Restraining Order, Memorandum of Law, the Declaration of E. Brendan Magrab, and counsel for the Plaintiff and Defendants having been heard on the motion,

The Court finds that Plaintiff has shown that it will be immediately and irreparably harmed absent temporary relief, it is therefore

ORDERED THAT, until further Order of this Court, Defendants Tommy G. Thompson, in his official capacity as Secretary of Health and Hum Services, and Mark B. McClellan, in his official capacity as Commissioner of Food and Drugs:

    1. shall immediately take appropriate action to delay the effective date of the final approval granted to Ivax Corp's abbreviated new drug applications for generic metformin extended release 500 mg tablets;

    2. shall not grant final approval to any additional abbreviated new drug applications for generic metformin extended release 500 mg tablets; and,

IT IS FURTHER ORDERED THAT

    3. Plaintiff Purepac Pharmaceutical Co. shall file a Motion for Preliminary Injunction, together with any supporting memoranda or affidavits, no later than _5_ days from the date of this Order. Defendants shall file any responsive papers no later than _5_

*Thereafter.*

days from the date of this Order. Plaintiff shall file any reply memorandum no later than _3_ days from the date of this Order. *Thereafter.*

4.  All parties shall appear in this Court on *November 12,* 2003, at *1:00 p.m.* o'clock, for argument on the Plaintiff's Motion for Preliminary Injunction, unless otherwise ordered by the Court.

*5. This Order to be effective upon plaintiff's filing*

SO ORDERED. *of a $100,000 injunction bond.*

_____
United States District Judge

*10/29/03*
Date

*3:07 p.m.*

# EXHIBIT B

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 04-5211**                                        **September Term, 2003**

04cv00605

Filed On: July 26, 2004 [838514]

Apotex, Inc.,
      Appellant

    v.

Food & Drug Administration, et al.,
      Appellees

**04-5046**                                             03cv02401

Apotex, Inc., *f/k/a* Torpharm, Inc.,
      Appellee

    v.

Food & Drug Administration, et al.,
      Appellants

Alphapharm Pty, Limited,
      Appellee

Consolidated with 04-5047

**BEFORE:**    Edwards, Sentelle, and Randolph, Circuit Judges

## O R D E R

Upon consideration of the emergency motion to consolidate No. 04-5211 with No. 04-5046 and expedite consideration of the appeals, the response and opposition thereto, and the reply; the emergency motion for injunction pending appeal in No. 04-5211, the oppositions thereto, and the reply; the motion to participate as amicus curiae in No. 04-5046, the opposition thereto, and the reply, it is

**ORDERED** that the Food and Drug Administration's final approval of Purepac Pharmaceutical Co.'s gabapentin capsule ANDA be stayed pending resolution of the appeal in No. 04-5211 m. Appellant has satisfied the standards required for a stay

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

**No. 04-5211**                                    **September Term, 2003**

pending appeal.  See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2002).  It is

**FURTHER ORDERED** that the motion to consolidate be denied.  The Clerk is directed to schedule No. 04-5211 for argument on the same date and before the same panel as No. 04-5046.  The Clerk is directed to enter a briefing schedule consistent with this order.  It is

**FURTHER ORDERED** that Purepac Pharmaceutical Co.'s motion to participate as amicus curiae be denied.

<u>**Per Curiam**</u>

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Deputy Clerk/LD

Page 2