# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDOZ, INC. | ) |
| Plaintiff, | ) |
| v. | ) Case No. 06-1134 |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) |
| Defendants, | ) |
| TEVA PHARMACEUTICALS USA, INC., IVAX PHARMACEUTICALS, INC. | ) |
| Proposed Intervenors-Defendants. | ) |

## OPPOSITION TO SANDOZ INC.'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER

Robert A. Dormer
Douglas B. Farquhar*
John R. Fleder
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St. N.W.
Washington, D.C. 20005
202-737-4282

Jay B. Shapiro (pro hac vice forthcoming)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200

*Counsel for Proposed Intervenor-Defendant
Ivax Pharmaceuticals, Inc.*
*Counsel of Record*

June 22, 2006

Jay P. Lefkowitz (DC 449280)*
John C. O'Quinn (DC 485936)
Michael D. Shumsky (DC 495078)
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC 20005
(202) 879-5000

*Counsel for Proposed Intervenor-Defendant
Teva Pharmaceuticals USA, Inc.*
* Counsel of Record

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................3

LEGAL STANDARD FOR INJUNCTIVE RELIEF ..........................................................6

ARGUMENT .......................................................................................................................7

I.    SANDOZ'S ACTION IS AN IMPROPER COLLATERAL CHALLENGE TO
      THIS COURT'S FINAL JUDGMENT. ....................................................................7

II.   SANDOZ'S TRO FAILS TO SATISFY THE RIGOROUS STANDARD FOR
      EXTRAORDINARY INJUNCTIVE RELIEF. .......................................................10

      A.    Sandoz Has No Chance Of Success On The Merits. ...................................10

      B.    Sandoz Does Not Face Irreparable Harm.....................................................11

      C.    The Balance of Harms Strongly Favors Teva And Ivax. ............................14

      D.    The Public Interest Strongly Favors Denying A TRO. ...............................17

CONCLUSION..................................................................................................................19

## INTRODUCTION

Sandoz Inc.'s eleventh-hour motion is nothing short of an improper collateral attack on this Court's final judgment in *Ranbaxy Laboratories Ltd., et al. v. Leavitt, et al.*, No. 05-1838, which awarded 180 days of generic exclusivity to Ivax Pharmaceuticals, Inc. ("Ivax"). Although this Court entered judgment on April 30, 2006—***nearly two months ago***—Sandoz waited until the eve of Ivax's anticipated launch of generic simvastatin (distributed by its parent, Teva Pharmaceuticals USA, Inc. ("Teva")) to bring this frivolous lawsuit and motion for Temporary Restraining Order ("TRO"). The Court should reject this meritless, last-ditch attempt to delay what should otherwise be a straightforward approval of Ivax's product for launch by the Food and Drug Administration ("FDA").

Make no mistake: If there were anything to Sandoz's suit, Sandoz would not have waited until ***the day before Ivax's approval*** to sandbag the FDA, Ivax, and this Court. As the Supreme Court unanimously observed just ten days ago in *Hill v. McDonough*, No. 05-8794, — U.S. —, Slip. Op. at 10 (June 12, 2006):

> A court considering a stay must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.' *Nelson*, [541 U. S. 637], 650 [2004]. *See also Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*) (noting that the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process may be grounds for denial of a stay).

Sandoz, of course, has known of the *Ranbaxy* case for months—having been told by the FDA on April 19, 2006 that the *Ranbaxy* case would impact the date upon which Sandoz's business partner, Aurobindo Pharma Ltd. ("Aurobindo"), would receive approval for its simvastatin application. And, of course, Sandoz has had some two months to consider whether to seek relief in light of this Court's judgment in *Ranbaxy*. Sandoz should not now be allowed to come to this Court seeking extraordinary emergency relief. Moreover, should the Court tarry over this

baseless action, causing the FDA to hesitate out of deference—or worse, should the Court grant a TRO based on Sandoz's smokescreen and rhetoric—the result will be a delayed approval of Ivax's product for launch. ***The cost to Ivax and Teva, and to the public, would be hundreds of millions of dollars.*** Thus, it is critical that this motion be denied immediately.

*First*, Sandoz's suit is clearly a collateral attack on this Court's judgment awarding Ivax exclusivity and, with it, the FDA's implementation of that decision. In its recent ruling, this Court plainly understood what was at stake in the *Ranbaxy* case—namely, Ivax's claim that "the FDA improperly nullified … Ivax's rights to a 180-day period of exclusive marketing of a generic drug." *Ranbaxy*, Slip Op. at 1 (attached as Exhibit 1). And this Court unambiguously vindicated Ivax's position. Sandoz's papers, however, plainly challenge Ivax's entitlement to exclusivity: They take issue with the relisting of the patents giving rise to Ivax's exclusivity, and claim Sandoz should be entitled to go to market immediately on the theory that Sandoz was not required to certify to the two patents on which Ivax was first to file, because those patents were not listed in the Orange Book. But that just begs the question of whether the FDA properly delisted those patents in the first place. That issue was precisely the issue presented in the *Ranbaxy* case and on which this Court entered a final judgment.

