# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SANDOZ, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-1134 |
| ) | |
| FOOD AND DRUG ADMINISTRATION, *et al.* ) | |
| ) | |
| Defendants, ) | |
| ) | |
| TEVA PHARMACEUTICALS USA, INC., ) | |
| IVAX PHARMACEUTICALS, INC., ) | |
| RANBAXY LABORATORIES LIMITED, *et al.* ) | |
| ) | |
| Intervenors-Defendants. ) | |

## TEVA'S AND IVAX'S OPPOSITION TO SANDOZ INC.'S MOTION FOR A PRELIMINARY INJUNCTION

Robert A. Dormer
Douglas B. Farquhar*
John R. Fleder
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St. N.W.
Washington, D.C. 20005
202-737-5600

Jay B. Shapiro (admitted *pro hac vice*)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200

*Counsel for Intervenor-Defendant Ivax Pharmaceuticals, Inc.*
*Counsel of Record*

June 29, 2006

Jay P. Lefkowitz (DC 449280)*
John C. O'Quinn (DC 485936)
Michael D. Shumsky (DC 495078)
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC 20005
(202) 879-5000

*Counsel for Intervenor-Defendant Teva Pharmaceuticals USA, Inc.*
*Counsel of Record*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD FOR INJUNCTIVE RELIEF ....................................................... 6

ARGUMENT ..................................................................................................................... 7

I.      SANDOZ'S ACTION IS AN IMPROPER COLLATERAL CHALLENGE TO
        THIS COURT'S FINAL JUDGMENT. ................................................................. 7

II.     SANDOZ'S MOTION FOR A PRELIMINARY INJUNCTION FAILS TO
        SATISFY THE RIGOROUS STANDARD FOR PRELIMINARY INJUNCTIVE
        RELIEF. ................................................................................................................ 10

        A.      Sandoz Has No Chance Of Success On The Merits. ............................... 10

        B.      Sandoz Does Not Face Irreparable Harm. ............................................... 13

        C.      The Balance of Harms Strongly Favors Teva And Ivax. ........................ 16

        D.      The Public Interest Strongly Favors Denying Injunctive Relief. ........... 18

III.    SANDOZ IS NOT ENTITLED TO THE RELIEF IT SEEKS BECAUSE THERE
        IS NO STATUTORY BASIS FOR ENJOINING IVAX FROM MARKETING
        GENERIC SIMVASTATIN. ................................................................................ 21

CONCLUSION. ................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Bell,*
 711 F.2d 161 (D.C. Cir. 1983) ........................................................................ 9

*Andrx Pharms., Inc. v. Biovail Corp.,*
 276 F.3d 1368 (Fed. Cir. 2002)...................................................................... 3

*Apotex, Inc. v. Food & Drug Admin.,*
 No. Civ.A. 06-0627 JDB,
 2006 WL 1030151 (D.D.C. April 19, 2006).................................... 14, 15, 16, 17, 19, 22

*Bell v. Eastman Kodak Co.,*
 214 F.3d 798 (7th Cir. 2000) ........................................................................ 9

*Ben Venue Labs., Inc. v. Novartis Pharm. Corp.,*
 10 F. Supp. 2d 446 (D.N.J. 1998) ................................................................ 14

*Boivin v. U.S. Airways, Inc.,*
 297 F. Supp. 2d 110 (D.D.C. 2003) .............................................................. 15

*Bristol Myers Squibb Co. v. Shalala,*
 923 F. Supp. 212 (D.D.C. 1996) .................................................................... 6

*City of Tempe v. Fed. Aviation Auth.,*
 239 F. Supp. 2d 55 (D.D.C. 2003) ................................................................ 14

*CityFed Fin. Corp. v. OTS,*
 58 F.3d 738 (D.C. Cir. 1995) ......................................................................... 6

*Dorfmann v. Boozer,*
 414 F.2d 1168 (D.C. Cir. 1969) .................................................................... 6

*Dr. Reddy's Labs. Ltd. v. Pfizer, Inc.,*
 No. 03-CV-726, 2003 WL 21638254 (D.N.J. July 8, 2003)............................. 3

*Fund for Animals v. Frizell,*
 530 F.2d 982 (D.C. Cir. 1975) ..................................................................... 13

*Gomez v. United States Dist. Court for Northern Dist. of Cal.,*
 503 U. S. 653 (1992)................................................................................. 2, 13

*GTE Corp. v. Williams,*
 731 F. 2d 676 (10th Cir. 1984) ................................................................... 13

*Gulf Oil Corp. v. Dept. of Energy,*
    514 F. Supp. 1019 (D.D.C. 1981) ............................................................ 14, 15

*Hill v. McDonough,*
    No. 05-8794, — U.S. — (June 12, 2006) ............................................... 2, 13

*In re Barr Labs.,*
    930 F.2d 72 (D.C. Cir. 1991) ................................................................... 19

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................................. 6

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998) ...................................................... 3, 6, 17, 22

*Mova Pharm. Corp. v. Shalala,*
    955 F. Supp. 128 (D.D.C. 1997) .............................................................. 6

*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ....................................................... 3, 13, 15

*Nat'l Pharm. Alliance v. Henney,*
    47 F. Supp. 2d 37 (D.D.C. 1996) ............................................................ 6

*Nelson v. Campbell,*
    541 U.S. 637 (2004) ................................................................................. 13

*Sociedad Anonima Vina Santa Rita v. Dep't of Treasury,*
    193 F.Supp.2d 6 (D.D.C. 2001) .............................................................. 15

*Torpharm, Inc. v. Thompson,*
    260 F. Supp. 2d 69 (D.D.C. 2003),
    *aff'd* 354 F.3d 877 (D.C. Cir. 2004) ...................................................... 12

*Varicon Int'l v. OPM,*
    934 F. Supp. 440 (D.D.C. 1996) ............................................................. 14

*Verizon Tel. Cos. v. FCC,*
    269 F.3d 1098 (D.C. Cir. 2001) .............................................................. 12

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ................................................................ 15

## Statutes

21 U.S.C. § 355(j)(2)(A)(vii) ......................................................................... 8, 11

21 U.S.C. § 355(j)(5)(B)(ii) ........................................................................... 21

21 U.S.C. § 355(j)(5)(B)(iv) ............................................................................... 3, 4, 17, 21

