## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDOZ, INC.,                ) | |
|                      ) | |
|      Plaintiff,         ) | |
|                      ) | |
|    v.                 ) | Civil Action No. 06-1134 (RCL) |

SANDOZ, INC.,                                )
                                            )
          Plaintiff,                         )
                                            )
     v.                                      )          Civil Action No. 06-1134 (RCL)
                                            )
FOOD AND DRUG ADMINISTRATION, )
MICHAEL O. LEAVITT, and                      )
ANDREW C. VON ESCHENBACH,                    )
                                            )
          Defendants,                        )
                                            )
     and                                     )
                                            )
TEVA PHARMACEUTICALS USA, INC., )
IVAX PHARMACEUTICALS, INC.,                  )
RANBAXY LABORATORIES LIMITED, )
RANBAXY, INC., and                           )
RANBAXY PHARMACEUTICALS, INC., )
                                            )
          Intervenor-Defendants.             )
                                            )
                                            )

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

On the eve of the expiration of a patent for the blockbuster[1] drug Zocor (simvastatin),

Sandoz, Inc. (Sandoz), a would-be distributor of generic simvastatin, filed this suit contending

that even though it was not the first applicant to file an abbreviated new drug application

(ANDA) for simvastatin with a certification challenging one of Zocor's patents, its approval

should not be delayed by a statutory exclusivity period that is granted solely to such first filers.

---

[1]Plaintiff, citing news reports, states that Zocor's U.S. sales in 2005 were approximately $3
billion.  Memorandum in Support of Motion for TRO ("Pl. Mem.") at 4.

As discussed in greater detail below, generally the first ANDA (*i.e.*, generic) applicant to challenge a patent (which is done through submission of a "paragraph IV certification"), is entitled to a 180-day exclusivity period *vis-a-vis* other ANDAs.[2]  Sandoz initially sought a temporary restraining order to enjoin the United States Food and Drug Administration (FDA) from approving any ANDA for generic simvastatin tablets pending this Court's consideration of its motion for preliminary injunction.  *See* Pl. Mem. and Pl. [Proposed] Temporary Restraining Order.  On June 23, 2006, this Court denied Sandoz' motion, noting at the hearing that Sandoz' likelihood of success on the merits was "negligible."  Sandoz' motion for a temporary restraining order, now deemed a motion for preliminary injunction,[3] should suffer the same fate for the same reason.

The present dispute finds its origins in the outcome of *Ranbaxy Labs., Ltd. v. Leavitt*, Civ. No. 05-1838 (RWR) (D.D.C), a lawsuit that intervenor-defendants IVAX Pharmaceuticals, Inc. (IVAX) and Ranbaxy Laboratories, Ltd. (Ranbaxy), two generic drug manufacturers, filed against FDA last year.  That lawsuit pertained to FDA's delisting of two patents for Merck's drug Zocor from the Orange Book.[4]  Prior to that delisting, Merck had listed three patents for Zocor: U.S. Patent Nos. 4,444,784 ('784 patent), which expired June 23, 2006; RE 36,481 ('481 patent); and RE 36,520 ('520 patent).  IVAX and Ranbaxy filed ANDAs for simvastatin that contained

---

[2]This applicant is referred to in this memorandum as a "first filer."

[3]Sandoz filed a motion for temporary restraining order on June 22, 2006.  After denying that motion, the Court deemed it a motion for preliminary injunction.  *See* June 23, 2006, Order at 1.

[4] The "Orange Book," FDA's "Approved Drug Products With Therapeutic Equivalence Evaluations," contains, among other things, patent information submitted by innovator companies pertaining to listed drugs.

paragraph IV certifications to the '481 and '520 patents. IVAX was the first filer for four strengths of simvastatin (5 milligrams (mg), 10 mg, 20 mg, and 40 mg), and Ranbaxy was the first filer for the remaining strength (80 mg).

Several years after the IVAX and Ranbaxy ANDAs were filed, but before the Sandoz ANDA was filed, FDA, at Merck's request, delisted the '481 and '520 patents. The effect of FDA's delisting was to render the delisted patents unavailable as a basis for the 180-day period of marketing exclusivity for IVAX and Ranbaxy.

In response, IVAX and Ranbaxy submitted citizen petitions to FDA in 2005 asking the agency to relist the subject patents and grant them 180-day exclusivity when their ANDAs became eligible for approval (upon the expiration of the sole remaining unchallenged patent ('784) listed for Zocor). FDA rejected IVAX's and Ranbaxy's request to relist, and the *Ranbaxy* suit followed. On April 30, 2006, on cross-motions for summary judgment, Judge Roberts ruled that FDA's response to the citizen petitions was "unlawful" and remanded the decision to FDA. *See Ranbaxy Labs. Ltd. v. Leavitt*, Civ. No. 05-1838 (RWR), 2006 WL 1147797, at *9 (hereinafter "Slip Op.") (this Slip Opinion is Attachment A to this memorandum).

FDA disagrees with Judge Roberts' decision and has filed an appeal. Despite FDA's disagreement with the decision, the agency did not seek to have the decision stayed pending appeal to permit consumers to have access to at least some generic simvastatin starting June 23, 2006, upon expiration of Merck's '784 patent. At FDA's request, the D.C. Circuit granted the appeal expedited consideration, and argument is scheduled for September 12, 2006.

Because the district court's order was not stayed, FDA was required on remand to address the listing of the two Zocor patents and any resulting 180-day exclusivity in a manner consistent

with Judge Roberts' decision. Noting that the court found FDA's delisting of the two Zocor

patents to be inconsistent with congressional intent regarding eligibility for exclusivity, FDA

concluded that Judge Roberts' Order "effectively requires that the patents be relisted, and that

eligibility for 180-day exclusivity be determined based on the paragraph IV certifications made to

the patents." Letter from FDA to Monte Browder, et al., dated June 22, 2006 at 2 (Attachment B

to this memorandum). Accordingly, on June 16, 2006, FDA relisted patents '481 and '520 in the

Orange Book and, on June 22, 2006, notified all applicants with pending ANDAs for simvastatin

that

> any new *or pending* ANDA referencing Zocor must, pursuant to section
> 505(j)(2)(A)(vii) of the Act [21 U.S.C. § 355(j)(2)(A)(vii)], contain patent
> certifications to these patents. . . . While the patents remain listed in the Orange
> Book, any ANDA for simvastatin that does not contain certifications to the '481
> and '520 patents will not be eligible for approval.

