UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDOZ, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1134 |
| ) | |
| FOOD AND DRUG ADMINISTRATION, ) | |
| MICHAEL O. LEAVITT and ) | |
| ANDREW C. VON ESCHENBACH, ) | |
| ) | |
| Defendants. ) | |

OPPOSITION OF RANBAXY LABORATORIES LIMITED TO MOTION OF
SANDOZ PHARMACEUTICALS FOR A PRELIMINARY INJUNCTION

Sandoz, Inc. ("Sandoz") challenges the Food and Drug Administration's ("FDA")

relisting of two patents in the Approved Drug Products with Therapeutic Equivalence Ratings

("Orange Book") and the agency's requirement that all pending Abbreviated New Drug

Applications ("ANDA") contain paragraph IV certifications to those patents. These are actions

that the FDA was required to take in order to effectuate the Court's decision and judgment in

Ranbaxy Labs., Ltd. v. Leavitt, 2006 U.S. Dist. LEXIS 24612 (D.D.C. 2006).

As FDA has explained, the issue before the Court in that case was whether it was

permissible for FDA to remove U.S. Patent Nos. RE 36481 ("the '481 patent") and RE 36520

("the '520 patent") from the Orange Book when ANDA applicants had already submitted

paragraph IV certifications to those patents, and thus had become eligible for 180-day exclusivity

under Section 505(j)(5)(B)(iv) of the Federal Food, Drug, and Cosmetic Act ("FDCA"). Letter

from Steven K. Galson, Director, Center for Drug Evaluation and Research to Monte R.

Browder, et al. (June 22, 2006) ("Galson Letter") (attached as Exh. B to Opp. of Ranbaxy Labs to Mot. of Sandoz Pharms. for TRO).  Ranbaxy Laboratories Limited, Ranbaxy Pharmaceuticals, Inc., and Ranbaxy, Inc. (collectively, "Ranbaxy") and IVAX Pharmaceuticals, Inc. ("IVAX"), who would have been eligible for 180-day exclusivity had the patents remained listed, sued FDA in response to the delisting of the '481 and '520 patents.  Judge Roberts held that FDA's denial of Ranbaxy's and IVAX's right to exclusivity was contrary to the intent of Congress, and remanded the decision to FDA.  FDA appealed the district court decision, but did not seek a stay of the decision.  See Ranbaxy Labs v. Leavitt, No. 06-5154 (D.C. Cir. June 1, 2006) (order granting expedited review and setting briefing schedule).

Because FDA is bound by Judge Roberts' decision, the agency is required to relist the patents and take steps to recognize and give effect to Ranbaxy's and IVAX's exclusivity.  To do so, it has required all ANDA applicants that filed ANDAs after Ranbaxy and IVAX, including Sandoz, to include in their ANDAs paragraph IV certifications to the relisted patents.  This decision is not only reasonable, but necessary.  Failing to do so would be a failure to comply with Judge Roberts' decision.

Because Sandoz cannot show (1) that there is a substantial likelihood that the plaintiff will succeed on the merits; (2) that the plaintiff will be irreparably injured if the injunction is not granted; (3) that the injunction will not substantially injure other parties; or (4) that the public interest will be furthered by the injunction, Sandoz's request for a preliminary injunction should be denied.

Applying this same standard only a week ago, this Court properly concluded that Sandoz's showing did not entitle it to a temporary restraining order.  Nothing since then has improved Sandoz's position.  Ranbaxy received approval from FDA to market its simvastatin 80

mg tablet and began supplying its customers. The harm to Ranbaxy that would be caused by an interruption in marketing would be substantial, irreparable and greatly exceed any harm claimed by Sandoz. Consumers would be deprived of the low price generic alternative to Zocor® that is now available to them, tipping the public interest strongly against Sandoz. Sandoz has also failed to advance any additional argument on the merits.