Specifically, the issue as framed by this Court was "whether the FDA can effectively restrict the [exclusivity] award to only a sued ANDA holder by delisting a patent after the ANDA holder successfully avoided suit." *Ranbaxy* Slip Op. at 19. As the Court then observed, "[h]ad the FDA not delisted here, the platiniffs [Ivax and Ranbxy] would have been entitled to a period of marketing exclusivity." *Id*. This Court found FDA's decision to be "unlawful" and "contrary to the clear intent of Congress." Thus, the Court granted Ivax's (and Ranbaxy's) motion for summary judgment, holding that their citizen petitions—which sought relisting of two

patents in the Orange Book and exclusivity, *see Ranbaxy*, Slip Op. at 12—were improperly denied. Sandoz did not intervene in that suit or otherwise seek to participate ***even though it was on notice that its ANDA approval might be delayed based on the outcome of that suit***. This Court's decision is binding on the FDA, prohibits the approval of Sandoz's ANDA, and cannot be collaterally attacked. Sandoz is in essence seeking is a belated rehearing—but having foregone a first bite at the apple, it is not entitled to a second.

*Second*, this TRO application is meritless. Sandoz has no likelihood of success on the merits precisely because this Court has already adjudicated the issues presented and determined that the two patents at issue should not have been delisted and that Ivax is entitled to exclusivity. Sandoz can show no cognizable irreparable harm. And in any event, the balance of harms decisively weights in favor of Teva and Ivax. In accordance with this Court's judgment, Teva and Ivax have made substantial investments in preparation for an exclusive launch tomorrow. Moreover, even a brief delay could cost Teva and Ivax *$200 million* in lost sales if, as widely anticipated, the branded company launches its authorized generic tomorrow—a harm that is orders of magnitude greater than any loss asserted by Sandoz. And of course, the loss of exclusivity to Ivax would greatly outweigh any harm to Sandoz, which merely seeks to be one of many companies in the simvastatin market. Finally, the public interest decisively weighs against granting the extraordinary relief sought by Sandoz. Sandoz's proposed TRO would bar all generic competition and therefore would extend the branded company's monopoly, depriving the public of any true generic simvastatin. Thus, the TRO should be denied immediately.

## BACKGROUND

Congress enacted the Hatch-Waxman Act of 1984 to lower the regulatory barriers facing generic drug companies and to encourage those companies to challenge the patents blocking generic entry to the market. *See, e.g., Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371

(Fed. Cir. 2002). In order to encourage generic drug companies to undertake the substantial costs of identifying patents to challenge and risks of potential patent litigation, Congress created a critical incentive under the Hatch-Waxman Act to reward the first generic manufacturer to file a Paragraph IV certification challenging a drug patent—namely, a 180 day period of "exclusivity" during which no other generic version of the drug can be approved. *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002); 21 C.F.R. § 314.107(c)(1). As this Court has explained:

> In order to encourage generic drug makers to incur the potentially substantial litigation costs associated with challenging pioneer drug makers' patents, the Hatch-Waxman Amendments provide an added incentive for generic drug producers to file Paragraph IV certifications. The first manufacturer to file an ANDA containing a Paragraph IV certification with respect to a specific patent is awarded a 180-day period of exclusive marketing rights for a generic version of the drug claimed by that patent. In other words, no other ANDA for the same generic drug product will be approved during those 180 days.

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000); *see also Mova*, 140 F.3d 1060, 1064 (D.C. Cir. 1998); *Dr. Reddy's Labs. Ltd. v. Pfizer, Inc.*, No. 03-CV-726, 2003 WL 21638254, at *7 (D.N.J. July 8, 2003). The statute provides that this exclusivity period begins when the generic company first commercially markets its product or, if earlier, if and when a court issues a decision "holding the patent which is the subject of the certification to be invalid or not infringed." *Id.*[1]

---

[1] The Medicare Modernization Act of 2003 ("MMA") amended the Hatch-Waxman Act provisions governing exclusivity. However, most of those amendments do not apply here because Ivax's ANDA was filed prior to the enactment of the 2003 Act. *See* Pub. L. No. 108-173 § 1102(b)(1). The MMA does, however, define the term "decision of a court" in the pre-amended statute as "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken." *Id.* § 1102(b)(3).

Here, Ivax was the first applicant to file a Paragraph IV certification for simvastatin in 5mg, 10 mg, 20 mg, and 40 mg doses. Specifically, Ivax filed a Paragraph IV certification as to U.S. Patent No. RE 36,481 ("the '481 patent"), and No. RE 36,520 ("the '520 patent"), and a Paragraph III certification as to U.S. Patent No. 4,444,784 ("the '784 patent"), which expires tomorrow. Subsequently the FDA purported to remove the '481 and '520 patents from the Orange Book, thereby depriving Ivax of the 180-days of exclusivity to which it was otherwise eligible. Ivax and Ranbaxy both filed citizen petitions seeking the relisting of the '481 and '520 patents and seeking their award of 180 days of marketing exclusivity. The FDA denied those petitions on October 24, 2005. *See Ranbaxy*, Slip Op. at 12.