Medicare Modernization Act,
      Pub. L. No. 108-173, ___ Stat. ___ (2003). ....................................................... 4

**Regulations**

21 C.F.R. § 314.107(c)(1) ......................................................................................... 3, 17

21 C.F.R. § 314.94(a)(12) ......................................................................................... 8, 11, 12

**Rules**

Fed. R. Civ. P. 62(c) ................................................................................................... 18

## INTRODUCTION

Sandoz, Inc.'s eleventh-hour motion for a temporary restraining order ("TRO"), which Sandoz has now asked the Court to treat as a motion for a preliminary injunction, is no more than an improper collateral attack on this Court's final judgment in *Ranbaxy Labs. Ltd., et al. v. Leavitt, et al.*, No. 05-1838 (D.D.C. Apr. 30, 2006). Though that decision made clear—*some two months ago*—that intervenor Ivax Pharmaceuticals, Inc. ("Ivax") is entitled 180 days of exclusivity for the sale of generic simvastatin in 5 mg, 10 mg, 20 mg, and 40 mg dosages, Sandoz waited until the eve of Ivax's anticipated launch of the product (distributed by its parent, intervenor Teva Pharmaceuticals USA, Inc. ("Teva")) to file this frivolous lawsuit. Just as it rejected Sandoz's meritless motion for a TRO, this Court should reject Sandoz's continuing attempt to deprive Ivax of its statutory entitlement to generic exclusivity for those products by having this Court enter a preliminary injunction.

Indeed, there is an even stronger basis for denying equitable relief now than there was when this Court rejected Sandoz's motion for a TRO last week. Shortly after that decision was issued, the FDA formally authorized Ivax to begin marketing its generic simvastatin product. Teva and Ivax immediately began distributing that product to their customers, and those customers have begun offering Ivax's generic simvastatin product to consumers. The consequences to Teva, Ivax, their customers, and the public if this Court were to enter a preliminary injunction now thus would be particularly severe. On one hand, Ivax would irreparably be harmed from the loss of its entitlement to generic exclusivity; because the 180-day exclusivity period runs from the moment a company begins marketing its drug, a preliminary injunction would literally eat away at Ivax's legitimate entitlement to exclusivity. Every day lost would cost Teva and Ivax millions of dollars in lost sales and profits. Even more important, entry of a preliminary injunction would rip low-cost generic simvastatin out of consumers'

hands.    Indeed, the hundreds of thousands of Americans who now depend on low-cost simvastatin would be deprived of their access to this newly affordable, life-saving medication; their potential loss—and the public's—would be incalculable.

As Teva previously explained, there was no basis for Sandoz to wait until ***the day before Ivax's approval*** to sandbag the FDA, Ivax, and this Court with this frivolous litigation, and under the current circumstances, there is even less of a basis for indulging their post-product launch request for preliminary injunctive relief now.  Again, as the Supreme Court unanimously observed just weeks ago in *Hill v. McDonough*, No. 05-8794, — U.S. —, Slip. Op. at 10 (June 12, 2006):

> A court considering a stay must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.' *Nelson*, [541 U. S. 637], 650 [2004].  *See also Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*) (noting that the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process may be grounds for denial of a stay).

Having been told by the FDA on April 19, 2006 that the *Ranbaxy* case would impact the date upon which Sandoz's business partner, Aurobindo Pharma Ltd. ("Aurobindo"), would receive approval for its simvastatin application; having had two months to consider whether to seek relief in light of this Court's judgment in *Ranbaxy*; and having been on notice for more than a month that the FDA would relist the patents at issue here in response to this Court's judgment in *Ranbaxy*, the "strong equitable presumption" propounded in *Hill* is a dispositive one.  In short, Sandoz should not now be allowed to come back to this Court in an effort to take generic simvastatin out of consumers' hands and deprive Ivax of its statutory right to generic exclusivity, and its motion should be denied—precluding Sandoz's last-ditch machinations from doing any more damage to Teva, Ivax, their customers, and the American public.

## BACKGROUND

Congress enacted the Hatch-Waxman Act of 1984 to lower the regulatory barriers facing

generic drug companies and to encourage those companies to challenge the patents blocking

generic entry to the market. *See, e.g.*, *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371

(Fed. Cir. 2002). In order to encourage generic drug companies to undertake the substantial cost

of identifying patents to challenge and bearing the accompanying risks of potential patent

litigation, Congress created a critical incentive under the Hatch-Waxman Act to reward the first

generic manufacturer to file a Paragraph IV certification challenging a drug patent—namely, a

180 day period of "exclusivity" during which no other generic version of the drug can be

approved. *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002); 21 C.F.R. § 314.107(c)(1). As this Court has

explained:

> In order to encourage generic drug makers to incur the potentially
> substantial litigation costs associated with challenging pioneer
> drug makers' patents, the Hatch-Waxman Amendments provide an
> added incentive for generic drug producers to file Paragraph IV
> certifications. The first manufacturer to file an ANDA containing a
> Paragraph IV certification with respect to a specific patent is
> awarded a 180-day period of exclusive marketing rights for a
> generic version of the drug claimed by that patent. In other words,
> no other ANDA for the same generic drug product will be
> approved during those 180 days.

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000); *see also Mova*, 140 F.3d

1060, 1064 (D.C. Cir. 1998); *Dr. Reddy's Labs. Ltd. v. Pfizer, Inc.*, No. 03-CV-726, 2003 WL

21638254, at *7 (D.N.J. July 8, 2003). The statute provides that this exclusivity period begins

when the generic company first commercially markets its product or, if earlier, when a court

3

issues a decision "holding the patent which is the subject of the certification to be invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv) (2002)[1]

Here, Ivax was the first applicant to file a Paragraph IV certification for simvastatin—a breakthrough cholesterol-lowering drug patented by Merck & Co. and sold under the brand name Zocor®—in 5 mg, 10 mg, 20 mg, and 40 mg doses.  Specifically, Ivax filed a Paragraph IV certification as to U.S. Patent No. RE 36,481 ("the '481 patent"), and No. RE 36,520 ("the '520 patent"), and a Paragraph III certification as to U.S. Patent No. 4,444,784 ("the '784 patent"), which expired on June 23, 2006.  The FDA subsequently purported to remove the '481 and '520 patents from the Orange Book, thereby depriving Ivax of the 180 days of exclusivity to which it was otherwise eligible.  Ivax and Ranbaxy both filed citizen petitions seeking the relisting of the '481 and '520 patents and seeking their award of 180 days of marketing exclusivity.  The FDA denied those petitions on October 24, 2005.  *See Ranbaxy*, Slip Op. at 12 (attached as Exhibit 1).