Attachment B at 2 (emphasis added).

The ANDAs submitted by Sandoz and its contract manufacturer Aurobindo Pharma Ltd.

(Aurobindo) did not include certifications to the '481 and '520 patents because the ANDAs were

filed after FDA delisted the patents at Merck's request but before the agency relisted the patents

at Judge Roberts' direction. *See* Complaint ¶¶ 29, 31, 39.

In this suit, Sandoz seeks to bypass the 180-day exclusivity enjoyed by IVAX and

Ranbaxy as a result of FDA's relisting the '481 and '520 patents in response to Judge Roberts'

Order. Sandoz professed at the oral argument on the TRO that this suit is not a collateral attack

on Judge Roberts' decision. Instead, Sandoz contends that FDA's relisting of the '481 and '520

patents reflects a misreading of Judge Roberts' decision. Sandoz also argues that FDA

misinterpreted the Federal Food, Drug, and Cosmetic Act (FDCA) by concluding that Sandoz'

and Aurobindo's ANDAs are subject to IVAX's and Ranbaxy's exclusivity.

Sandoz' arguments are untenable. Sandoz does not cite any portion of Judge Roberts' decision in support of its conclusory assertion that FDA misread the Court's command to the agency on remand. Nor could it. Judge Roberts' decision is unambiguous in its holding and direction to the agency. Similarly, Sandoz' statutory argument that it need not amend its certifications to include a certification to the relisted '481 and '520 patents is based on an unsupportable interpretation of the FDCA. The FDCA and its implementing regulations require all pending ANDA applicants referencing Zocor, including Sandoz and Aurobindo, to certify to all of the patents listed in the Orange Book for Zocor, including the recently relisted Merck patents. Sandoz' and Aurobindo's failure to comply with the certification requirement, Complaint ¶¶ 29, 31, 39, renders their applications ineligible for approval. In sum, Sandoz has no likelihood of succeeding on the merits of this case, and, as a result, its motion for preliminary injunction should be denied.

## STATUTORY FRAMEWORK

### I.    New Drug Applications

Under the FDCA,[5] pharmaceutical companies seeking to market "pioneer" or "innovator" drugs must first obtain FDA approval by filing a new drug application (NDA) containing extensive scientific data demonstrating the safety and effectiveness of the drug. 21 U.S.C.

---

[5]Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) (MMA). Pursuant to the effective dates of those amendments, they do not apply to the exclusivity determinations for the ANDAs in this case because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date of the MMA. *See id.* § 1102(b)(1). Accordingly, this brief refers to the pre-MMA version of the statute.

§ 355(a), (b). With the filing of its application, the NDA applicant must also submit information

on any patent that claims the drug, or a method of using the drug, and for which a claim of patent

infringement could reasonably be asserted against an unauthorized party. 21 U.S.C. § 355(b)(1);

21 C.F.R. § 314.50(h); 21 C.F.R. § 314.53. After a new drug application is approved, the NDA

holder continues to have an obligation to submit patent information in the event new patents are

issued. 21 U.S.C. § 355(c)(2); *see also* 21 C.F.R. § 314.53(c)(2)(ii) & (d). FDA must publish

the patent information it receives (whenever it receives it) and does so in the Orange Book. 21

U.S.C. § 355(b)(1), (c)(2); *see also* 21 C.F.R. § 314.53(e).

## II.     Abbreviated New Drug Applications

Under the Hatch-Waxman Amendments to the FDCA, an abbreviated new drug

application, or ANDA, may be filed for a generic drug that references, in part, on the FDA's

approval of an innovator or "listed" drug. 21 U.S.C. § 355(j). Specifically, under 21 U.S.C.

§ 355(j), the agency can approve duplicates of listed drugs on the basis of chemistry,

manufacturing, and bioequivalence data without evidence from literature or clinical data to

establish effectiveness and safety. Under these provisions, if an ANDA applicant establishes that

its proposed drug product has the same active ingredient, strength, dosage form, route of

administration, labeling, and conditions of use as a listed drug, and that it is bioequivalent to that

drug, the applicant can rely on the fact that the FDA has previously found the listed drug to be

safe and effective.[6]

In addition to data demonstrating, *inter alia*, that the generic drug is bioequivalent to the

---

[6]Two drugs are considered bioequivalent if, in general, the rate and extent of absorption of the
generic drug do not show a significant difference from the rate and extent of absorption of the
listed drug. 21 U.S.C. § 355(j)(8)(B).

listed drug, each ANDA must contain at least one of the following four types of patent certifications with respect to *each patent* listed in the Orange Book for the listed drug:

(I)     that the required patent information related to such patent has not been filed;

(II)    that such patent has expired;

(III)   that such patent will expire on a particular date; or

(IV)    that such patent is invalid or will not be infringed by the drug for which approval is being sought.

21 U.S.C. § 355(j)(2)(A)(vii).

At issue in this case are paragraph IV certifications – *i.e.*, that the patent covering the listed drug is invalid, unenforceable, or will not be infringed by the generic drug for which approval is being sought. 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i). An ANDA applicant who submits a paragraph IV certification must provide notice of the filing of its ANDA to the patent owner and to the holder of the NDA for the listed drug. 21 U.S.C. § 355(j)(2)(B)(i). The filing of a paragraph IV certification is an act of infringement, enabling the NDA holder and patent owner to sue the ANDA applicant for patent infringement based solely on the filing of such a certification. 35 U.S.C. § 271(e)(2)(A).