Statutory and Factual Background

The Hatch Waxman Framework

Before marketing a drug that has not previously been approved by FDA, a manufacturer must submit a New Drug Application ("NDA") to FDA for approval. 21 U.S.C. § 355(a). Among other information, an NDA must contain studies demonstrating that the drug is sufficiently safe and effective to merit approval. 21 U.S.C. § 355(b).

A generic drug is a version of an approved drug ("pioneer drug") that contains the same active ingredient as, and is usually approved for the same indications as, the pioneer drug, but that sells for less than the pioneer drug. Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1063 (D.C. Cir. 1998); Mylan Pharms. Inc. v. Thompson, 139 F. Supp. 2d 1, 5-6 (D.D.C. 2001) ("[G]eneric drugs are generally much cheaper to the consumer than brand-name drugs."); rev'd on other grounds 268 F.3d 1323 (Fed. Cir. 2001); United States v. Brown, 763 F.2d 984, 994 (8th Cir. 1985) ("It is well-known that generics are cheaper than the equivalent brand name product . . . ."). In 1984 Congress enacted the Drug Price Competition and Patent Term Restoration Act, known as "Hatch Waxman." Hatch Waxman struck a balance between incentives for innovation and incentives "for quickly getting lower-cost generic drugs to market." Teva Pharm. Indus. Ltd. v. Crawford, 410 F.3d 51, 54 (D.C. Cir. 2005). In order to facilitate the entry of generic drugs into the marketplace, the statute provided a simplified

application process for generic drugs.  An applicant for a generic version of an approved drug

may complete an ANDA, in which safety and effectiveness may be demonstrated through studies

showing that the drug that is the subject of the application is bioequivalent to the pioneer drug.

21 U.S.C. § 355(j)(2)(A)(iv).

 Hatch Waxman also encouraged the swift marketing of generic products by establishing a

system for prompt generic company challenges to pioneer company patents on their drugs.

Under Hatch Waxman, the pioneer drug company must include in its NDA the patent number

and expiration date of any patent claiming the drug (or use of the drug) that is the subject of the

application.  21 U.S.C. § 355(b)(1).  FDA lists this patent information in the Orange Book.

Purepac Pharm. Co. v. Torpharm, Inc., 354 F.3d 877, 880 (D.C. Cir. 2004).

 Hatch Waxman also requires that, for each patent listed in the Orange Book, an ANDA

applicant must certify whether its generic drug would infringe the patent, and, if not, why it

would not.  21 U.S.C. § 355(j)(2)(A)(vii).  An ANDA applicant has four certification options:  it

may certify (I) that the required patent information has not been filed; (II) that the patent has

expired; (III) the date on which an unexpired patent will expire; or (IV) that the patent is invalid

or will not be infringed by the drug.  Id.

 If the applicant makes a certification under paragraphs I or II, FDA may approve the

ANDA effective immediately.  21 U.S.C. § 355(j)(5)(B)(i).  If the applicant makes a certification

under paragraph III, the FDA may approve the ANDA effective on the date that the patent will

expire.  Id. at (j)(5)(B)(ii).

 If the applicant makes a certification under paragraph IV (a "paragraph IV certification"),

the applicant must also provide notice to the NDA holder of the paragraph IV certification.  21

U.S.C. § 355(j)(2)(B)(i).  This notice must include specific information setting out the factual

and legal basis for certifying that the patent is invalid or will not be infringed.  21 C.F.R. §

314.95(c)(6).

The filing of an ANDA with a paragraph IV certification is an act of patent infringement

that enables the NDA holder to sue the ANDA applicant.  35 U.S.C. § 271(e)(2)(A).  Once an

ANDA applicant makes a paragraph IV certification and provides notice, the NDA holder can

determine whether it believes that the drug product that is the subject of the ANDA infringes its

listed patent, and it may file a patent infringement suit against the ANDA applicant.  If the patent

holder brings suit within 45 days of receiving notice, FDA may not approve the ANDA while the

validity, enforceability and/or infringement of the patent is litigated, up to a period of 30 months

(a "30 month stay").  21 U.S.C. § 355(j)(5)(B)(iii).  If no action is brought within 45 days, the

approval "shall be made effective immediately."  Id.