Ivax and Ranbaxy each filed suits against the FDA and the other federal defendants named in this case (collectively "FDA"), and the suits were consolidated. *Ranbaxy Laboratories, Ltd. v. Leavitt*, No. 05-1838. On April 30, this Court granted Ivax and Ranbaxy's motions for summary judgment, holding that the agency had improperly denied their citizen petitions. As plaintiff notes, "[t]he Court declared that FDA's decision was unlawful." Sandoz TRO Br. at 6. FDA subsequently filed a notice of appeal; that case is pending before the D.C. Circuit. FDA did not seek temporary relief pending appeal due to its concern that a stay pending appeal would deprive the public of any generic simvastatin. FDA made its intention not to seek a stay pending appeal clear in an unopposed motion seeking an expedited appeal, filed on May 25, 2006—nearly one month ago. As FDA notes in its merits brief filed in the D.C. Circuit, "[u]nder the district court's order, at least both Ranbaxy and Ivax are eligible for approval on June 23, 2006," so consumers will not be "deprived of generics as of that date." Brief for the Appellants at 18 n.10, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed June 21, 2006).

Nearly two months after this Court's entry of final judgment, and one month after FDA filed its notice of appeal, Sandoz filed this action—a mere one day before Ivax was due to receive final approval from the FDA and Teva was set to distribute Ivax's generic simvastatin product.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

In this Circuit, the standard for a TRO or preliminary injunction is well-established. The relief Sandoz seeks is "an extraordinary remedy and must be sparingly granted." *Bristol Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996) (citing *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969)). It is appropriate only when the party seeking the relief carries its burden of persuasion by a clear showing. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To demonstrate an entitlement to temporary injunctive relief a plaintiff must show that (1) there is a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury if the requested injunction is denied; (3) an injunction will not substantially injure the opposing party or other third parties; and (4) the public interest will be furthered by the issuance of the injunction. *See Mova Pharm. Co. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). The district court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997). Thus, the burden is on Sandoz to demonstrate "*by a clear showing* a probability of success on the merits," *PhRMA v. Walsh*, 538 U.S. 644, 663 (2003) (emphasis added), and it has not done so in this case. "Here, because the likelihood of success is slim, plaintiff[] would have to make a very substantial showing of severe irreparable injury in order to prevail on [its] motion." *Nat'l Pharm. Alliance v. Henney*, 47 F. Supp. 2d 37, 41 (D.D.C. 1996); *see also CityFed*, 58 F.3d at 747. Moreover, the balance of harms strongly counsels against granting a TRO. An injunction on the eve of Teva's launch of

6

Ivax's generic simvastatin will irreparably harm Teva and Ivax, and will greatly injure the public by extending the patent-holder's monopoly for the life of this litigation.

## ARGUMENT

### I. SANDOZ'S ACTION IS AN IMPROPER COLLATERAL CHALLENGE TO THIS COURT'S FINAL JUDGMENT.

In the *Ranbaxy* case, decided nearly two months ago, this Court determined that the FDA had unlawfully delisted two patents, thereby improperly depriving Ivax of its 180 days of exclusivity. The Court ordered FDA to grant Ivax's (and Ranbaxy's) citizen petitions, which requested the relisting of those patents, thereby restoring Ivax's entitlement for exclusivity. Sandoz is blatantly challenging that judgment—seeking approval of its own ANDA in the complaint and delay of Ivax's in the request for a TRO. This newly-minted assault on Ivax's exclusivity is foreclosed by the *Ranbaxy* decision. After all, "[t]he issue" before this Court in *Ranbaxy* was "whether the FDA can effectively restrict the [exclusivity] award to only a sued ANDA holder by delisting a patent after the ANDA holder successfully avoided suit." *Ranbaxy*, Slip Op. at 19. This Court answered that question in the negative, observing that, "*[h]ad the FDA not delisted here, the platiniffs [Ivax and Ranbxy] would have been entitled to a period of marketing exclusivity* triggered by their notice to the FDA of their first commercial marketing of the generic drug once the FDA approved their ANDAs." *Id.* (emphasis added). In other words, the question before the Court then was whether the patents must be relisted and the exclusivity award reinstated. Indeed, Ivax specifically brought suit to "challeng[e] the FDA's refusal to relist the '481 and '520 patents for Zocor and [FDA's] refusal to grant any ANDA applicant

eligibility for 180-day exclusivity for the generic version of Zocor." *Ranbaxy*, Slip Op. at 14. This Court granted Ivax the relief it sought.[2]