Ivax and Ranbaxy each filed suits against the FDA and the other federal defendants named in this case (collectively "FDA"), and those suits were consolidated.  *Ranbaxy Labs., Ltd. v. Leavitt*, No. 05-1838.  On April 30, this Court granted Ivax and Ranbaxy's motions for summary judgment, holding that the agency had improperly denied their citizen petitions.  As plaintiff notes, "[t]he Court declared that FDA's decision was unlawful." Sandoz Br. at 6.  The FDA subsequently filed a notice of appeal; that case is pending before the D.C. Circuit.  The FDA did not seek temporary relief pending appeal due to its concern that a stay pending appeal

---

[1] The Medicare Modernization Act of 2003 ("MMA") amended the Hatch-Waxman Act provisions governing exclusivity.  However, most of those amendments do not apply here because Ivax's ANDA was filed prior to the enactment of the 2003 Act.  *See* Pub. L. No. 108-173 § 1102(b)(1).  The MMA does, however, define the term "decision of a court" in the pre-amended statute as "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken." *Id.* § 1102(b)(3).

would deprive the public of any generic simvastatin. Indeed, the FDA made that decision clear more than one month ago, when it filed an unopposed motion seeking to expedite its appeal. *See* Appellants' Motion for Expedited Briefing and Oral Argument at 11 n.6, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed May 25, 2006) (attached as Exhibit 2) ["FDA Mot. for Expedited Briefing"]. As the FDA later explained in its D.C. Circuit merits brief, "[u]nder the district court's order, at least both Ranbaxy and Ivax are eligible for approval on June 23, 2006," so consumers will not be "deprived of generics as of that date." Brief for the Appellants at 18 n.10, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed June 21, 2006).

Nearly two months after this Court's entry of final judgment, and one month after the FDA filed its appeal, Sandoz filed this action and sought entry of a TRO—a mere one day before Ivax was due to receive final approval from the FDA and Teva was set to launch Ivax's generic simvastatin product into the market. This Court fully considered Sandoz's current arguments on the merits, the alleged hardships from denying Sandoz interim relief, the severe and irreparable harm that would befall Teva and Ivax if such relief were granted, and the public's ultimate interest, and, given the record of this case, had little trouble concluding that Sandoz's motion for emergency equitable relief should be denied. *Sandoz, Inc. v. FDA et al.*, No. 06-1134, Dkt. #6 (June 23, 2006). Nothing has changed to cast doubt on the Court's decision. Indeed, subsequent events have only strengthened the case for denying Sandoz interim relief. Shortly after the TRO hearing, Ivax received final FDA approval to begin commercially marketing its generic simvastatin product on an exclusive basis. Supplemental Decl. Of David Marshall ¶¶ 3-4 ("Marshall Supp. Decl.") (attached as Exhibit 3). Teva began shipping previously prepared customer orders within hours. *Id.* ¶ 5. Now more than ever, the equities thus strongly counsel against the entry of preliminary injunctive relief.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

In this Circuit, the standard for a preliminary injunction is both well-established and indistinguishable from the standards that governed this Court's denial of Sandoz's prior motion for a TRO. Preliminary injunctive relief is "an extraordinary remedy and must be sparingly granted." *Bristol Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996) (citing *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969)). It is appropriate only when the party seeking the relief carries its burden of persuasion by a clear showing. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To demonstrate an entitlement to preliminary injunctive relief a plaintiff must show that (1) there is a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury if the requested injunction is denied; (3) an injunction will not substantially injure the opposing party or other third parties; and (4) the public interest will be furthered by the issuance of the injunction. *See Mova Pharm. Co. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). The district court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997). Where, as here, a movant's likelihood of success is slim, it must "make a very substantial showing of severe irreparable injury in order to prevail on [its] motion." *Nat'l Pharm. Alliance v. Henney*, 47 F. Supp. 2d 37, 41 (D.D.C. 1996); *see also CityFed*, 58 F.3d at 747. As explained below, Sandoz has not remotely sustained its burden; indeed, it is Teva, Ivax, their customers, and the public that would sustain a "severe irreparable injury" from entry of the requested relief.

**ARGUMENT**

I.    **SANDOZ'S ACTION IS AN IMPROPER COLLATERAL CHALLENGE TO THIS COURT'S FINAL JUDGMENT.**

In the *Ranbaxy* case, decided nearly two months ago, this Court determined that the FDA had unlawfully delisted two patents and thereby improperly deprived Ivax of its 180 days of exclusivity for sales of generic simvastatin product in specified doses.  This Court thus ordered FDA to grant Ivax's (and Ranbaxy's) citizen petitions, which had requested the relisting of those patents and the consequent restoration of Ivax's entitlement for exclusivity.  Sandoz now blatantly challenges the validity of that judgment by seeking entry of a preliminary injunction that would enjoin Teva from marketing Ivax's generic simvastatin product on an exclusive basis (and, indeed, that would require Teva to withdraw Ivax's product from the market pending the resolution of this case).  *Ranbaxy* squarely forecloses this last-ditch assault on Ivax's exclusivity.  After all, "[t]he issue" before this Court in *Ranbaxy* was "whether the FDA can effectively restrict the [exclusivity] award to only a sued ANDA holder by delisting a patent after the ANDA holder successfully avoided suit."  *Ranbaxy*, Slip Op. at 19.  This Court unmistakably answered that question in the negative, explaining:

> ***Had the FDA not delisted here, the plaintiffs [Ivax and Ranbaxy] would have been entitled to a period of marketing exclusivity triggered by their notice to the FDA of their first commercial marketing of the generic drug once the FDA approved their ANDAs.***

*Id.* (emphasis added).  In other words, the question before the *Ranbaxy* Court was whether the patents must be relisted and Ivax's statutory right to exclusivity thus restored.  Ivax specifically brought suit to "challeng[e] the FDA's refusal to relist the '481 and '520 patents for Zocor and