FDA may approve an ANDA with a paragraph IV certification, and the approval may become effective immediately despite the unexpired patent, unless an action for patent infringement (*see* 35 U.S.C. § 271(e)(2)(A)) is brought against the ANDA applicant within 45 days of the date the patent owner and NDA holder receive notice of the paragraph IV certification. 21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2). If a patent action is brought, approval of the ANDA is automatically stayed until at least 30 months from the date

7

that the patent owner and NDA holder received notice ("the 30-month stay"), unless a final

decision is reached earlier in the patent case or the court otherwise orders a longer or shorter

period. 21 U.S.C. § 355(j)(5)(B)(iii).

As an incentive to the first generic drug manufacturer to expose itself to patent litigation,

the statute provides that the manufacturer who files an ANDA containing the first paragraph IV

certification to a patent is eligible for a 180-day period of marketing exclusivity *vis-a-vis*

subsequent ANDAs that contain paragraph IV certifications to the same patent. 21 U.S.C.

§ 355(j)(5)(B)(iv). *See Mova Pharm. Corp.*, 140 F.3d 1060, 1064 (D.C. Cir. 1998). The generic

exclusivity provision states as follows:

> If the application contains a certification described in subclause (IV) of paragraph
> (2)(A)(vii) and is for a drug for which a previous application has been submitted
> under this subsection [containing][7] such a certification, the application shall be
> made effective not earlier than one hundred and eighty days after —
>
>> (I) the date the Secretary receives notice from the applicant under the
>> previous application of the first commercial marketing of the drug under
>> the previous application, or
>>
>> (II) the date of a decision of a court * * * holding the patent which is the
>> subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

*See* 21 U.S.C. § 355(j)(5)(B)(iv)(I) & (II) (2000); 21 C.F.R. § 314.107(c)(1) & (2). The first date

is known as the "commercial marketing" trigger, the second as the "court decision" trigger. The

180-day exclusivity period, therefore, begins with the first commercial marketing of the generic

---

[7] Courts have observed that the word "continuing" as it appears in the statute reflects a
typographical error and should probably be read as "containing." *See Purepac Pharm. Co. v.
Friedman*, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova*, 140 F.3d at 1064 n.3. *See also*
21 C.F.R. §§ 314.107(c)(1) & (2).

drug or on the date of a court decision finding the patent covering the innovator drug invalid, unenforceable, or not infringed, whichever occurs first. 21 U.S.C. § 355(j)(5)(B)(iv); 21 C.F.R. § 314.107(c).

**III.    Continuing Obligation to Certify to Patents Claiming the Listed Drug**

As noted above, an NDA holder's obligation to submit patent information in the event new patents are issued continues after its application is approved. 21 U.S.C. § 355(c)(2); *see also* 21 C.F.R. § 314.53(c)(2)(ii) & (d). Applicants with pending ANDAs likewise have a continuing obligation to update their patent certifications if there are changes in the patents for the listed drug.

Section 355(j)(2)(A), which specifies the information to be included in an ANDA, states that an ANDA "*shall contain*" a certification "with respect to *each patent* which claims the listed drug" and "for which information is required to be filed under subsection (b) or (c) of this section." 21 U.S.C. § 355(j)(2)(A)(vii) (emphasis added). "Subsection (b)" refers to 21 U.S.C. § 355(b), which requires listing of patents issued before NDA approval, and "subsection (c)" refers to § 355(c), which requires listing of patents issued after NDA approval. The statute further provides that an ANDA shall not be approved if, among other things, the application fails to meet any requirement of section 355(j)(2)(A). *See* 21 U.S.C. § 355(j)(4)(J) ("Subject to paragraph (5), the Secretary shall approve an application for a drug *unless the Secretary finds*– . . . (J) the application *does not meet any other requirement of paragraph (2)(A)* . . . .") (emphasis added). Under these provisions, a pending ANDA must contain an appropriate certification for every patent listed in the Orange Book for the listed drug.

In addition, FDA regulations provide that an applicant "shall amend a submitted

certification if, *at any time before the effective date of the approval of the application*, the

applicant learns that the submitted certification is no longer accurate." 21 C.F.R.

§ 314.94(a)(12)(viii)(C) (emphasis added).[8]  As FDA explained in the Federal Register when

proposing this rule,

> If patent information is submitted on a listed drug and, if, as of the time FDA
> concludes that an ANDA that refers to that drug is approvable, the ANDA
> applicant has not submitted an appropriate certification or statement on the patent,
> FDA will notify the applicant of the existence of the submitted patent before
> approval.  (Because the applicant will then have to comply with any applicable
> certification and notification requirements, possibly delaying approval, applicants
> should make every effort to keep themselves informed as to whether patent
> information has been submitted while their ANDA's are pending.)

*Abbreviated New Drug Application Regulations; Proposed Rule*, 54 Fed. Reg. 28871, 28886

(July 10, 1989).

Another FDA regulation, 21 C.F.R. § 314.94(a)(12)(vi), also contemplates that pending

ANDAs are required to certify to patents listed while the ANDA is pending, and notes a very

limited exception for patents listed by the NDA holder more than 30 days after the patent is

issued.[9]  However, this narrow exception is not relevant here.  Thus, an applicant with a pending

ANDA must certify to all of the patents in the Orange Book for the listed drug, including patents

---

[8]If a patent is removed from the Orange Book, an applicant with a pending ANDA who made a
certification with respect to that patent must amend its certification; however, a patent that is the
subject of a lawsuit under 21 C.F.R. § 314.107(c) shall not be removed from the list until FDA
determines either that no delay in effective dates of approval is required under that section as a
result of the lawsuit, that the patent has expired, or that any such period of delay in effective
dates of approval is ended.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(B).  FDA's application of this
regulation to the delisted Merck patents was at issue in *Ranbaxy*.  *Ranbaxy*, Slip Op. at *3, 8.

[9]This provision was "intended to effectuate Congress' intent to enforce timely submission of
patent information."  *Abbreviated New Drug Application Regulations; Patent and Exclusivity
Provisions; Final Rule*, 59 Fed. Reg. 50338, 50347 (Oct. 3, 1994).

that are newly listed after the ANDA has been submitted.