In considering how to encourage generic company challenges of suspect pioneer

company patents, the framers of Hatch Waxman recognized that the first ANDA applicant to file

a paragraph IV certification generally bears considerable costs associated with the investigation

necessary to determine the strength or weakness of the listed patent and the research and

development necessary to manufacture a non-infringing drug.  The first company to file an

ANDA with a paragraph IV certification also faces the risk of patent litigation and its associated

costs.  Therefore, as an incentive for generic applicants to bear these costs and risks, Congress

provided in Hatch Waxman that the first generic applicant to file a paragraph IV certification

against a particular patent would receive a 180-day period of exclusivity, during which time

FDA may not approve other ANDAs containing paragraph IV certifications against the same

patent ("180-day exclusivity").  21 U.S.C. § 355(j)(5)(B)(iv).

This 180-day exclusivity provision is of central importance to the Hatch Waxman framework, since it encourages generic companies to challenge pioneer company patents as soon as possible and, where such challenges are successful, gives consumers quicker access to lower-priced generic versions of brand drug products. See Testimony of Timothy J. Muris, Chairman, Federal Trade Commission, before the U.S. Senate Committee on the Judiciary (June 17, 2003), available at http://www.ftc.gov/os/2003/06/030617pharmtestimony.htm (last visited June 30, 2006) (noting that 180-day exclusivity "increases the economic incentives for a generic company to be the first to file an ANDA, because the generic applicant has the potential to reap the reward of marketing the only generic drug product" during the period of exclusivity).

The Litigation Distinction

When a patent-holder requests that one of its patents be removed from the Orange Book, FDA decided it would distinguish between ANDA applicants that had been sued by the patent owner for infringement and those that had been successful in avoiding suit in awarding 180-day exclusivity.[1] Ranbaxy and IVAX challenged this distinction and Judge Roberts held that FDA's determination was contrary to the clear intent of Congress. The ruling in Ranbaxy v. Leavitt meant that Ranbaxy and IVAX would be entitled to 180-day exclusivity. As stated by Judge Roberts, "[h]ad the FDA not delisted here, the plaintiffs [Ranbaxy and IVAX] would have been entitled to a period of marketing exclusivity triggered by their notice to the FDA of their first commercial marketing of the generic drug once the FDA approved their ANDAs." 2006 U.S. Dist. LEXIS at *27.

---

1. FDA previously adopted a litigation distinction in situations other than delisting, requiring the first ANDA applicant with a paragraph IV certification to have successfully defended a patent infringement suit in order to be entitled to 180-day exclusivity. That requirement was invalidated by the Court of Appeals in Mova Corp v. Shalala, 140 F. 3d 1060.

FDA appealed the decision on an expedited basis but did not seek a stay of the judgment. FDA made its approval of Ranbaxy's ANDA for simvastatin 80 mg effective June 23, 2006 and Ranbaxy currently is marketing the tablets. Oral argument on the appeal is scheduled for September 12, 2006.

Argument

Sandoz is not likely to Succeed on the Merits

Sandoz' likelihood of success on the merits is at best negligible. Sandoz first argues that FDA has no basis for relisting the patents at issue. This is not correct. As FDA correctly reasoned, Judge Roberts' Order "effectively requires that the patents be relisted." Galson Letter at 2. FDA is well within its authority to correct its original error, relist the patents and require paragraph IV certifications from Sandoz and Aurobindo. As Judge Huvelle has explained:

> where an agency's assurances about the law are subsequently undermined through the process of judicial review, it is clear that the agency may rectify its original mistake without concern about retroactivity. The fact that one party may have relied on that mistake does not render its belated correction unlawful, at least (as here) where the correction comes in direct response to the decision of a federal court.