Sandoz now argues that it was not required to certify to the patent in question because it was not listed in the Orange Book. However, that just begs the question presented in *Ranbaxy*—in which the Court held the two patents must be relisted and Ivax's exclusivity restored. Those patents being listed in the Orange Book, Sandoz's application obviously cannot be approved absent a certification as to those patents. *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. §§ 314.94(a)(12)(vi), 314.94(a)(12)(viii)(C). At bottom, Sandoz argues that "there is no statutory basis of any kind for FDA's purported relisting of the two patents." Sandoz TRO Br. at 11. Indeed, Sandoz seeks relief on the theory that "FDA's decision to 'relist' is directly contrary to various judicial decisions." *Id*. *But that was the very issue in the Ranbaxy case, which held the patents must be relisted*. The arguments presented in Sandoz's TRO are precisely the kinds of arguments which should have been addressed to this Court in *Ranbaxy*.

---

[2] Sandoz's suggestion that this Court's *Ranbaxy* opinion "did not expressly address which ANDA sponsors (if any) would be eligible for 180-day exclusivity, and which subsequent sponsors (if any) would have their final approvals delayed by such exclusivity," Sandoz TRO Br. at 6, is nothing short of bizarre. That was the whole point of the *Ranbaxy* case. *See Ranbaxy*, Slip Op. at 1 (noting Ivax and Ranbaxy "each sued the [FDA] claiming that the FDA improperly nullified [their] rights to a 180-day period of exclusive marketing"); *id*. at 9 (noting Ivax and Ranbaxy "sought to take advantage of the 180-day exclusivity under the Hatch-Waxman Amendments"); *id*. at 12 (noting the citizen petitions "request[ed] that the FDA confirm that it would not approve subsequent ANDAs until after the 180-day period"); *id*. at 14 (noting that Ivax and Ranbaxy sued the FDA over its "refusal to grant any ANDA applicant eligibility for 180-day exclusivity for the generic version of Zocor"); *id*. at 19 (noting that "[t]he issue here, then, is whether the FDA can effectively restrict the [exclusivity] reward to only a sued ANDA holder"); *id*. at 21 (noting FDA's disparate treatment "contravened the plain and undisputed intent of Congress" by effectively eliminating the commercial marketing exclusivity trigger); *id*. at 22 (holding the FDA "acted contrary to the clear intent of Congress in its decision to deny the plaintiffs' citizen petitions" which requested that the FDA confirm that it would not approve subsequent ANDAs until after the 180-day period).

What is clear, however, is that the relief Sandoz seeks is irreconcilable with this Court's judgment in *Ranbaxy*. Sandoz cannot prevail without this Court ordering FDA to do something that the judgment entered in *Ranbaxy* orders FDA not to do. FDA is bound by this Court's prior judgment to grant the citizen petitions, thereby relisting the two patents and awarding exclusivity to Ivax. Granting Sandoz the relief it seeks would tread on this Court's judgment—which now may only be altered on appeal.

Thus, Sandoz's suit must be seen for what it is—a collateral attack on this Court's judgment in *Ranbaxy*. This is impermissible. The *en banc* D.C. Circuit rejected just such a challenge in *Adams v. Bell*, 711 F.2d 161, 168-70 (D.C. Cir. 1983). There the Court of Appeals turned back a challenge to agency action, noting that "[h]ad appellants intervened in the North Carolina U.S. District Court proceeding, they could have taken an appeal to the Fourth Circuit Court of Appeals and then petitioned the United States Supreme Court." *Id*. The court observed that "***appellants had ample opportunity to assert their rights through the normal routes of judicial review***." *Id*. Thus, the court held that "[t]he district court therefore correctly declined to exercise extraordinary supervisory power over the Department to further appellants' interests: These interests could have been fully protected by intervention in a pending lawsuit which provided an appropriate forum for consideration of appellants' claims." *Id*. at 169-70; *see also Bell v. Eastman Kodak Co.*, 214 F.3d 798 (7th Cir. 2000). So too here. Sandoz was on notice and had adequate opportunity to seek to participate in the *Ranbaxy* case. Having declined to do so, it cannot now collaterally challenge the judgment that bars the FDA from giving Sandoz the relief it seeks.

**II.    SANDOZ'S TRO FAILS TO SATISFY THE RIGOROUS STANDARD FOR EXTRAORDINARY INJUNCTIVE RELIEF.**

**A.    Sandoz Has No Chance Of Success On The Merits.**

This Court need not speculate as to whether Sandoz may succeed on the merits of its claim.   In *Ranbaxy*, This Court considered ***and rejected*** the very arguments marshaled by Sandoz—arguments based on the "plain language of the FDC Act" and that claim relisting is "inconsistent with [FDA's] ministerial role in patent listings." Thus, FDA's refusal to give final approval to Sandoz's simvastatin application until Ivax has exhausted its 180 days of exclusivity is not a discretionary act to be reviewed again and again, but was compelled by this Court's decision in *Ranbaxy*.   Unless FDA prevails on its appeal to the D.C. Circuit, Ivax remains entitled to exclusivity as the first-filer and FDA may not approve Sandoz's subsequent application until 180 days have run from Ivax's "first commercial marketing of the generic drug." *Ranbaxy*, Slip Op. at 19.