7

[FDA's] refusal to grant any ANDA applicant eligibility for 180-day exclusivity for the generic version of Zocor." *Ranbaxy*, Slip Op. at 14. And this Court granted Ivax precisely that relief.[2]

Sandoz's brief thus collapses into an attempt to reargue the merits of the *Ranbaxy* case. To that end, Sandoz argues that it was not required to certify to the patents in question because those patents were not listed in the Orange Book. But that claim just begs the question presented in *Ranbaxy*—where the Court held that the FDA had unlawfully removed those patents, was required to relist the those patents, and was obligated to restore Ivax's exclusivity. The FDA publicly announced its intention to comply with that judgment notwithstanding its pending appeal, *see* FDA Mot. for Expedited Briefing at 9, and subsequently carried out that intention. With the patents at issue in this case properly restored to the Orange Book, the FDA obviously cannot approve Sandoz's application until Sandoz files a certification as to those patents. *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. §§ 314.94(a)(12)(vi), 314.94(a)(12)(viii)(C). And while Sandoz complains that "there is no statutory basis of any kind for FDA's purported relisting of

---

[2] Sandoz's suggestion that this Court's *Ranbaxy* opinion "did not expressly address which ANDA sponsors (if any) would be eligible for 180-day exclusivity, and which subsequent sponsors (if any) would have their final approvals delayed by such exclusivity," Sandoz Br. at 6, is nothing short of bizarre. That was the whole point of the *Ranbaxy* case. *See Ranbaxy*, Slip Op. at 1 (noting Ivax and Ranbaxy "each sued the [FDA] claiming that the FDA improperly nullified [their] rights to a 180-day period of exclusive marketing"); *id.* at 9 (noting Ivax and Ranbaxy "sought to take advantage of the 180-day exclusivity under the Hatch-Waxman Amendments"); *id.* at 12 (noting the citizen petitions "request[ed] that the FDA confirm that it would not approve subsequent ANDAs until after the 180-day period"); *id.* at 14 (noting that Ivax and Ranbaxy sued the FDA over its "refusal to grant any ANDA applicant eligibility for 180-day exclusivity for the generic version of Zocor"); *id.* at 19 (noting that "[t]he issue here, then, is whether the FDA can effectively restrict the [exclusivity] reward to only a sued ANDA holder"); *id.* at 21 (noting FDA's disparate treatment "contravened the plain and undisputed intent of Congress" by effectively eliminating the commercial marketing exclusivity trigger); *id.* at 22 (holding the FDA "acted contrary to the clear intent of Congress in its decision to deny the plaintiffs' citizen petitions" which requested that the FDA confirm that it would not approve subsequent ANDAs until after the 180-day period).

the two patents," Sandoz TRO Br. at 11, and seeks relief on the theory that "FDA's decision to 'relist' is directly contrary to various judicial decisions," *id.*, *those were the very issues in* **Ranbaxy***, which resolved those issues by holding that the FDA was required to relist the patents and restore Ivax's statutory exclusivity*. If Sandoz wanted to present its current arguments, it should have done so (and had ample opportunity to do so) in *Ranbaxy*.

At bottom, the relief Sandoz seeks is irreconcilable with this Court's judgment in *Ranbaxy*. Sandoz cannot prevail without this Court ordering the FDA to do something that the judgment entered in *Ranbaxy* orders FDA not to do. The FDA is bound by this Court's prior judgment to grant the citizen petitions, has relisted the two patents, and now has awarded exclusivity to Ivax. Granting Sandoz the relief it seeks would tread on this Court's judgment— which now may only be altered on appeal.

Thus, Sandoz's suit must be seen for what it is—a collateral attack on this Court's judgment in *Ranbaxy*. This is impermissible. Indeed, the *en banc* D.C. Circuit rejected just such a challenge in *Adams v. Bell*, 711 F.2d 161, 168-70 (D.C. Cir. 1983). There the Court of Appeals turned back a challenge to agency action, noting that "[h]ad appellants intervened in the North Carolina U.S. District Court proceeding, they could have taken an appeal to the Fourth Circuit Court of Appeals and then petitioned the United States Supreme Court." *Id*. The court observed that "*appellants had ample opportunity to assert their rights through the normal routes of judicial review*." *Id*. Thus, the court held that "[t]he district court therefore correctly declined to exercise extraordinary supervisory power over the Department to further appellants' interests: These interests could have been fully protected by intervention in a pending lawsuit which provided an appropriate forum for consideration of appellants' claims." *Id*. at 169-70; *see also Bell v. Eastman Kodak Co.*, 214 F.3d 798 (7th Cir. 2000). So too here. Sandoz was on notice

and had adequate opportunity to seek to participate in the *Ranbaxy* case. Having declined to do so, it cannot now collaterally challenge the judgment that bars the FDA from giving Sandoz the relief it seeks.

## II.    SANDOZ'S MOTION FOR A PRELIMINARY INJUNCTION FAILS TO SATISFY THE RIGOROUS STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF.

Even if this Court were inclined to entertain Sandoz's collateral attack on the *Ranbaxy* judgment, there is no basis for entering a preliminary injunction that would essentially wrench Ivax's generic simvastatin product out of consumers' hands. Indeed, Sandoz cannot remotely demonstrate any of the four traditional factors considered by courts addressing motions for injunctive relief—much less prevail in the ultimate balancing of those factors.

### A.    Sandoz Has No Chance Of Success On The Merits.

This Court need not speculate as to whether Sandoz may succeed on the merits of its claim. In *Ranbaxy*, this Court considered ***and rejected*** the very arguments marshaled by Sandoz—arguments based on the "plain language of the FDC Act" and that claim relisting is "inconsistent with [FDA's] ministerial role in patent listings." Thus, FDA's refusal to give final approval to Sandoz's simvastatin application until Ivax has exhausted its 180 days of exclusivity is not a discretionary act to be reviewed again and again, but was compelled by this Court's decision in *Ranbaxy*. Unless and until FDA prevails on its appeal to the D.C. Circuit, Ivax remains entitled to exclusivity as the first-filer and FDA may not approve Sandoz's subsequent application until 180 days have run from Ivax's "first commercial marketing of the generic drug." *Ranbaxy*, Slip Op. at 19.