## FACTUAL BACKGROUND

**I.    Merck's NDA and IVAX and Ranbaxy's ANDAs**

Merck & Co. (Merck) holds approved NDA No. 19-766 for Zocor tablets, 5 mg, 10 mg,

20 mg, 40 mg, and 80 mg. FDA approved the NDA for Zocor 5 mg, 10 mg, 20 mg, and 40 mg in

1991, and the 80 mg strength in 1998. *See* Electronic Orange Book, available at

*http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=019766&TABLE1=*

*OB_Rx.* Merck submitted the '784 patent, and it was listed when the NDA was approved in

1991. The '784 patent and its associated pediatric exclusivity expired on June 23, 2006. In

January 2000, Merck submitted the '481 and '520 patents for listing in the Orange Book, within

30 days of their issuance.

In December 2000, Ivax submitted an ANDA for the 5 mg, 10 mg, 20 mg, and 40 mg

strengths of simvastatin. *Ranbaxy,* Slip Op. at *4. In November 2001, Ranbaxy submitted an

ANDA for the 10 mg, 20 mg, 40 mg, and 80 mg strengths. *Id.* Both the IVAX and Ranbaxy

applications contained paragraph III certifications to the '784 patent (indicating that they did not

plan to market their products until that patent expired), and paragraph IV certifications to the

'481 and '520 patents (indicating their products will not infringe those patents, or that the patents

are invalid or unenforceable). *Id.* Both companies provided notice to Merck of their paragraph

IV certifications, but Merck did not sue either of them for patent infringement based on those

certifications. *Id.* As a result of their paragraph IV certifications, IVAX is the first filer as to the

5 mg, 10 mg, 20 mg, and 40 mg strengths of simvastatin, and Ranbaxy is the first filer as to the

80 mg strength.

## II.    Administrative and Judicial Proceedings

In October 2003 and again in June 2004, Merck requested that FDA delist the '481 and '520 patents. *Id.* FDA withdrew the patents from the Orange Book in September 2004, *id.*, pursuant to its regulation that allows such delisting upon the NDA holder's request unless the patents are the subject of litigation. *See* 21 C.F.R. § 314.94(a)(12)(viii)(B).

In 2005, IVAX and Ranbaxy submitted separate citizen petitions to FDA, each arguing that the agency erred in delisting patents '481 and '520. Both citizen petitions requested that FDA reinstate the patents in the Orange Book. On October 24, 2005, FDA responded to the citizen petitions, stating that the agency would not relist the '481 and '520 patents for Zocor. FDA stated further that no applicant would be eligible for 180-day exclusivity as to these patents, and that FDA would approve ANDAs for all strengths of simvastatin when they are otherwise eligible for approval under 21 U.S.C. § 355(j). *Ranbaxy*, Slip Op. at *4.

IVAX and Ranbaxy each filed suit to challenge FDA's denial of their respective citizen petitions. They sought a declaration that the patents should be relisted and that they were entitled to exclusivity (IVAX on the 5 mg, 10 mg, 20 mg, and 40 mg strengths, and Ranbaxy for the 80 mg strength) based on their paragraph IV certifications to those patents. *Ranbaxy*, Slip Op. at *6.

On April 30, 2006, Judge Roberts granted summary judgment in favor of IVAX and Ranbaxy, and remanded the decision to the agency. *Id.* at *9. Pursuant to the Court's ruling, on June 16, 2006, FDA relisted the '481 and '520 patents. On June 22, 2006, FDA notified all applicants with pending ANDAs referencing Zocor that the '481 and '520 patents had been relisted and that their ANDAs must contain patent certifications to those patents. Attachment B at 2. FDA explained further that any ANDA for simvastatin that does not contain certifications

12

to those patents "will not be eligible for approval." *Id.*

**III.     Sandoz' and Aurobindo's ANDAs**

On April 21, 2005, and June 28, 2005, Aurobindo and Sandoz, respectively, submitted their ANDAs for generic simvastatin tablets in 5 mg, 10 mg, 20 mg, 40 mg, and 80 mg strengths. Complaint ¶¶ 29, 31.  At the time of those submissions, the only patent listed in the Orange Book for Zocor was the '784 patent, and Aurobindo and Sandoz filed paragraph III certifications to that patent.  Complaint ¶¶ 29, 31; Decl. of Shashank Upadhye ¶ 11, 13 (filed in support of Sandoz' motion).

FDA issued a tentative approval letter to Aurobindo on April 19, 2006, which noted that the agency's determination that no exclusivity would bar Aurobindo's approval on June 23, 2006, was "currently being challenged in Ranbaxy Laboratories, Ltd. v. Leavitt, No. 05-1838 (D.D.C)." *See* Declaration of Sadie Ciganek Exh 1 at 2 (filed in support of Sandoz' motion).  As discussed above, as a result of relisting the patents in response to Judge Roberts' decision, IVAX and Ranbaxy were granted exclusivity.  *See* Attachment B.  Apparently because Aurobindo has received a tentative approval letter, Sandoz has entered into a contract with Aurobindo to market and distribute that company's generic simvastatin once it receives final FDA approval. Complaint ¶¶ 35, 36.

Sandoz and Aurobindo were among the recipients of FDA's June 22, 2006, letter because they are applicants with pending ANDAs referencing Zocor.  Although Sandoz is aware that the '481 and '520 patents have been relisted, Complaint ¶ 33, Sandoz argues that certification to those patents is not required.

**ARGUMENT**

To obtain either a TRO or a preliminary injunction, a party must demonstrate that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury in the absence of preliminary relief; (3) other interested parties will not be substantially injured if the requested relief is granted; and (4) granting such relief would serve the public interest. *See Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 1-2 (D.D.C. 1997); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d at 1066. The Court must balance the four factors in deciding whether to grant the injunctive relief. *Id.*

The injunctive relief Sandoz seeks is "an extraordinary form of judicial relief" and is not to be granted lightly. *Mylan v. Thompson*, 139 F. Supp. 2d 1, 17 (D.D.C.) ("*Mylan (buspirone)*"), *rev'd other grounds*, 268 F.3d 1323 (Fed. Cir. 2001); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996).