Torpharm, Inc. v. Thompson, 260 F. Supp. 2d 69, 85 (D.D.C. 2003), aff'd, 354 F.3d 877 (D.C. Cir. 2004). See also Verizon Tel. Cos. v. FCC, 269 F.3d 1098, 1111 (D.C. Cir. 2001). FDA, therefore, had authority to relist the patents that it erroneously delisted and require paragraph IV certifications of other ANDA applicants in response to Ranbaxy v Leavitt.

FDA's regulations also require Sandoz to submit paragraph IV certifications upon the relisting of the patents. FDA's regulations provide that, with certain exceptions not relevant in this case, "an applicant shall amend a submitted certification if, at any time before the effective date of approval of the application, the applicant learns that the submitted certification is no longer accurate." 21 C.F.R. § 314.94(a)(12)(viii)(C)(1). Neither Sandoz nor Aurobindo have

7

received approval. Thus, each must change its certification if it is no longer accurate. Both the Sandoz and Aurobindo ANDAs contain certifications only to the expired patent. Neither is accurate because neither contains a certification to the '481 and '520 patents, though both are listed in the Orange Book. Accordingly, each is required to amend its certification to include one of the four statements required by Section 505(j)(2)(A)(vii), 21 U.S.C. § 355(j)(2)(A)(vii). See Apotex, Inc. v. Thompson, 347 F.3d 1335, 1350-51 (Fed. Cir. 2003).

The regulation exempts from its scope ANDAs that have become effective. 21 C.F.R. § 314.94(a)(12)(viii)(C)(2). Since neither Sandoz's nor Aurobindo's ANDAs have been approved, this exemption does not aid Sandoz. The regulation also does not require an amended certification if the patent holder, here Merck, does not submit the patent information "within 30 days of issuance of the patent." 314.94 (a)(12)(vi). That exception does not aid Sandoz either.

Sandoz also argues that, under the statute, ANDA applicants that originally had paragraph IV certifications are blocked by IVAX's and Ranbaxy's exclusivity, but that applicants like Sandoz that never had a paragraph IV certification are not blocked. This argument is without basis in the FDCA. Even Sandoz does not make the argument with any conviction, arguing that the statute's provisions "permit – if not require" this interpretation. Mem. in Supp. of Sandoz, Inc.'s Mot. for a TRO, Sandoz, Inc. v. FDA, No. 06-1134 (June 23, 2006) at 13 ("Sandoz Mem."). Whether the statute "permits" such an interpretation, which it surely does not, is not relevant here. FDA has not chosen to interpret the statute as Sandoz suggests.

Sandoz's "solution," approving its and Aurobindo's ANDAs, while denying approval of ANDAs that originally had paragraph IV certifications, would result in an unearned windfall for Sandoz. Sandoz attempts to leapfrog to the head of the line for simvastatin approvals, based on

an accident of timing. Because it filed <u>after</u> others who submitted ANDAs with paragraph IVs. FDA's error in delisting the '481 and '520 patents allowed Sandoz to submit its ANDA without a paragraph IV certification. As a matter of policy and law, this cannot be a reason for Sandoz to receive an early approval.

These arguments illustrate how Sandoz's suit inevitably constitutes a collateral attack on the Court's holding in <u>Ranbaxy v. Leavitt</u>. To succeed in its argument on the merits, Sandoz must establish, as it asserts in its pleadings, that Ranbaxy is "not entitled" to 180-day exclusivity. Sandoz Brief at 1-2. To succeed on the merits, therefore, Sandoz must directly challenge the decision in <u>Ranbaxy v. Leavitt</u>. Its suit is, in substance, an impermissible collateral attack on this Court's previous decision. See <u>Adams v. Bell</u>, 711 F.2d 161, 168-70 (D.C. Cir. 1983) (upholding district court decision declining to exercise supervisory power over the Department of Education where the interests involved "could have been fully protected by intervention in a pending lawsuit").