The only remotely new argument marshaled by Sandoz is that its approval should not be delayed because it was not required to file any certification at the time it filed an ANDA.   That argument plainly fails because, once the patents were relisted in the Orange Book, the FDCA and FDA regulations clearly require that Sandoz update its application to include a Paragraph III or IV certification to those patents.   *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(vi) ("An application whose abbreviated new drug application is submitted after a late submission of patent information, *or whose pending abbreviated application was previously submitted but did not contain an appropriate patent certification* at the time of the patent submission, shall submit a certification ....") (emphasis added); *see also* 21 C.F.R. § 314.94(a)(12)(viii)(C) ("[A]n applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted

certification is no longer accurate."). Thus, under settled—and unchallenged—FDA regulations, Sandoz was required to submit a certification to the patents once the patents were relisted, thereby precluding final approval of Sandoz's ANDA until Ivax's exclusivity has lapsed.

Nor can Sandoz claim any unfair surprise. As Sandoz concedes, when it received its tentative approval letter from the FDA, the agency made clear that its position on the delisting of the '481 and '520 patents had been challenged. *See* Sandoz TRO Br. at 8. Sandoz was aware that there could be "further decisions with regard to the delisting of the '481 and '520 patents." *Id.* The relief Sandoz now seeks—in essence a windfall from the FDA's wrongful actions—is inconsistent with the "period of marketing exclusivity" Ivax "would have been entitled to" had "the FDA not delisted." *Ranbaxy*, Slip Op. at 19.

### B.    Sandoz Does Not Face Irreparable Harm.

Sandoz's claim of irreparable harm suffers from two independent defects: (1) its delay in seeking relief, and (2) the nature of the harm asserted. As noted above, Sandoz has literally delayed pursuing this action until the eleventh hour, despite its awareness of the *Ranbaxy* suit, and the *Ranbaxy* decision. That alone diminishes its claim for emergency relief. As noted at the outset, the Supreme Court recently reiterated that a "court considering a stay must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill v. McDonough*, No. 05-8794, — U.S. —, Slip. Op. at 10 (June 12, 2006) (quoting *Nelson v. Campbell*, 541 U. S. 637, 650 (2004). Indeed, the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process is grounds for denial of a stay, in and of itself. *Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*); *see also GTE Corp. v. Williams,* 731 F. 2d 676 (10th Cir. 1984) ("Delay in seeking relief, however, undercuts any presumption that infringement alone has caused

irreparable harm *pendente lite*; therefore, such delay may justify denial of a preliminary injunction for trademark infringement."). Likewise in *Fund for Animals v. Frizell*, 530 F.2d 982, 987 (D.C. Cir. 1975), the D.C. Circuit denied emergency relief where the movant sought it on the day a final regulation was set to issue, despite the fact that the movant had known of the anticipate agency action some 44 days earlier. The Court noted that "[o]ur conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one." *Id.*; *see also City of Tempe v. Fed. Aviation Auth.*, 239 F. Supp. 2d 55, 765 n.13 (D.D.C. 2003) ("Further undermining plaintiffs' case is the fact that they have not been diligent in seeking a preliminary injunction."); *Ben Venue Labs., Inc. v. Novartis Pharm. Corp.*, 10 F. Supp. 2d 446, 458 (D.N.J. 1998) (denying TRO where movant "knew of its claim but did nothing" for over a month).[3]

Moreover, the irreparable injury requirement erects a very high bar for a movant. *See Varicon Int'l v. OPM*, 934 F. Supp. 440, 447 (D.D.C. 1996). A plaintiff must show that it will suffer harm that is "more than simply irretrievable." *Gulf Oil Corp. v. Dept. of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981). In this jurisdiction, harm that is "merely economic" in

---

[3] To the extent Sandoz suggests that its did not unduly delay seeking relief because the FDA purportedly relisted the '481 and '520 patents "[o]n or about June 19, 2006," Sandoz TRO Br. at 6, that is plainly no excuse. Sandoz knew from the outset that the *Ranbaxy* case could affect the approval date for Aurobindo's ANDA. *See id.* at 8. And if it had any doubt about the upshot of this Court's judgment in *Ranbaxy*, Sandoz had some two months to seek clarification. Finally, FDA's position that it would not approve subsequent applicants was made clear one month ago when FDA filed its notice of appeal and motion for expedited briefing in the D.C. Circuit on May 25, 2006. FDA made clear that "the district court's decision" was an "obstacle to the Food and Drug Administration's (FDA) ability to approve on June 23rd *all* applications to market a generic version of the brand name drug." Appellants' Motion for Expedited Briefing and Oral Argument at 2, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed May 25, 2006). FDA clearly stated that "[p]ursuant to the district court's ruling, FDA must relist the '481 and '520 patents" and that "[a]ll ANDAs for simvastatin will thus have to be amended to include paragraph IV certifications to the relisted patents and, accordingly, be subject to a stay of final approval until the expiration of the 180-day period that commences on the first day of commercial marketing of Ivax's and Ranbaxy's generic products." *Id.* at 9.