The only remotely new argument marshaled by Sandoz is that its approval should not be delayed because it was not required to file any certification at the time it filed an ANDA. That argument plainly fails because, once the patents were relisted in the Orange Book, the FDCA and

FDA regulations clearly require that Sandoz update its application to include a Paragraph III or IV certification to those patents. *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(vi) ("An application whose abbreviated new drug application is submitted after a late submission of patent information, *or whose pending abbreviated application was previously submitted but did not contain an appropriate patent certification* at the time of the patent submission, shall submit a certification ....") (emphasis added); *see also* 21 C.F.R. § 314.94(a)(12)(viii)(C) ("[A]n applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate."). Thus, under settled—and unchallenged—FDA regulations, Sandoz was required to submit a certification to the patents once the patents were relisted, thereby precluding final approval of Sandoz's ANDA until Ivax's exclusivity has lapsed.

At oral argument on its TRO, Sandoz implausibly suggested that 21 C.F.R. § 314.94(a)(12)(vi) actually absolves it from filing a certification regarding the relisted patents. That contention is meritless. That regulation absolves filers from amending a previously filed ANDA *only* where a new "patent on the listed drug is issued *and the holder of the approved application for the listed drug does not submit the required information* on the patent within 30 days of issuance of the patent." *Id.* (emphasis added). This regulation could not reasonably be construed to apply here, where the patents were promptly listed by the holder of the NDA, were subsequently delisted by the FDA, and the *Ranbaxy* court subsequently held that the patents should not have been delisted. Moreover, Merck neither was issued new patents on simvastatin nor failed to submit the required information on such new patents within 30 days of their issuance; instead, the FDA improperly removed the listings of Merck's previously-issued and

previously-submitted patents from the Orange Book. By its plain text, then, § 314.94(a)(12)(vi) does not remotely free Sandoz from its responsibility to file a certification as to those patents.

In any event, Sandoz cannot rely on the FDA's unlawful—if serendipitous—removal of those patents from the Orange Book in order to evade its legal obligation to file an amended certification once the FDA relisted those patents. *See, e.g., Torpharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 85 (D.D.C. 2003), *aff'd* 354 F.3d 877 (D.C. Cir. 2004). Again, the import of the *Ranbaxy* decision is that the disputed patents ***should never have been delisted***. As such, Sandoz cannot claim any benefit from the FDA's "unlawful" act of removing them. As this Court observed in *Torpharm*, "where an agency's assurances about the law are subsequently undermined through the process of judicial review, it is clear that the agency may rectify its original mistake ***without concern about retroactivity***." 260 F. Supp. 2d at 85 (emphasis added). Thus, the fact that Sandoz purportedly "relied on that mistake does not render [the FDA's] belated correction unlawful, at least (as here) where the correction comes in direct response to the decision of a federal court." *Id.*; *cf. Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C. Cir. 2001) ("[A]dministrative agencies have greater discretion to impose their rulings retroactively when they do so in response to judicial review, that is, ***when the purpose of retroactive application is to rectify legal mistakes identified by a federal court***.") (emphasis added).

Nor can Sandoz claim any unfair surprise or reasonable reliance on the FDA's unlawful action. As Sandoz concedes, when it received its tentative approval letter from the FDA, the agency made clear that its position on the delisting of the '481 and '520 patents had been challenged. *See* Sandoz TRO Br. at 8. Sandoz was aware that there could be "further decisions with regard to the delisting of the '481 and '520 patents." *Id.* The relief Sandoz now seeks—in

essence a windfall from the FDA's wrongful actions—is inconsistent with the "period of marketing exclusivity" Ivax "would have been entitled to" had "the FDA not delisted." *Ranbaxy*, Slip Op. at 19.

**B.      Sandoz Does Not Face Irreparable Harm.**

Sandoz's claim of irreparable harm suffers from two independent defects:  (1) its delay in seeking relief, and (2) the nature of the harm asserted.   As noted above, Sandoz has delayed pursuing this action until the eleventh hour despite its awareness of the *Ranbaxy* suit and its implications, despite the *Ranbaxy* decision, and despite the FDA's announcement that it intended to implement the *Ranbaxy* Court's mandate.   That alone precludes Sandoz's claim for emergency relief.   As noted at the outset, the Supreme Court recently reiterated that a "court considering a stay must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill v. McDonough*, No. 05-8794, — U.S. —, Slip. Op. at 10 (June 12, 2006) (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)).   Indeed, the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process is grounds for denial of a stay, in and of itself.  *Gomez v. United States Dist. Court for the N. Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*); *see also GTE Corp. v. Williams,* 731 F. 2d 676 (10th Cir. 1984) ("Delay in seeking relief, however, undercuts any presumption that infringement alone has caused irreparable harm *pendente lite*; therefore, such delay may justify denial of a preliminary injunction for trademark infringement."); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000) ("[D]elay in bringing this action further undercuts [the movant's] allegation of irreparable harm.").   Thus, in *Fund for Animals v. Frizell*, 530 F.2d 982, 987 (D.C. Cir. 1975), the D.C. Circuit denied emergency relief where the movant sought it on the day a final regulation was set to issue, despite the fact that the movant had known of the anticipated agency action

13

some 44 days earlier. The court noted that "[o]ur conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one." *Id.*; *see also City of Tempe v. Fed. Aviation Auth.*, 239 F. Supp. 2d 55, 65 n.13 (D.D.C. 2003) ("Further undermining plaintiffs' case is the fact that they have not been diligent in seeking a preliminary injunction."); *Ben Venue Labs., Inc. v. Novartis Pharm. Corp.*, 10 F. Supp. 2d 446, 458 (D.N.J. 1998) (denying TRO where movant "knew of its claim but did nothing" for over a month).[3]

Even if this Court were willing to forgive Sandoz's inexplicable delay in asserting its rights, Sandoz cannot surmount the high bar established by the traditional irreparable injury requirement. *See Varicon Int'l v. OPM*, 934 F. Supp. 440, 447 (D.D.C. 1996). A plaintiff seeking preliminary injunctive relief must show that it will suffer harm that is "more than simply irretrievable." *Gulf Oil Corp. v. Dept. of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981). In this jurisdiction, harm that is "merely economic" in character is not sufficiently grave under this standard. *See Apotex, Inc. v. Food & Drug Admin.*, No. Civ.A. 06-0627 JDB, 2006 WL 1030151, *16-*17 (D.D.C. April 19, 2006); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674