**I.      Sandoz Has No Chance of Succeeding on the Merits**

Sandoz offers two equally baseless arguments in support of its challenge to FDA's determination that the Sandoz and Aurobindo ANDAs are subject to IVAX's and Ranbaxy's 180-day exclusivity. First, Sandoz contends that FDA misinterpreted Judge Roberts' Opinion and Order as requiring the agency to relist the '481 and '520 patents. Second, Sandoz argues that because the Sandoz and Aurobindo ANDAs were submitted during the period of time when the '481 and '520 patents were not listed in the Orange Book, they are not required to certify to those patents, and thus neither the IVAX nor the Ranbaxy exclusivity should delay approval of their ANDAs. Both of these arguments are meritless.

14

**A.    In the Absence of a Stay, Judge Roberts' Opinion and
Order Required FDA to Relist the '481 and '520 Patents**

Sandoz contends that FDA's relisting of the Merck patents was "not required by the terms

of this Court's Order and Memorandum Opinion."  Complaint ¶ 39; *see also* Pl. Mem. at 14

("The agency incorrectly interpreted this Court's April 30 Memorandum Opinion and order . . .

.").  While, as noted above, FDA believes that Judge Roberts' decision was incorrect and has

appealed the decision, there can be no question that Judge Roberts' Opinion and Order effectively

direct FDA to relist the '481 and '520 patents.

In the *Ranbaxy* suit, IVAX and Ranbaxy argued that FDA erred in delisting, and in

refusing to relist, Merck's '481 and '520 patents, and thereby wrongfully denied IVAX and

Ranbaxy marketing exclusivity.  Judge Roberts framed the issue before him as "whether the FDA

can effectively restrict the reward [of exclusivity] to only a sued ANDA holder by delisting a

patent after the ANDA holder successfully avoided suit."  *Ranbaxy*, Slip Op. at *8.  The Court

further noted:  "Had the FDA not delisted here, the plaintiffs would have been entitled to a period

of marketing exclusivity triggered by their notice to the FDA of their first commercial marketing

of the generic drug once the FDA approved their ANDAs."  *Id.*  The Court held that the

"delisting practice as applied here effectively eliminated Congress's 'first commercial marketing'

trigger, in violation of the clear command of Congress."  *Id.*  Because Judge Roberts concluded

that FDA had "acted contrary to the clear intent of Congress in its decision to deny the plaintiffs'

citizen petitions" and to refuse to relist the patents, he granted summary judgment for IVAX and

Ranbaxy and remanded the decision to FDA.  *Id.* at *9.

Judge Roberts' decision is not open to multiple interpretations.  Accordingly, in the

absence of a stay, FDA was bound to, and did, "address the listing of the '481 and '520 patents

and any resulting 180-day exclusivity in a manner consistent with the court's decision."

Attachment B at 2. Because of the nature and scope of the issue addressed and resolved by Judge

Roberts, it is appropriate to treat his decision as intended to apply retroactively and to regard

these two patents as though they had never been delisted from the Orange Book. *See Torpharm,*

*Inc. v. Thompson*, 260 F.Supp. 2d. 69, 85 & n.16 (D.D.C. 2003). *aff'd sub nom. Purepac Pharm.*

*Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004). Sandoz baldly asserts that FDA misread the

decision. Yet, Sandoz cites not a single passage from the *Ranbaxy* decision in support of that

claim. Because FDA's reading of Judge Roberts' decision to require relisting was the only

reasonable interpretation of the decision, Sandoz cannot show that it has any likelihood of

success in showing that FDA erred in relisting the patents in response to Judge Roberts' decision

and in awarding 180 days of exclusivity to IVAX and Ranbaxy.[10]

### B.     The FDCA and FDA Regulations Require Sandoz And Aurobindo to Certify to the '481 and '520 Patents

#### 1.     FDA's Interpretation of the FDCA and its Implementing Regulations Is Entitled to Deference

The Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense*

*Council*, 467 U.S. 837 (1984), and its progeny set forth a two-step framework for reviewing an

administrative agency's interpretation its statute. Under *Chevron* step 1: "First, always, is the

question whether Congress has directly spoken to the precise question at issue. If the intent of

---

[10]Sandoz also argues that FDA should not have relisted the patents because FDA's role in patent listing is only ministerial, and Merck, the NDA holder for simvastatin, "has spoken and requested that the patents be removed from the Orange Book." Pl. Mem. at 12. This argument ignores Judge Roberts' Order; FDA's relisting of the '481 and '520 patents at the direction of a federal district court is fully consistent with the agency's ministerial role in patent listing.

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-843.

     *Chevron* step 2 applies when Congress has not directly addressed the issue or has done so

ambiguously. In that event, the Court may not "simply impose its own construction on the

statute," but rather must determine whether the agency's construction is based on a permissible

interpretation of the statute. *See Chevron*, 467 U.S. at 843; *id.* at 843-844 & n.11 (in case of

ambiguity, court must uphold agency's interpretation if construction is permissible under the

statute; court need not conclude that agency construction was the only one it permissibly could

have adopted or even the reading the court would have reached); *see also Barnhart v. Walton*,

535 U.S. 212, 218 (2002) (reviewing court must decide: (1) whether the statute unambiguously

forbids agency interpretation, and (2) whether the agency interpretation exceeds the bounds of the

permissible); *United States v. Mead*, 533 U.S. 218, 229 (2001).

     Moreover, when a court is evaluating an agency's interpretation of its own regulations, the

agency is entitled to "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504,

512 (1994); *United States Air Tour Ass'n v. FAA*, 298 F.3d 997, 1005 (D.C. Cir. 2002) (courts

"defer to an agency's reading of its own regulation, unless that reading is 'plainly erroneous or

inconsistent with the regulation'") (internal citations omitted); *Wyoming Outdoor Council v. U.S.*

*Forest Serv.,* 165 F.3d 43, 52 (D.C. Cir. 1999).