Simply put, Sandoz seeks to exploit FDA's error in delisting the '481 and '520 patents. It should not be allowed to do so.

<u>Sandoz Cannot Show it Will Suffer Irreparable Harm if Relief is Not Granted</u>

Because Sandoz has almost no chance of success on the merits, it must show that it will suffer great irreparable harm if it is denied relief, and that Ranbaxy will not be substantially harmed if relief is granted. It can do neither.

This Court recently had occasion to address the showing that a plaintiff must make in order to establish that it is entitled to a preliminary injunctive relief:

> The irreparable injury requirement erects a very high bar for a movant. See <u>Varicon Int'l v. OPM</u>, 934 F. Supp. 440, 447 (D.D.C. 1996). A plaintiff must show that it will suffer harm that is "more than simply irretrievable." <u>Gulf Oil Corp. v. Dept. of Energy</u>, 514 F. Supp. 1019, 1026 (D.D.C. 1981). In this jurisdiction, harm that

is "merely economic" in character is not sufficiently grave under this standard. <u>See</u> <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985); <u>Boivin v. US Airways, Inc.</u>, 297 F. Supp. 2d 110, 118 (D.D.C. 2003); <u>Mylan Pharms., Inc. v. Shalala</u>, 81 F. Supp. 2d 30, 42 (D.D.C. 2000). To successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to "cause extreme hardship to the business" or threaten its very existence. <u>Gulf Oil</u>, 514 F. Supp. at 1025; <u>see</u> <u>also</u> <u>Wisconsin Gas</u>, 758 F.2d at 674; <u>Experience Works, Inc.</u>, 267 F. Supp. 2d at 96; <u>Sociedad Anonima Vina Santa Rita v. Dep't of Treasury</u>, 193 F. Supp. 2d 6, 14 (D.D.C. 2001). To warrant emergency injunctive relief, the harm alleged must be certain, great, actual, and imminent. <u>See</u> <u>Wisconsin Gas</u>, 758 F.2d at 674. Moreover, because Apotex has not established a likelihood of success on the merits, its showing of irreparable harm must be very strong. <u>See</u> <u>Cuomo</u>, 772 F.2d at 974; <u>Davenport</u>, 166 F.3d at 366.

<u>Apotex, Inc. v. FDA</u>, 2006 U.S. Dist. LEXIS 20894 at *53-54, <u>aff'd</u>, 2006 U.S. App. LEXIS 14086 (D.C. Cir. 2006). Sandoz does not and cannot satisfy this "very high bar."

Closely examined, Sandoz's allegations of irreparable harm are far less substantial than they are crafted to appear. First, though Sandoz alleges that it "anticipated being able to go to market with its own generic simvastatin on or about June 23, 2006," Declaration of Frank J. Dellafera in Support of Sandoz Mem. ¶ 15 ("Dellafera Decl."), Sandoz has not yet received tentative approval from FDA. <u>See</u> FDA Overview for simvastatin, <u>available</u> <u>at</u> www.accessdata.fda.gov/scripts/cder/drugsastfda/index.cfm?fuseaction=search.overview&drugn ame=simvastatin (last visited June 30, 2006). This means that FDA is not satisfied that Sandoz has met all of the substantive requirements for approval of its ANDA. Dellafera Decl. ¶ 10. Without approval from FDA, Sandoz cannot market its simvastatin tablets. 21 U.S.C. § 355(a). Thus, Sandoz's current inability to market any of its own inventory is attributable solely to its failure to satisfy the substantive standard for approval, and not to FDA's decision to correct its previous mistake.

Aurobindo, whose product Sandoz apparently has contracted to sell, does appear to have tentative approval. At the time Aurobindo received tentative approval, it was also put on notice by FDA that FDA's decision not to grant any exclusivity had been challenged by Ranbaxy. Declaration of Shashank Upadhye in Support of Sandoz Mem. ¶ 15. Perhaps because of its uncertainty, Aurobindo manufactured only about $1.1 million worth of inventory.[2] Because, as Sandoz concedes, it expects that it will attain some market share even without sharing exclusivity with IVAX and Ranbaxy, Dellafera Decl. ¶ 22, Sandoz ought to be able to sell this inventory once exclusivity expires, and Sandoz does not argue otherwise.