character is not sufficiently grave under this standard. *See Apotex, Inc. v. Food & Drug Admin.*, No. Civ.A. 06-0627 JDB, 2006 WL 1030151, *16-*17 (D.D.C. April 19, 2006); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118 (D.D.C. 2003); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000). As this Court recently held in a closely related context, "[t]o successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence." *Apotex, Inc.*, 2006 WL 1030151, at *16 (quoting *Gulf Oil*, 514 F.Supp. at 1025); *see also Wisconsin Gas*, 758 F.2d at 674; *Sociedad Anonima Vina Santa Rita v. Dep't of Treasury*, 193 F.Supp.2d 6, 14 (D.D.C. 2001). To warrant emergency injunctive relief, the harm alleged must be certain, great, actual, and imminent. *See Wisconsin Gas*, 758 F.2d at 674. Moreover, because Sandoz cannot establish "a likelihood of success on the merits, its showing of irreparable harm must be very strong." *Apotex, Inc.*, 2006 WL 1030151, at *16 (citations omitted).

Sandoz cannot satisfy these standards. Sandoz merely submits that it stands to lose approximately $11 million in sales over 180 days if proposed intervenor-defendants are permitted to exercise their statutory exclusivity entitlements. Even assuming the accuracy of that representation, "the harm that [Sandoz] allegedly faces cannot be called anything other than 'merely economic.'" *Apotex, Inc.*, 2006 WL 1030151, at *17. Sandoz publicly represents that it "develop[s], produce[s] and distribute[s] patent-free compounds, pharmaceuticals and intermediates, as well as biopharmaceuticals and biogenerics, for all major therapeutic areas" including "[m]ore than 600 substances for 5,000 pharmaceutical compounds in 110 countries." http://sandoz.com/site/en/business/retail_generics/products/content.shtml (last visited June 22, 2006). Moreover, "Sandoz reported generic pharmaceutical sales in 2005 were USD 4.7

billion." http://sandoz.com/site/en/company/profile/facts_and_figures/content.shtml (last visited June 22, 2006). "Under the circumstances, it hardly seems possible that a [$11] million loss in sales over [six months] would cause extreme hardship, much less threaten the company's very existence, and [Sandoz] has not established (or even contended) that it would." *Apotex, Inc.*, 2006 WL 1030151, at *17. Sandoz's "speculative sales loss thus remains an economic loss that does not meet the irreparable harm standard. So, too, its concerns about a lost market share fall well short of the serious, irretrievable damage to its business required to warrant a preliminary injunction" or TRO. *Id.* In any event, as discussed below, Teva and Ivax stand to lose a much greater sum if the launch of their generic products is delayed. "Particularly where [Sandoz] has made a very weak showing of likely success on the merits, that balance of harms is fatal to its request for emergency injunctive relief." *Id.*

**C.    The Balance of Harms Strongly Favors Teva And Ivax.**

Because Sandoz has virtually no chance of success on the merits, it must demonstrate that the harm to Sandoz greatly outweighs the harm to Teva and Ivax. It cannot do so by any benchmark. By filing the first Paragraph IV ANDA for generic simvastatin in 2000, Ivax obtained a statutory entitlement to be the first and exclusive seller of generic simvastatin for 180 days. Teva and Ivax intend to begin marketing generic simvastatin upon FDA approval, which will presumably follow the expiration of the '784 patent tomorrow—June 23, 2006. Declaration of David Marshall (attached as Exhibit 2) (hereinafter "Marshall Decl.") ¶¶ 4, 7. In order to prepare for that launch, Teva has negotiated a number of major distribution contracts with customers, *id.* ¶ 7, and has invested many millions of dollars in preparing for tomorrow's product roll-out. *Id.*

Issuance of a TRO or preliminary injunction thus would have a tremendous, irremediably adverse effect on Teva and Ivax in the marketplace. Most of the value from 180-day exclusivity

comes during the first few weeks of a product launch, when the exclusive generic entrant negotiates and begins executing long-term distribution contracts with major market players. *Id.* ¶¶ 15-16. Needless to say, entry of an order barring Teva from marketing Ivax's generic simvastatin product would preclude it from fulfilling the contracts it already has negotiated with major simvastatin purchasers, *id.* at ¶ 8, and the accompanying uncertainty would both undercut Teva's ability to negotiate additional long-term contracts and impair its future access to major customers. *Id.* ¶ 13.