---

[3] To the extent Sandoz suggests that it did not unduly delay seeking relief because the FDA purportedly relisted the '481 and '520 patents "[o]n or about June 19, 2006," Sandoz TRO Br. at 6, that is plainly no excuse. Sandoz knew from the outset that the *Ranbaxy* case could affect the approval date for Aurobindo's ANDA. *See id.* at 8. And if it had any doubt about the upshot of this Court's judgment in *Ranbaxy*, Sandoz had some two months to seek clarification. Finally, FDA's position that it would not approve subsequent applicants was made clear one month ago when FDA filed its notice of appeal and motion for expedited briefing in the D.C. Circuit on May 25, 2006. FDA made clear that "the district court's decision" was an "obstacle to the Food and Drug Administration's (FDA) ability to approve on June 23rd *all* applications to market a generic version of the brand name drug." FDA Mot. for Expedited Briefing at 2. FDA clearly stated that "[p]ursuant to the district court's ruling, FDA must relist the '481 and '520 patents" and that "[a]ll ANDAs for simvastatin will thus have to be amended to include paragraph IV certifications to the relisted patents and, accordingly, be subject to a stay of final approval until the expiration of the 180-day period that commences on the first day of commercial marketing of Ivax's and Ranbaxy's generic products." *Id.* at 9.

(D.C. Cir. 1985); *Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118 (D.D.C. 2003); *Mylan*, 81 F. Supp. 2d at 42. As this Court recently held in a closely related context, "[t]o successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence." *Apotex, Inc.*, 2006 WL 1030151, at *16 (quoting *Gulf Oil*, 514 F.Supp. at 1025); *see also Wisconsin Gas*, 758 F.2d at 674; *Sociedad Anonima Vina Santa Rita v. Dep't of Treasury*, 193 F.Supp.2d 6, 14 (D.D.C. 2001). To warrant emergency injunctive relief, the harm alleged must be certain, great, actual, and imminent. *See Wisconsin Gas*, 758 F.2d at 674. Moreover, because Sandoz cannot establish "a likelihood of success on the merits, its showing of irreparable harm must be very strong." *Apotex, Inc.*, 2006 WL 1030151, at *16 (citations omitted).

Sandoz cannot satisfy these standards. Sandoz merely submits that it stands to lose approximately $11 million in sales over 180 days if proposed intervenor-defendants are permitted to exercise their statutory exclusivity entitlements. Even assuming the accuracy of that representation, "the harm that [Sandoz] allegedly faces cannot be called anything other than 'merely economic.'" *Apotex, Inc.*, 2006 WL 1030151, at *17. Sandoz publicly represents that it "develop[s], produce[s] and distribute[s] patent-free compounds, pharmaceuticals and intermediates, as well as biopharmaceuticals and biogenerics, for all major therapeutic areas" including "[m]ore than 600 substances for 5,000 pharmaceutical compounds in 110 countries." http://sandoz.com/site/en/business/retail_generics/products/content.shtml (last visited June 22, 2006). Moreover, "Sandoz reported generic pharmaceutical sales in 2005 were USD 4.7 billion." http://sandoz.com/site/en/company/profile/facts_and_figures/content.shtml (last visited June 22, 2006). "Under the circumstances, it hardly seems possible that a [$11] million loss in

sales over [six months] would cause extreme hardship, much less threaten the company's very existence, and [Sandoz] has not established (or even contended) that it would." *Apotex, Inc.*, 2006 WL 1030151, at *17. Sandoz's "speculative sales loss thus remains an economic loss that does not meet the irreparable harm standard. So, too, its concerns about a lost market share fall well short of the serious, irretrievable damage to its business required to warrant a preliminary injunction." *Id.* Indeed, because Sandoz asserted that it would suffer the very same market losses *if Teva and Ivax launched their product into the market*, and because Teva has now begun distributing Ivax's generic simvastatin, Sandoz has presumably incurred the lion's share of its alleged harm already. In short, Sandoz's assertion that it faces irreparable harm—which was not viable from the start—has only gotten weaker since this Court last considered and rejected Sandoz's claims.

### C.    The Balance of Harms Strongly Favors Teva And Ivax.

Because Sandoz has virtually no chance of success on the merits, it must demonstrate that the harm to Sandoz from denying injunctive relief greatly outweighs the harm to Teva and Ivax from granting injunctive relief. It cannot do so by any benchmark. By filing the first Paragraph IV ANDA for generic simvastatin in 2000, Ivax obtained a statutory entitlement to be the first and exclusive seller of generic simvastatin for 180 days. Following the entry of this Court's June 23, 2006 Order denying Sandoz's motion for a TRO, the FDA authorized Ivax to begin marketing its generic simvastatin product on an exclusive basis, and Teva and Ivax actually began marketing generic simvastatin after receiving that authorization. Marshall Supp. Decl. ¶¶ 3-5. Entry of an injunction at this point in time thus would have a tremendous, irremediably adverse effect on Teva and Ivax.

To begin with, entry of the injunction would irreparably deprive Ivax of the exclusivity to which it is entitled. Under the statute, exclusivity runs from "the first commercial marketing of

the drug," 21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also* 21 C.F.R. § 314.107(c)(1). Given that Teva began distributing Ivax's generic simvastatin product on June 23, 2006, that 180-day exclusivity period is ticking away. Entry of an injunction removing Ivax's generic simvastatin product from the market would therefore strip Ivax of its statutory entitlement to exclusivity, to the tune of millions of dollars a day. *See* Declaration of David Marshall ("Marshall Decl.") at ¶¶ 15-16 (attached as Exhibit 4); Marshall Supp. Decl. at ¶¶ 11-12. "Once the statutory entitlement has been lost, it cannot be recaptured." *Apotex, Inc.*, 2006 WL 1030151, at *17. Such harms have long been deemed irreparable. *See, e.g.*, *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998); *Apotex, Inc.*, 2006 WL 1030151, at *17 (noting under similar circumstances intervenors "stand to lose a statutory entitlement, which is a harm that has been recognized as sufficiently irreparable").