     The D.C. Circuit has repeatedly given deference to FDA's interpretation of the FDCA, as

well as the agency's own implementing regulations. *See, e.g., Novartis Pharms. Corp. v. Leavitt*,

435 F.3d 344, 349 (D.C. Cir. 2006) ("We have held on a number of occasions that FDA

interpretations of the FDCA receive deference, as do its interpretations of its own regulations

17

unless plainly erroneous or inconsistent with the regulations."); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1281 (D.C. Cir. 2004); *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319, 1320 (D.C. Cir. 1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). *See also Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1351-52 (Fed. Cir. 2003) (deference is to the agency's regulations is called for when Congress delegated rulemaking authority to the agency and, "[i]n the case of the Hatch-Waxman Act, Congress specifically authorized FDA to engage in notice-and-comment rulemaking necessary for administration of the Act."). Moreover, *Chevron* deference extends to administrative determinations that are not embodied in rulemaking or formal adjudication, including a decision letter setting forth the agency's statutory construction of a provision of the FDCA. *See Mylan v. Thompson*, 389 F.3d at 1279-80.[11]

Here, as in *Barnhart*, "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that

---

[11] *Chevron* deference applies when, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law ...." *Gonzales v. Oregon*, 126 S. Ct. 904, 908 (2006) (quoting *Mead*, 533 U.S. at 226-27). "Delegation of such authority may be shown in a variety of ways ...." *Mead*, 533 U.S. at 227. With the FDCA, Congress has authorized and directed FDA to decide what drugs may lawfully enter the marketplace. *See, e.g.*, 21 U.S.C. §§ 355(c), 355(d), 355(e), 355(f), 355(j).

Even if FDA were not entitled to *Chevron* deference, FDA is, at a minimum, entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944) (courts give "considerable and in some cases decisive weight" to statutory interpretations "made in pursuance of official duty, [and] based upon more specialized experience and broader investigations and information" than a court is likely to have, provided that the administrative decision is carefully and thoughtfully made). Here, FDA's interpretation and implementation of the FDCA's patent certification requirements involves a "highly detailed" regulatory scheme to which the agency has brought its "specialized experience" to bear. *Mead*, 533 U.S. at 235. FDA's June 22, 2006, letter "claim[s] the merit of its writer's thoroughness, logic and expertness."

administration, and the careful consideration the Agency has given the question over a long period of time" all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the agency interpretation here at issue. 535 U.S. at 222.

### 2.    FDA Properly Required Applicants with Pending ANDAs for Simvastatin to Certify to the Relisted Patents

As set forth in its June 22, 2006, letter, FDA has determined that ANDA applicants with new or pending ANDAs must certify to the relisted '481 and '520 patents. Requiring pending ANDA applicants to certify to these patents follows directly from the statutory language and FDA's implementing regulations, regardless of whether the patents are treated as having never been delisted or as newly listed. This result is also consistent with the agency's long-held view that applicants must keep their certifications in their ANDAs accurate until they receive final approval.

Sandoz' challenge to FDA's interpretation of the statute leapfrogs over the issue of whether Sandoz and Aurobindo must amend their certifications to certify to the relisted patents. Rather, Sandoz rests its argument on the fact that the Sandoz and Aurobindo ANDAs do not presently contain paragraph IV certifications to the '481 and '520 patents because those patents were not listed in the Orange Book when the ANDAs were submitted. Because the 180-day period of marketing exclusivity exists *vis-a-vis* subsequent ANDAs *that contain paragraph IV certifications* to the same patent, 21 U.S.C. § 355(j)(5)(B)(iv), Sandoz concludes that "FDA's decision to impose 180-day exclusivity that delays the final approval of ANDAs that do not include Paragraph IV certifications for the two patents in question . . . is contrary to the plain language of" 21 U.S.C. § 355(j)(5)(B)(iv). Pl. Mem. at 10. However, this argument misses the

point entirely: Sandoz and Aurobindo are obliged to certify to the '481 and '520 patents, and if they do not, their ANDAs are not eligible for approval.

Section 355(j)(2)(A)(vii), which specifies the information to be included in an ANDA, states that an ANDA "shall contain" a certification "with respect to *each patent* which claims the listed drug" and "for which information is required to be filed under subsection (b) [re: patents issued before NDA approval] or (c) of this subsection [re: patents listed after NDA approval]." (emphasis added). The statute further provides that an ANDA shall not be approved if the application fails to meet the requirements of 21 U.S.C. § 355(j)(2)(A). 21 U.S.C. § 355(j)(4)(J). Under these statutory provisions, ANDAs are required to certify to all patents, even those listed after the approval of an NDA, and FDA's decision can be affirmed under *Chevron* step 1.

Even if this Court were to determine that the statute does not directly address the issue present here, FDA would prevail under *Chevron* step 2. FDA interprets these provisions to mean that a pending ANDA must contain an appropriate certification for every patent listed in the Orange Book for a listed drug. This interpretation is reflected in 21 C.F.R. § 314.94(a)(viii)(C), which provides that an applicant "shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate." Indeed, the agency has previously explained that

> If patent information is submitted on a listed drug and, if, as of the time FDA concludes that an ANDA that refers to that drug is approvable, the ANDA applicant has not submitted an appropriate certification or statement on the patent, FDA will notify the applicant of the existence of the submitted patent before approval ..., [and] the applicant will then have to comply with any applicable certification and notification requirements, possibly delaying approval . . . .

*Abbreviated New Drug Application Regulations; Proposed Rule*, 54 Fed. Reg. 28871 at 28886

(July 10, 1989). *See also* 21 C.F.R. § 314.94(a)(12)(vi) (recognizing that pending ANDAs are to certify to patents listed within 30 days of issuance).

FDA's interpretation of the FDCA to require applicants with pending ANDAs to file certifications to newly listed patents was upheld in *Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003). In that case, generic drug manufacturer Apotex challenged FDA's requirement that ANDA applicants file certifications for patents that are listed in the Orange Book after the ANDA is filed. The Federal Circuit rejected the challenge, holding:

> The statutory language shows a clear congressional intention to require certification whenever an ANDA applicant seeks approval of a drug that is claimed by a patent that is listed in the Orange Book. The FDA's requirement that ANDA applicants make additional certifications with respect to patent information that is submitted after the ANDA is first filed is consistent with that intention and does not violate any provision of the Act. We therefore uphold the FDA's practice of requiring certifications in response to patent information that is submitted after the ANDA is first filed.