Sandoz is a part of Novartis AG, one of the largest pharmaceutical companies in the world. Novartis AG dwarfs Ranbaxy in size -- its annual sales exceed $32 billion, over 25 times those of Ranbaxy. Second Declaration of Jayadeep R. Deshmukh ¶ 18 ("Deshmukh Decl."). To a company of that size, the alleged projected losses will likely have no more than a negligible effect.

The harm of which Sandoz complains is nothing more than the lack of an opportunity to share in the market advantage that Ranbaxy earned as the first to file an ANDA containing a paragraph IV certification to listed patents. See, e.g., Dellafera Decl. ¶ 21. Sandoz finds itself in this position because it lost any entitlement to exclusivity, when it did not file its ANDA before Ranbaxy. In fact, Sandoz did not file its ANDA until 2005, four years after Ranbaxy did so. Any harm from the loss of exclusivity is attributable to Sandoz's own conduct, not FDA's actions.

---

2. Aurobindo is alleged to have produced 18 million, or 36%, of the 50 million tablets Sandoz ordered. Dellafera Decl. ¶ 16. Thirty six percent of the total order, $3 million, id., is approximately $1.1 million.

Apotex v. FDA, 2006 U.S. Dist. LEXIS 20894, involved an analogous situation to the one present here: an effort by a potential generic entrant seeking to enjoin FDA from approving the ANDAs of ANDA applicants entitled to 180-day exclusivity. In that case, Judge Bates denied Apotex's motion for a preliminary injunction in part because Apotex was unable to make the requisite showing of irreparable harm. Sandoz stands in the same position in this case as Apotex and is no more able to satisfy the irreparable harm requirement in this case.

Moreover, Sandoz's "delay in bringing this action further undercuts its allegation of irreparable harm." Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 44 (D.D.C. 2000). Ranbaxy and IVAX's Citizen Petitions asserting that the Merck patents were wrongly delisted were a matter of public knowledge, filed with FDA before Sandoz even submitted its ANDA to FDA. Ranbaxy's lawsuit, filed last year, was reported in the trade press, and discussed extensively within the Generic Pharmaceutical Manufacturer's Association ("GPHA"). See Ranbaxy's Opp. to Sandoz Mot. for TRO, Exhs. C, D. Judge Robert's decision is now nearly two months old. Sandoz surely has known for some time that it might be required to file paragraph IV certifications on these patents. If Sandoz wanted to participate in the deliberations about whether these patents should or should not be delisted, and whether, as a result, it was or was not required to submit paragraph IV certifications, it has had ample opportunity to do so. Sandoz could have intervened in any of these precedings to protect its alleged claim to approval. Its failure to do so undermines any claim of immediacy. See Ben Venue Labs, Inc. v. Novartis Pharm. Corp., 10 F. Supp. 2d 446, 459 (D.N.J. 1998).

Ranbaxy Will Be Substantially and Irreparably Harmed by a Preliminary Injunction

Ranbaxy is marketing simvastatin 80 mg tablets to its customers. If Sandoz's request for a preliminary injunction is granted and Ranbaxy is forced to stop its current marketing, it will lose sales totaling hundreds of thousands of dollars a day that it will never be able to recover to

help offset its huge investment in the drug. Deshmukh Decl. ¶¶ 10-11. If Ranbaxy is not able to continue to supply to its customers as promised, irreparable damage will also be done to its customer relationships and credibility.