Those harms are particularly pronounced in this case. Merck, which holds the underlying simvastatin patents, has entered into an agreement with Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") to market an authorized generic. *Id.* ¶ 9. Dr. Reddy's could therefore enter the simvastatin market on June 23, ***regardless of any injunction granted by the Court***. *Id.* ¶ 11. It is Teva's and Ivax's understanding that Dr. Reddy's is already negotiating long-term contracts with major potential customers of generic simvastatin, *id.* ¶ 10, and an order barring Teva and Ivax from going to market tomorrow would give Dr. Reddy's a pronounced advantage in negotiating its own long-term customer contracts for the supply of generic simvastatin. *Id.* ¶ 12. Indeed, Dr. Reddy's could conceivably step in to fulfill the contracts Teva already has negotiated but would not be able to fulfill in the event an injunction is entered. *Id.* ¶¶ 13, 15.

The consequences are profound. Given the structure of the generic market and the enormous demand for generic simvastatin, even a one-week delay could cost Ivax and Teva more than ***$200 million*** in lost sales and ***$150 million*** in lost profits if Dr. Reddy's seizes the opportunity that entry of a TRO would provide. *Id.* ¶ 15. And while some authorized generics do not launch until after ANDA applicants enter the market, others do not wait. *Id.* ¶ 14. Teva should not be required to bear the enormous risk that Dr. Reddy's will take advantage of a short

window of uncertainty and tie up the market while Teva struggles under the specter of a TRO. In any event, Teva and Ivax stand to lose more than *$350 million* in lost sales and more than *$250 million* in profits from the loss of six-month exclusivity. *Id.* ¶ 16.

These harms dwarf any asserted by Sandoz. As a threshold matter, Sandoz itself has acknowledged that these harms are real and significant; indeed, it actually asserts the very same kind of harms in support of its motion. *See, e.g.*, Brief at 15 ("Once IVAX and Ranbaxy launch, they will tie up distribution channels and access to customers; enter into long-term sales agreements; increase sales across all product lines, and retain greater market share in the long-term. Sandoz, on the other hand, will lose the opportunity to effectively compete in the market.") (internal citation omitted). Yet there is a key difference between Teva and Ivax, on the one hand, and Sandoz, on the other: While Teva and Ivax seek to be the *exclusive* distributor of generic simvastatin in 5 mg, 10 mg, 20 mg, and 40 mg doses, Sandoz seeks to be *one of many* distributors of generic simvastatin. Thus, while Teva and Ivax alone will bear the costs of a TRO or preliminary injunction that prevents them from marketing 5 mg, 10 mg, 20 mg, and 40 mg doses of generic simvastatin, any costs from the denial of a TRO would be shared across the universe of subsequent ANDA filers, of which Sandoz is just one. It thus should come as no surprise that, for all its irrelevant talk of third-party product purchases and labeling expenditures, Sandoz ultimately estimates that it stands to lose a paltry $11 million in sales over the entire 6-month period of exclusivity. *Id.* at 17-18. Of course, that is *one-twentieth* of the lost sales Teva and Ivax may suffer during the first week following entry of a TRO, and *well under one-twentieth* of the total lost profits Teva and Ivax face from the loss of six-month exclusivity.

Given that the balance of harms so decisively favors Teva and Ivax, there is simply no basis for the entry of a TRO or injunction in this case.[4]

**D.    The Public Interest Strongly Favors Denying A TRO.**

Finally, entry of the TRO proposed by Sandoz would severely harm the public interest by denying patients access to more affordable, generic simvastatin products pending this Court's resolution of proceedings.    Merck currently has a monopoly on the market for simvastatin product.    Across all dosages, annual simvastatin sales are well in excess of *$4 billion per year*. *See* Marshall Decl. ¶ 5.    That monopoly is scheduled to end tomorrow, June 23, 2006, with Teva's launch of Ivax's generic simvastatin products into the market—an event that will provide significant price relief to the millions of Americans who rely on simvastatin every day.    Indeed, the specter of generic competition from Teva and Ivax has already prompted Merck to announce significant—indeed, predatory—price reductions for its brand-name simvastatin product Zocor. *See, e.g.*, Heather Won Tesoriero, *Merck Will Sell Zocor Below Price of Generics: Move May Spur Bidding War Among Drug Makers to Keep Pace in Nonbranded Market*, WALL ST. J., June 22, 2006, at A2; Rita Rubin, *Zocor Prices Go Through Changes As Patent Expires Thursday Night*, USA TODAY, June 21, 2006; Devlin Bartlett, *Lawmaker: Merck Scheming To Undercut Generic Zocor*, ASSOC. PRESS, June 21, 2006.