Moreover, entry of an order barring Teva from marketing Ivax's generic simvastatin product would preclude it from fulfilling the contracts it has negotiated with major simvastatin purchasers, Marshall Supp. Decl. at ¶ 7, and which it has begun to fulfill. *Id*. at ¶ 5. That would not only undercut Teva's ability to negotiate additional long-term contracts, but would irreparably harm Teva by destroying its goodwill and impairing its future access to major customers. Marshall Decl. ¶ 13; Marshall Supp. Decl. at ¶¶ 7, 10.

Those harms would be particularly pronounced in this case. Merck, which holds the underlying simvastatin patents, entered into an agreement with Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") to market an authorized generic. Marshall Decl. ¶ 9. As noted at the oral argument on Sandoz's TRO, Dr. Reddy's entered the simvastatin market on June 23. *See* June 22, 2006 Letter from Dr. Reddy's to Harvard Drug Group LLC (attached as Exhibit 5); *see also* Marshall Supp. Decl. at ¶ 8. An injunction effectively removing Ivax's generic simvastatin

17

product from the market would thus give Dr. Reddy's a pronounced advantage in negotiating long-term customer contracts for the supply of generic simvastatin, Marshall Supp. Decl. ¶¶ 9-10, and would permit Dr. Reddy's to step in to fulfill the contracts Teva and Ivax could no longer lawfully fulfill. *Id.* ¶¶ 10-11; *see also* Marshall Decl. ¶¶ 13, 15. The consequences are profound. Given the structure of the generic market and the enormous demand for generic simvastatin, even a brief delay could cost Ivax and Teva hundreds of millions of dollars in lost sales and profits. Marshall Supp. Decl. ¶¶ 11-12; *see also* Marshall Decl. ¶¶ 15-16.

These harms dwarf any asserted by Sandoz. As noted at the TRO stage of this litigation, the financial consequences to Teva and Ivax thoroughly outweighed those asserted by Sandoz. At that point in time, Teva and Ivax were seeking to be the *exclusive* generic distributor of generic simvastatin in 5 mg, 10 mg, 20 mg, and 40 mg doses, while Sandoz sought to be *one of many* distributors of generic simvastatin. As a result, the $11 million in *lost sales* alleged by Sandoz over the entire 6-month period of exclusivity paled in comparison to the hundreds of millions of dollars in *lost profits* alleged by Teva and Ivax. With Ivax's product now on the market, the balance of hardships tips even more decisively in Teva and Ivax's favor. There is, in short, no basis for the entry of an injunction in this case.[4]

**D.    The Public Interest Strongly Favors Denying Injunctive Relief.**

Ivax's entry into the market has another notable consequence: It tilts the public interest analysis even more sharply in Teva and Ivax's favor than it was at the TRO stage (when this Court deemed the public interest to strongly favor denial of Sandoz's proposed TRO). As Teva

---

[4] Should the Court nonetheless grant Sandoz's motion, Teva and Ivax respectfully request that the Court require Sandoz to post a substantial bond in order to guarantee that Teva and Ivax will be reimbursed for the substantial harm that will inevitably befall them if a preliminary injunction is wrongly entered. *See* Fed. R. Civ. P. 62(c).

and Ivax noted then, hundreds of thousands of Americans rely on simvastatin every single day. Until recently, however, Merck had a monopoly on the market for simvastatin product, and thus was able to extract billions of dollars a year in monopoly rents. Ivax's June 23, 2006 entry into the market broke that monopoly; Ivax's generic simvastatin product is now being distributed to end-users. Marshall Supp. Decl. ¶ 6. The onset of true generic competition promises to provide literally ***billions of dollars*** of annual price relief to those consumers, by saving them ***tens of millions of dollars a day***. *See* Alex Berenson, *Merck Loses Protection for Patent on Zocor*, N.Y. TIMES, June 23, 2006 ("Merck's cholesterol-lowering drug Zocor loses its United States patent protection, becoming the largest-selling drug yet to be opened to cheap generic competition. That change will cost Merck billions of dollars a year.") If this Court enters the injunction requested by Sandoz, however, it will effectively rip Ivax's low-cost generic simvastatin product out of the hands of consumers, Marshall Supp. Decl. ¶ 6, and effectively extend Merck's monopoly for this multibillion dollar drug indefinitely (tempered only by its own authorized generic, which would bring only minimal price relief in and of itself, *see Apotex, Inc.*, 2006 WL 1030151, at *18).

Make no mistake: The real losers from Sandoz's proposed injunction thus would be the hundreds of thousands of patients who indisputably and irremediably will be harmed by a court order restricting their access to generic simvastatin—in breach of the clear purpose of the Hatch-Waxman Act, which is to "get generic drugs into the hands of patients at reasonable prices—fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991). The FDA has recognized as much: It specifically declined to seek a stay of the *Ranbaxy* judgment pending appeal, precisely because it would have potentially led to an injunction as to ***all*** generic simvastatin manufacturers. *See* Brief for the Appellants at 18 n.10, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed June

21, 2006); FDA Mot. for Expedited Briefing at 11 n.6.  FDA recognized that because, "[u]nder the district court's order, at least both Ranbaxy and Ivax are eligible for approval on June 23, 2006," the public interest was best served by permitting their approvals to go forward so consumers will not be "deprived of generics as of that date."  Brief for the Appellants at 18 n.10, *Ranbaxy Labs. Ltd. v. Leavitt*, D.C. Cir. No. 06-5154 (filed June 21, 2006).  And this Court agreed with those views at the June 23, 2006 hearing on Sandoz's TRO.

Sandoz cannot possibly contend otherwise; instead, it has conceded the point, by asserting that the public interest best would be served by permitting more "generic entrants into the simvastatin market, rather than only two."  Sandoz TRO Br. at 19.  But that simply is not what Sandoz's proposed injunction would do.  By precluding ***any*** generic manufacturer from the market until the resolution of their case on the merits, Sandoz would ensure that there is ***no*** generic competition for the foreseeable future.  There is simply no possibility that the near-term consumer losses from continued monopoly pricing will eventually be outweighed by the addition of two more generic entrants at some unknown point in the future.  In any event, Congress made the determination that the public will ultimately benefit most by providing first-filers with a 180-day exclusivity period in order to reward their risk-taking and encourage further patent challenges in the future.  Entry of an injunction that effectively eliminates such exclusivity would fundamentally disrupt Congress's carefully balanced incentive scheme, with severe long-term consequences for the entire generic pharmaceutical industry.  Sandoz tellingly says nothing on this score.