*Id.* at 1350-51. *See also Dr. Reddy Labs., Inc. v. Thompson,* 302 F. Supp. 2d 340, 355 (D.N.J. 2003) (FDA "regulations imposing a duty upon ANDA applicants to assure its certifications are accurate until the date of final approval" are supported by 21 U.S.C. § 355(j)(4)(J)&(K), which provide that "FDA may deny approval of an ANDA that fails to comply with the ANDA content requirements or that contains an untrue statement of material fact.").

Consistent with this interpretation of the statute, FDA determined that all applicants with new or pending ANDAs for simvastatin must include certifications to the '481 and '520 patents. Attachment B at 2. Sandoz' and Aurobindo's ANDAs remain pending, and therefore they must certify to the '481 and '520 patents. They have two options: They could submit paragraph III certifications to the '481 and '520 patents, thereby agreeing not to market their products until

21

expiration of those patents (including any pediatric exclusivity) in 2008 and 2009. Or, they could

submit paragraph IV certifications to the '481 and '520 patents. If they opt to submit paragraph

IV certifications, Sandoz' and Aurobindo's ANDAs would not be eligible for approval until the

IVAX and Ranbaxy exclusivity runs because they admittedly would not be the first filers of such

certifications. 21 U.S.C. § 355(j)(5)(B)(iv). In any event, any ANDA referencing Zocor that

does not contain a certification to the '481 and '520 patents is not eligible for approval. *See*

21 U.S.C. §§ 355(j)(2)(A)(vii) & 355(j)(4)(J).[12]

## II.    Sandoz Has Not Shown That It Will Suffer Irreparable
##        Harm Without Preliminary Injunctive Relief

Sandoz has failed to demonstrate that it will suffer irreparable harm absent injunctive

relief. Courts insist that only *irreparable* harm justifies the issuance of a preliminary injunction.

Indeed, "[t]he *sine qua non* of granting any preliminary injunctive relief is a clear and convincing

showing of irreparable injury to the plaintiff." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d

93, 96 (D.D.C. 2003). Because Sandoz' "likelihood of success is slim," Sandoz "would have to

make a very substantial showing of severe irreparable injury" to prevail on its motion. *Nat'l*

*Pharm. Alliance v. Henney,* 47 F. Supp. 2d 37, 41 (D.D.C. 1999). *See also Apotex, Inc. v. FDA*,

2006 U.S. Dist. LEXIS 20894 *54 (D.D.C. Apr. 19, 2006). "Irreparabilty of injury is a very high

standard." *See Bristol-Myers,* 923 F. Supp at 220. The injury alleged must be certain, great,

actual, and imminent, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and it

---

[12] As noted above, it is appropriate to treat Judge Roberts' decision as applying retroactively, and
therefore regard the '481 and '520 patents as though they had never been delisted from the
Orange Book, *see Torpharm,* 260 F.Supp. 2d. at 85 & n.16. Whether the patents are treated as
relisted or as never having been delisted, the result is the same: Any pending ANDA referencing
Zocor must contain certifications to those patents.

must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Mylan (buspirone)*, 139 F. Supp. 2d at 27 (quoting *Gulf Oil Corp. v. Dept. of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

It is well settled that mere economic loss in and of itself does not constitute irreparable harm. *Wisconsin Gas*, 758 F.2d at 674; *Apotex, Inc. v. FDA*, 2006 U.S. Dist. LEXIS 20894 *53; *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) ("*Mylan (terazosin)*"); *Bristol-Myers*, 923 F. Supp. at 220. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" are inadequate. *Wisconsin Gas*, 758 F.2d at 674 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Even irrecoverable economic loss does not rise to the level of irreparable harm unless the financial injury is "serious in terms of its effect on the plaintiff." *Gulf Oil*, 514 F. Supp. at 1026; *see also Apotex, Inc. v. FDA*, 2006 U.S. Dist. LEXIS 20894 *54; *Experience Works, Inc.*, 267 F. Supp. 2d at 96 ($21.1 million reduction in funding is serious financial blow, but one frequently faced by other similar entities, and not an economic loss that threatens survival of the business); *Sociedad Anonima Viña Santa Rita v. Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business"); *Mylan (terazosin)*, 81 F. Supp. 2d at 42-43.

Sandoz asserts that it will be harmed if IVAX and Ranbaxy are granted a six-month head start in the generic pravastatin market. Sandoz claims that it has "*budgeted* for over $11 million in sales in the first 6 months after launch" of its generic simvastatin and that "[n]ext year's *forecast* is for about $20 million in sales." Pl. Mem. at 16 (emphasis added). Sandoz speculates that it will "lose 80 to 90% of these anticipated sales" if IVAX and Ranbaxy "are allowed to

launch with 180 days of exclusivity prior to all other applicants." Pl. Mem. at 16.

There is no reason to believe, however, that this litigation will take more than six months to reach a resolution on the merits. The relevant time period within which to calculate Sandoz' claimed harm is not over the next year and a half, but only the period between the time Sandoz' competitors launched on or about June 23, and the time the case is resolved on the merits, at which time, if Sandoz has prevailed on its claims, it could market a simvastatin product. In the unlikely event that Sandoz were to prevail on the merits of its claim, its ANDA could conceivably be approved well *before* expiration of the exclusivity period. Thus, even if FDA's decision grants Sandoz' competitors some head start, it is unclear that such a head start would be of sufficient duration to afford any meaningful market advantages. The scenario that Sandoz posits – that it must wait 180 days after the first applicants launch – would likely occur only if Sandoz loses this litigation on the merits.