Dr. Reddy's Laboratories Ltd. has begun marketing its authorized generic version.[3] If Ranbaxy is unable to supply its current customers, Dr. Reddy's is certain to step into the void left by Ranbaxy. Ranbaxy's credibility in the market would be eroded and Dr. Reddy's would benefit by capturing Ranbaxy's existing simvastatin 80 mg customers. The effect on Ranbaxy will be substantial. Ranbaxy will experience an immediate loss of revenue as well as even more significant losses going forward. Ranbaxy would, for example, also lose the expected share of the market for simvastatin products, and suffer losses for other drug products as well. Deshmukh Decl. ¶¶ 12, 14-15. None of these losses could be redressed by a subsequent decision in its favor on the merits.

The Public Interest Favors Denial of Preliminary Relief

As this court has explained, the public interest would not be furthered by barring generics from the market, since "[s]uch an order would effectively constitute a constructive extension of the brand manufacturer's patent." Apotex, 2006 U.S. Dist. LEXIS at *60. This would only forestall the availability of cheaper versions of simvastatin to the public, and preclude substantial savings to consumers, employers, and the government alike. FDA did not seek a stay pending appeal precisely because of its concern that a stay might "have prevented the entry of any generic

_____

3. An authorized generic is chemically identical to the brand name drug, but packaged in generic trade dress that the brand name manufacturer authorizes to be marketed under its own NDA. No ANDA need be filed to market the authorized generic. The brand name manufacturer either sells the authorized generic itself or through a license to a generic firm. See Teva, 410 F.3d at 52; 71 Fed. Reg. 16779, 16780 (Apr. 4, 2006); FDA Response to Citizen Petitions Submitted by Mylan Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc., Docket Nos. 2004 P – 0075/CP1 and 2004 P – 0261/CP1 (July 2, 2004). Authorized generics will likely sell for less than the brand name drugs but are highly unlikely to offer nearly the amount of savings that third party generics do. Apotex, 2006 U.S. Dist. LEXIS at *60.

simvastatin products into the market . . . and consumers would suffer because Merck's monopoly and the accompanying price structure for its pioneer drug, product would continue." Brief for Appellants, Ranbaxy Laboratories Limited, et al v. Leavitt, et al, No. 06-5154 (D.C. Cir. filed June 21, 2006) at 18 n. 10.

Ranbaxy already is providing generic simvastatin at about a third of the price charged by Merck prior to June 23, 2006. Deshmukh Decl. ¶ 19. The savings represented by this price cut would dissipate as prices rise again in the absence of true generic competition. Apotex, 2006 U.S. Dist. LEXIS at *61.

There also is a strong public interest in preserving the incentives Congress adopted for generics in the Hatch Waxman Amendments. "Congress. . . intended to reward the generic manufacturer for incurring the substantial risks and expense of defending an infringement suit and/or designing around the patent." Ranbaxy, 2006 U.S. Dist. LEXIS at *25-26 (citing Teva, 410 F.3d at 54). Because an important purpose of the Hatch-Waxman Amendments was to provide generic companies with a powerful incentive to challenge brand-name companies' patents by rewarding them with 180-day exclusivity, Apotex, 2006 U.S. Dist. LEXIS at *61, the public interest strongly favors the denial of Sandoz's motion.

Conclusion

Sandoz submitted its ANDA years after Ranbaxy and IVAX. Sandoz waited to submit its ANDA until it could avoid filing a paragraph IV certification, and thus avoided exposing itself to the risk of patent litigation. Now it seeks a windfall that it has not earned. Instead of participating in Ranbaxy v. Leavitt, in which its interest could have been adjudicated along with that of others, it has delayed asserting its alleged interests. Sandoz has known at least since April 30, 2006, when Ranbaxy v. Leavitt was decided, that it would have to file paragraph IV

certifications; yet it raises this issue only now.  These are not the actions of a company that deserves injunctive relief.

Dated:  June 30, 2006                               Respectfully submitted,

_Kate C. Beardsley_
Kate C. Beardsley
D.C. Bar No. 416806
Carmen M. Shepard
D.C. Bar No. 331314

Buc & Beardsley
919 Eighteenth Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 736-3600

Counsel for Ranbaxy