Of course, if this Court enjoins FDA from permitting Teva and Ivax to take its generic simvastatin to market, it will effectively extend Merck's monopoly for this multibillion dollar drug indefinitely.    Without true generic competition, consumers will be deprived of access to

---

[4] Should the Court nonetheless grant Sandoz's motion, Teva and Ivax respectfully request that the Court require Sandoz to post a substantial bond in order to guarantee that Teva and Ivax will be reimbursed for the substantial harm that will inevitably befall them if a TRO is wrongly entered.    *See* Fed. R. Civ. P. 62(c).

cheaper generic alternatives (and to reduced-price Zocor). On a daily basis, consumers would be forced to pay literally tens of millions of additional dollars for brand-name simvastatin. Even the launch of an authorized generic would not bring the kind of dramatic price relief that accompanies true competition from a genuine generic product. Make no mistake: The real losers from Sandoz's proposed TRO are the millions of patients who indisputably and irremediably will be harmed by a court order restricting their access to generic simvastatin—in breach of the clear purpose of the Hatch-Waxman Act, which is to "get generic drugs into the hands of patients at reasonable prices—fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991). FDA recognized as much. Thus, it specifically declined to seek a stay of the *Ranbaxy* judgment pending appeal precisely because it would have potentially lead to an injunction as to ***all*** generic simvastatin manufacturers. *See* Brief for the Appellants at 18 n.10, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed June 21, 2006); Appellants' Motion for Expedited Briefing and Oral Argument at 11 n.6, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed May 25, 2006). FDA recognized that because, "[u]nder the district court's order, at least both Ranbaxy and Ivax are eligible for approval on June 23, 2006," the public interest was best served by permitting their approvals to go forward so consumers will not be "deprived of generics as of that date." Brief for the Appellants at 18 n.10, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed June 21, 2006).

Sandoz notably does not contend otherwise; instead, it asserts that the public interest best would be served by permitting "four generic entrants into the simvastatin market, rather than only two." Brief at 19. But that simply is not what Sandoz's proposed TRO would do. By precluding the FDA from approving ***any*** generic manufacturer's ANDA until the resolution of their case on the merits, Sandoz would ensure that there are ***no*** generic entrants for the

18

foreseeable future. Given the sales volume for this drug, the monopoly rents that Merck is currently extracting, and Merck's planned price reductions upon the launch of generic simvastatin, it is far from likely that the near-term consumer losses from continued monopoly pricing will eventually be outweighed by the addition of two more generic entrants at some unknown point in the future. In any event, Congress made the determination that the public will ultimately benefit the most by providing the 180-day exclusivity period as a reward to encourage patent challenges thereby incentivizing generic drug manufacturers. Sandoz tellingly says nothing on this score.

Perhaps because its recognizes how weak its arguments are, Sandoz ultimately falls back on a claim that entry of a TRO would serve the general public interest in "faithful application of the laws." Sandoz Br. at 19. Suffice it to say, that vague, generic interest is insufficient to justify extending Merck's monopoly to the unmistakable detriment of the public—and all the more so because the only court that has squarely addressed the issue in this case flatly *rejected* the position that Sandoz's legal arguments reflect a "faithful application of the laws." *Cf.* Brief at 19.

## CONCLUSION

For the foregoing reasons, Ivax and Teva respectfully request that the Court deny in all respects Sandoz's motion for a temporary restraining order.

Respectfully submitted,

_____/s/_____
Jay P. Lefkowitz (DC 449280)*
John C. O'Quinn (DC 485936)
Michael D. Shumsky (DC 495078)
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC 20005
(202) 879-5000

19

*Counsel for Proposed Intervenor-Defendant
Teva Pharmaceuticals USA, Inc.*

*\* Counsel of Record*

_____/s/_____
Robert A. Dormer
Douglas B. Farqhuar
John R. Fleder
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St. N.W.
Washington, D.C. 20005
202-737-4282

Jay B. Shapiro (*pro hac* forthcoming)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL  33130
(305) 789-3200

*Counsel for Proposed Intervenor-Defendant
Ivax Pharmaceuticals, Inc.*

June 22, 2006

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 22nd day of June 2006, at true and correct copy of the foregoing Opposition to Sandoz Inc.'s Motion for a Temporary Restraining Order, and the attachments thereto was served via email as follows:

Arthur Y. Tsien
Olsson, Frank and Weeda, P.C.
1400 16th St., NW  Suite 400
Washington, D.C.  20036-2220
*Counsel for Plaintiff*

Drake Cutini
U.S. Department of Justice
Office of Consumer Litigation
Room 950 North
1331 Pennsylvania Ave., NW
Washington, D.C. 20004
*Counsel for the Federal Defendants*

Kate C. Beardsley
Carmen M. Shepard
Buc & Beardsley
919 18th St., NW, Suite 60
Washington D.C.  20006
*Counsel for Proposed Intervenors-Defendants Ranbaxy Laboratories Limited, Ranbaxy Inc., and Ranbaxy Pharmaceuticals, Inc.*

_____/s/_____
John C. O'Quinn
*Counsel for Proposed Intervenor-Defendant Teva Pharmaceuticals USA, Inc.*

21