Perhaps because its recognizes how weak its arguments are, Sandoz ultimately falls back on a claim that entry of a preliminary injunction would serve the general public interest in "faithful application of the laws."  Sandoz Br. at 19.  Suffice it to say, that vague, general interest

is insufficient to justify extending Merck's monopoly to the unmistakable detriment of the public—and all the more so because the only court that has squarely addressed the issue in this case flatly *rejected* the position that Sandoz's legal arguments reflect a "faithful application of the laws." *Ranbaxy*, Slip Op. at 22; *cf. Sandoz TRO Br.* at 19.

### III. SANDOZ IS NOT ENTITLED TO THE RELIEF IT SEEKS BECAUSE THERE IS NO STATUTORY BASIS FOR ENJOINING IVAX FROM MARKETING GENERIC SIMVASTATIN.

Even if Sandoz could otherwise satisfy the high standard for preliminary injunctive relief, which it cannot, it would still not be entitled the specific relief sought in its motion—namely enjoining the FDA's approval of Ivax's generic simvastatin product. Simply put, there is no statutory basis for enjoining Ivax from marketing generic simvastatin. Under 21 U.S.C. § 355(j)(5)(B)(ii), the FDA is *required* to approve Ivax's product once all blocking patents have expired (*i.e.*, patents for which the applicant filed a Paragraph III certification, such as the '784 patent). That provision is written in mandatory terms: "If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval *shall be made effective immediately* …." *Id.* (emphasis added). Once the relevant patents have expired, the only basis for delaying final approval of an otherwise approvable ANDA is if another generic company is entitled to exclusivity, thereby delaying approval for 180 days. *Id.* § 355(j)(5)(B)(iv).

Thus, even if Sandoz could satisfy the rigorous standard for preliminary injunctive relief, that would *at most* entitle Sandoz to an order preliminarily enjoining the FDA *from declining to approve Sandoz's ANDA because of Ivax's exclusivity*.[5] It would not entitle Sandoz to approval

---

[5] Sandoz would still have to satisfy the four-part test for preliminary injunctive relief. Little would change in that analysis. The balance of harms would still strongly favor Teva and Ivax, particularly given that approval of Sandoz's (or Aurobindo's) ANDA before expiration of Ivax's exclusivity would deprive Ivax of its statutory reward. Here, of course, this Court has already

(Continued…)

of its ANDA (or Aurobindo's ANDA)—as there may be other regulatory obstacles to approval—and it most certainly would not authorize an injunction prohibiting Ivax from marketing its product. There is no question Ivax is entitled to go to market now that the '784 patent has expired; the only question is whether Sandoz may go to market too. Indeed, precisely because Sandoz makes no claim that *it* is entitled to exclusivity, its motion conspicuously fails even to suggest that the approval of Ivax's ANDAs (or any other applicant's ANDA) would be improper, unwarranted, or unlawful. To the contrary, Sandoz's only claim is that its ANDA should be approved at the same time as the first applicant's (*i.e.*, Ivax's). Thus, Sandoz's extraordinary gambit—first, to enjoin the FDA's approval of Ivax's ANDA and, now that Ivax has been approved, to enjoin Ivax from marketing—is utterly baseless. Whether or not Sandoz could conceivably succeed in this action (or on the real underlying claim that Ivax is not entitled to exclusivity, the issue decided in *Ranbaxy*), granting the relief requested would only result in an unwarranted extension of Merck's current market monopoly, to the detriment of both Ivax and Teva, their customers, and, ultimately, the American public.

---

made a ***final*** determination in *Ranbaxy* that Ivax is entitled to exclusivity. Such a loss of exclusivity is "sufficiently irreparable" to warrant denying preliminary relief. *Apotex, Inc.*, 2006 WL 1030151, at *17; *see also Mova*, 140 F.3d at 1066 n.6. In any event, in its motion, Sandoz does not seek to enjoin the FDA from refusing to approve its (or Aurobindo's) ANDA, but only to enjoin approval of the intervenors' ANDAs.

## CONCLUSION

For the foregoing reasons, Ivax and Teva respectfully request that the Court deny in all respects Sandoz's motion for a preliminary injunction.

Respectfully submitted,

_____/s/_____
Jay P. Lefkowitz (DC 449280)*
John C. O'Quinn (DC 485936)
Michael D. Shumsky (DC 495078)
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC 20005
(202) 879-5000

*Counsel for Intervenor-Defendant*
*Teva Pharmaceuticals USA, Inc.*
* *Counsel of Record*

_____/s/_____
Robert A. Dormer
Douglas B. Farquhar*
John R. Fleder
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St. N.W.
Washington, D.C. 20005
202-737-5600

Jay B. Shapiro (admitted *pro hac vice*)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200

*Counsel for Intervenor-Defendant*
*Ivax Pharmaceuticals, Inc.*
* *Counsel of Record*

June 29, 2006

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 29th day of June 2006, at true and correct copy of the foregoing Opposition to Sandoz Inc.'s Motion for a Preliminary Injunction, and the attachments thereto was served via email and this Court's ECF system as follows:

Arthur Y. Tsien
Olsson, Frank and Weeda, P.C.
1400 16th St., NW  Suite 400
Washington, D.C.  20036-2220
*Counsel for Plaintiff*

Drake Cutini
U.S. Department of Justice
Office of Consumer Litigation
Room 950 North
1331 Pennsylvania Ave., NW
Washington, D.C. 20004
*Counsel for the Federal Defendants*

Kate C. Beardsley
Carmen M. Shepard
Buc & Beardsley
919 18th St., NW, Suite 60
Washington D.C.  20006
*Counsel for Intervenors-Defendants Ranbaxy Laboratories Limited,*
*Ranbaxy Inc., and Ranbaxy Pharmaceuticals, Inc.*

                    _____/s/_____
                    John C. O'Quinn
                    *Counsel for Intervenor-*
                    *Defendant Teva Pharmaceuticals*
                    *USA, Inc.*