In any event, Sandoz' claimed financial loss, as well as its claim of intangible losses, are speculative and are merely forms of economic loss that do not meet the high standards set forth above. Allegations of lost sales and a lost opportunity to gain certain market advantages are a far cry from the required demonstration of a "serious" and "irretrievable" loss that "would significantly damage its business above and beyond a simple diminution in profits." *Mylan (buspirone)*, 139 F. Supp. 2d at 27 (also noting that the "D.C. Circuit is hesitant to award injunctive relief based purely on loss opportunities and market share."); *Mylan (terazosin)*, 81 F. Supp. 2d at 42.

Sandoz' speculative losses of 80-90% of $31 million in sales over the next year and half represent less than 1 percent of Sandoz' sales from generic drugs. *See*

*http://www.sandoz.com/site/en/company/ profile/facts_ and_figures/content.shtml* (reporting generic pharmaceutical sales of $4.7 billion in 2005). A "loss of less than 1 percent of total sales is not irreparable harm." *See Bristol-Myers*, 923 F. Supp. at 221. *See also Apotex, Inc. v. FDA*, 2006 U.S. Dist. LEXIS 20894 *56 (projected loss of $9.9 million in sales over a year not irreparable harm to company with annual revenues of $700 million). Sandoz has failed to demonstrate that obtaining a smaller market position than it had anticipated would result in economic injury "sufficiently large in proportion to [its] operations that the loss of the amount of money involved would also cause extreme hardship to [its] business, or even threaten destruction of [its] business." *Gulf Oil*, 514 F. Supp. at 1025.

Finally, Sandoz' decision to wait to file this suit until the eve of the expiration of the '784 patent counsels strongly against issuance of a preliminary injunction. *Mylan (terazosin)*, 81 F. Supp. 2d at 43-44 (delay in bringing action "undercuts [plaintiff's] allegation of irreparable harm"); *see also Hill v. McDonough,* 74 U.S.L.W. 4307, 2006 U.S. LEXIS 4674 (June 12, 2006) (a court considering the equitable remedy of a stay "must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'") (quoting *Nelson v. Campbell*, 541 U.S. 637 (2004)). Judge Roberts' decision was issued on April 30, 2006, nearly two months before Sandoz filed this action. To excuse its delay, Sandoz claims that it did not realize that the outcome of the *Ranbaxy* litigation would affect whether its application or Aurobindo's would be eligible for approval on June 23, 2006, when Merck's '784 patent expired.

The writing was on the proverbial wall, however, long before June 22, 2006. FDA sent

an tentative approval letter to Aurobindo on April 19, 2006, which noted that the agency's

"decision to grant no exclusivity had been challenged in . . . *Ranbaxy Laboratories, Ltd. v.*

*Leavitt . . . .*"  Upadhye Decl. ¶ 15; Ciganek Decl. Exh 1 at 2.  Sandoz admits that it has

"closely followed the progress of Aurobindo's ANDA" and that it received a copy of FDA's

tentative approval letter from Aurobindo.  Upadhye Decl. ¶¶ 14-15.  If the possible relisting of

the '481 and '520 patents would have had no bearing on the timing of the approval of

Aurobindo's ANDA, it would have been entirely unnecessary for FDA to alert Aurobindo to the

*Ranbaxy* lawsuit in the tentative approval letter.

       In any event, FDA's position was plainly articulated in its May 25, 2006, request to the

D.C. Circuit for expedited briefing on its appeal of Judge Roberts' decision:

> Pursuant to the district court's ruling, FDA must relist the '481 and '520 patents
> as requested by IVAX and Ranbaxy.  *All ANDAs for simvastatin will thus have*
> *to be amended to include paragraph IV certifications to the relisted patents* and,
> accordingly, *be subject to a stay of final approval until expiration of the 180-*
> *day period* that commences on the first day of commercial marketing of IVAX's
> and Ranbaxy's generic products.

Appellants' Motion for Expedited Briefing and Oral Argument at 9 (filed in *Ranbaxy Labs.,*

*Ltd. v. Leavitt*, No. 06-5154 (D.C. Cir.)) (emphasis added).

       For all of these reasons, Sandoz has failed to make the requisite showing of irreparable

injury.

## III.     The Requested Relief Will Not Serve the Public Interest

       Sandoz has also failed to show that any harm it will suffer in the absence of injunctive

relief outweighs the potential harm to other parties, or that the entry of such relief would further

the public interest – the third and fourth requirements for preliminary injunctive relief.

Sandoz has not shown that the stakes are higher for it than for IVAX and Ranbaxy. Indeed, any harm that Sandoz might suffer in the absence of preliminary injunctive relief would be at least equaled, if not exceeded, by the harm to the simvastatin exclusivity holders should they be deprived of their exclusivity reward. *See, e.g., Boehringer*, 993 F. Supp. at 2-3 (benefit to subsequent applicant of revoking exclusivity would be offset by loss to first applicant, who would lose the advantage of being the first to market).

Finally, Sandoz cannot show that the public interest would be served by blocking access to generic simvastatin. Such a stay would cause consumers to suffer because Merck's monopoly and the accompanying price structure for its innovator drug would continue. *See Boehringer*, 993 F. Supp. at 3 ("there is the public interest in receiving generic competition to brand-name drugs as soon as is possible"). *See also Apotex, Inc. v. FDA*, 2006 U.S. Dist. LEXIS 20894 *60 (public interest is not served by injunction that "would effectively constitute a constructive extension of the brand manufacturer's patent . . . ."). Sandoz contends that the "public's interest lies in the 'faithful application of the laws.'" Pl. Mem. at 19. Given Sandoz' slim likelihood of success on the merits, however, that public interest "would be better served by denying [Sandoz'] motion." *Boehringer*, 993 F. Supp. at 3.

## CONCLUSION

For the foregoing reasons, Sandoz' motion for preliminary injunction should be denied.

Of Counsel:

PAULA M. STANNARD
Acting General Counsel

SHELDON T. BRADSHAW
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

PAIGE TAYLOR
Associate Chief Counsel
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD  20857
301-827-1161

June 30, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

EUGENE M. THIROLF
Director


DRAKE CUTINI
Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
Tel:  202-307-0044
Fax:  202-514-8742